**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION**

MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.,

              Plaintiff,

vs.

FRANK L. AMODEO and JAMES
SADRIANNA,

              Defendants.

_____/

**02 - 61191**

Case No. _____ **CIV - HUCK** MAGISTRATE JUDGE
                         **TURNOFF.**

## COMPLAINT

Plaintiff, Merrill Lynch Business Financial Services Inc. ("Merrill Lynch"), sues Defendants,

Frank L. Amodeo and James Sadrianna (together, the "Transferee Principals"), and alleges

## PARTIES, JURISDICTION, AND VENUE

1.      Merrill Lynch is a Delaware corporation duly formed and existing under the laws of

the State of Delaware, and doing business in the State of Florida.

2.      Smith International Enterprises, Inc. a/k/a Ameriplast (the "Transferor") is a Florida

corporation duly formed and existing under the laws of the State of Florida, and formerly doing

business in Broward County, Florida.

3.      Signature Graphics, Inc. (the "Transferee"), is purported successor-in-interest by

merger or by other events to Horton Printing, Davis Consulting, and Apopka Printing, is a Florida

corporation duly formed and existing under the laws of the State of Florida, and is doing business

in Broward County, Florida.



4.      The Transferee Principals are each individuals residing in Orange County, Florida, and are both presently principals of the Transferor and the Transferee.

5.      As to each cause of action set forth herein, this complaint asserts causes of action that each exceed the sum of $75,000, exclusive of interest and costs, or that seek related equitable relief, brought between citizens of different states of the United States.  Accordingly, this Court possesses jurisdiction over this cause pursuant to 28 U.S.C. § 1332.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because each cause of action asserted herein has arisen in Broward County, Florida.

## ALLEGATIONS COMMON TO ALL COUNTS

7.      The Transferor has historically maintained a business focusing upon the production and sale of printed plastic cards such as hotel guest room keys, credit cards, and similar products, as well as a more generalized printing operation.  The Transferor's historic principal place of business has been located in Fort Lauderdale, Florida, in Broward County.

8.      During the twelve months preceding the principal actions of the Transferee Principals giving rise to causes of action asserted herein, the Transferor had over $12,000,000 in sales associated with the ordinary operation of its business, and maintained a comfortable profit margin in these regards.  The Transferor had a worldwide network of printing customers, a skilled labor force of nearly 100 employees, and a printing facility with state of the art equipment largely purchased and financed with proceeds of Merrill Lynch's loans to the Transferor as referenced below.

9.      Since during or about April 2000, Merrill Lynch has possessed a series of claims (the "Claims") against the Transferor.  The Claims are personally and unconditionally guaranteed by C. Leo Smith and Pilar Concha (the "Former Principals"), who functioned as the principals of the

Transferor until during or about April 2002. The Claims are evidenced by a series of loan, security, and guaranty documents (together, the "Loan Documents"), a set of which is attached as Composite Exhibit "A."

10. Pursuant to the Loan Documents, the Transferor granted Merrill Lynch a series of security interests and liens to secure the Claims in all or virtually all of the Transferor's assets (the "Collateral").

11. The Claims are currently in excess of $1,604,172.18, inclusive of principal plus non-default rate interest, but exclusive of late fees, attorneys' fees, and related costs incurred since May 8, 2002. The Claims have been accelerated and demanded by Merrill Lynch as against the Transferor and the Former Principals. The Claims additionally include the Transferor's liability for reimbursement of Merrill Lynch's attorneys' fees, court costs, and related compensable expenses incurred in prosecuting and enforcing its rights and remedies pursuant to the Loan Documents, and governing law.

12. On April 30, 2002 (the "Petition Date"), the Transferor initiated a voluntary chapter 11 reorganization in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court"), thus initiating a reorganization styled In re Smith International Enterprises, Inc. a/k/a Ameriplast, Case No. 02-04459-6J1 (the "Bankruptcy Case"). The Transferee Principals were responsible for the initiation of the Bankruptcy Case, that was planned to coincide with their assumption of control of the Transferor.

13. Shortly after the initiation of the Bankruptcy Case, Merrill Lynch learned that the Former Principals had transferred control of the Transferor to the Transferee Principals. At this time, Merrill Lynch was precluded pursuant to Bankruptcy Code § 362(a) from recovering on the Claims in rem or in personam as against the Transferor or the Collateral. However, Merrill Lynch did

initiate a state court action to enforce the Loan Documents in personam against the Former Principals styled Merrill Lynch Business Financial Services Inc. v. C. Leo Smith and Pilar Concha, Case No. 02-009140, pending in the Circuit Court in and for Broward County, Florida (the "Guarantor Case").

14.     Before the initiation of the Bankruptcy Case and the Guarantor Case, and therefore before the Former Principals transferred equity ownership of the Transferor to the Transferee and the Transferee Principals (together, the "Co-Conspirators"), the Collateral had sufficient going concern value to service the Transferor's debt service obligations arising under the Loan Documents.

15.     Notwithstanding the financial capacity of the Transferor and the Collateral position of Merrill Lynch prior to the transfer of ownership referenced above, the Transferee Principals initiated the Bankruptcy Case in a manner consistent with a plan implemented shortly pre-petition to conduct a "bust out" of the Transferor's business.  This scheme involved the initiation of the Bankruptcy Case and a purported corporate restructuring in order to draw attention away from the Co-Conspirators' looting of accounts receivable that had been generated by the operation of the Transferor's business in the immediately prior months by the Former Principals.   Accounts receivable of the Transferor were invoiced and re-invoiced in the name of the Transferee and other business entities, facilitating transfer to operating accounts other than those maintained by the Transferor. The Transferor was introduced to the Transferee's customers as the successor entity, thereby depriving the Transferor of going concern value associated with the "good will" component of the Collateral.   The Transferor's employees and other business relations were similarly interrupted.

16.     In connection with the activities outlined above, the Transferee Principals transferred assets to the Transferee and other business entities, including the following business entities operating in bankruptcy:

a.     <u>In re Quantar Communications, Inc.</u>, Case No. 01-07415-6B7;

b.     <u>In re VDX Services, Inc. a/k/a Visible Diminsions, Inc.</u>, Case No. 01-11317-6J1; and

c.     <u>In re Davis Digital Printing, Inc.</u>, Case No. 01-07190-6B7.

All of the foregoing cases are pending in the Bankruptcy Court.

17.     On May 22, 2002, Merrill Lynch inspected certain books and records of the Transferor pertaining to its collateral position in Ft. Lauderdale, Florida. Merrill Lynch has documented the following irregularities regarding the Transferor's business operations that are consistent with a scheme to remove all assets from the Transferor and thus deprive Merrill Lynch of its practical ability to enforce its rights arising under the Loan Documents <u>in rem</u> or <u>in personam</u>:

a.     The Transferor has no inventory records as of the Petition Date.

b.     the Transferor had no post-petition inventory.

c.     The Transferor's pre-petition accounts receivable were in the stated amount of approximately $350,000 or approximately one-eighth of pre-petition levels.

d.     The Transferor's payroll obligations and withholding obligations were being covered through an employee leasing business that, like the Transferee, is controlled by the Transferee Principals.

e.     The Transferor had no post-petition accounts receivable, instead operating under a "sharing arrangement," a copy of this agreement being attached as Exhibit "B," that was prepared after the fact in an effort to mask the syphoning off of payments to the Transferee.

f.     The Tranferee's letterhead was being used to provide wire transfer

information to the Transferor's account debtors, with requests that accounts be forwarded to an account maintained by or for the benefit of the Transferee at Bank of America, a copy of one such request being attached as Exhibit "C."

18.    Soneet Kapila (the "Examiner") was appointed as examiner pursuant to Bankruptcy Code § 1104 in the Bankruptcy Case to investigate allegations by Merrill Lynch and other parties that the Transferee Principals were in charge of the Transferor and were using their position and the protections afforded pursuant to the Bankruptcy Code to hinder, delay, and defraud creditors. Although the Examiner's investigation was not conclusive, he presented a report to the Bankruptcy Court (the "Examiner Report") that is consistent with Merrill Lynch's contention that the Transferor's assets were being looted by the Transferee Principals under the guise of a corporate restructure. A copy of the Examiner Report, exclusive of exhibits too voluminous to attach, is attached Exhibit "D."

19.    The assets transferred by the Transferor to the Transferee (collectively, the "Transferred Assets") in all or virtually all respects include components of the Collateral subject to the continuing liens and security interests of Merrill Lynch. The continued perfection of said security interests and liens is confirmed in part by the timely filed continued UCC-3 financing statement filed on behalf of Merrill Lynch (the "Continuation Statement"). A copy of the Continuation Statement is attached hereto as Exhibit "E."

19.    The act of transferring the Transferred Assets from the Transferor to the Transferor (the "Fraudulent Transfer") was conducted with the knowledge and participation of the Transferee Principals, and occurred without the advance notice or consent of Merrill Lynch, which consent would have been reasonably withheld had it been solicited. The Fraudulent Transfer was undertaken

by the Co-Conspirators with the intent to hinder, delay, and defraud Merrill Lynch and other creditors of the Transferor, and to conceal the Collateral for the separate use of the Co-Conspirators. Little or no value was received by the Transferor or its legitimate creditors in connection with the Transfer, and the Transfer occurred with millions of dollars in secured debt outstanding by the Transferor to its creditors.

20.    As a result of the conduct described above, the Co-Conspirators have converted elements of the Collateral to their own use, destroyed the going concern value of the Collateral, and dissipated cash and non-cash components of the Collateral making it impractical or impossible to marshal the same.  In these regards, the Co-Conspirators have failed and refused to account to Merrill Lynch for the Transferred Assets.

### COUNT I:  CORPORATE VEIL PIERCING AS TO TRANSFEREE

This is a cause of action for piercing the corporate veil of the Transferee, which is a sham and an alter-ego of the Transferor, the Former Principals, the Transferee Principals, or some combination of the same.

21.    Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

22.    The Transferee has no corporate existence or purpose that is legitimate or lawful. Instead, it was formed solely as a mechanism to transfer a significant portion of the Collateral as a going concern and thus unfairly prejudice Merrill Lynch and other creditors of the Transferor by placing these valuable assets outside of the reach of Merrill Lynch at the time of the Transferor's insolvency.

23.    Because the Transferee was formed and operated for an improper purpose, because the Transferee has no legitimate or separate corporate existence, and because the Transferee was

formed as a buffer with the intent to separate the Collateral from the Transferor, as well as the

difficulties presented by the Bankruptcy Case and the Guarantor Case, the corporate existence of this

Florida business entity should be disregarded.

WHEREFORE, Merrill Lynch requests an adjudication disregarding the corporate existence

of the Transferee, and finding this business entity to be nothing more than an alter-ego of some

combination of the Co-Conspirators, acknowledging the continued ownership of the Collateral by

the Examiner as successor to the Transferor, subject to the liens and security interests continuing in

favor of Merrill Lynch in the Transferred Assets, and further holding the appropriate Co-

Conspirators individually responsible for all usurious loans effectuated through this business entity.

## COUNT II: IMPOSITION OF
## CONSTRUCTIVE TRUST ON TRANSFERRED ASSETS

This is a cause of action for imposition of a constructive trust upon the Transferred Assets.

24.     Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though

fully set forth herein.

25.     Merrill Lynch and other creditors relied upon the Transferor's ownership of the

Transferred Assets and the operation of its business in extending credit to the Transferor.  Under

such circumstances, Merrill Lynch and other creditors will have been unfairly denied the benefit of

such assets as a result of the Fraudulent Transfer absent the imposition of a constructive trust on the

Transferred Assets.  Alternatively, if Merrill Lynch is not entitled to impose a constructive trust on

the Transferred Assets, they are entitled to recover from such proceeds an amount necessary to

satisfy the Claims and all other just claims of creditors of the Transferor.

26.     Merrill Lynch has no adequate remedy at law.

WHEREFORE, Merrill Lynch requests the entry of a judgment in its favor and against the

Transferee, imposing a constructive trust on the Transferred Assets, in favor of Merrill Lynch on behalf of the Transferor, and that this Court grant such other and further relief as is just and proper.

## COUNT III:  IMPOSITION OF
## EQUITABLE LIEN ON THE TRANSFERRED ASSETS

This is a cause of action for imposition of an equitable lien upon the Transferred Assets as against the Transferee in connection with the Fraudulent Transfer from the Transferor to the Transferee.

27.     Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

28.     Merrill Lynch and other creditors relied upon the Transferor's ownership of the Transferred Assets and the operation of its business in extending credit to the Transferor.  Under such circumstances, Merrill Lynch and other creditors will have been unfairly denied the benefit of such assets as a result of the Fraudulent Transfer absent the imposition of an equitable lien on the Transferred Assets.  Alternatively, if Merrill Lynch is not entitled to impose an equitable lien on the Transferred Assets, they are entitled to recover from such proceeds an amount necessary to satisfy the Claims and all other just claims of creditors of the Transferor.

29.     Merrill Lynch has no adequate remedy at law.

WHEREFORE, Merrill Lynch requests the entry of a judgment in its favor and against the Transferee, imposing an equitable lien on the Transferred Assets, in favor of Merrill Lynch on behalf of the Transferor, and that this Court grant such other and further relief as is just and proper.

## COUNT IV: DECLARATORY RELIEF

This is an action by Merrill Lynch against the Co-Conspirators for declaratory relief pursuant to Florida Statutes § 86.011.

30.     Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

31.     For reasons alleged above, Merrill Lynch is uncertain as to the scope and extent of its claims, liens, and other rights with respect to the Transferred Assets. Accordingly, Merrill Lynch is in need of an adjudication of the rights of the parties in order to proceed further with respect to the Transferred Assets.

32.     It is appropriate for Merrill Lynch to confirm that it is subject to its liens and encumbrances. In these regards, the Co-Conspirators are either silent or have objected to the relief sought by Merrill Lynch.

33.     A declaratory judgment should also be entered with respect to the true rights to own and possess the Transferred Assets, as well as the scope and extent of liens encumbering the same, and in these regards, Merrill Lynch notes that the matter is at issue: There is a compelling reason to grant the declaratory relief requested herein.

WHEREFORE, Merrill Lynch requests judgment in its favor and against the Co-Conspirators that will:

    a.     Provide declaratory relief that the Transferred Assets are subject to Merrill Lynch's security interests and liens to the same extent as if they had never been transferred by the Transferor;

    b.     provide declaratory relief that the liens and security interests of Merrill Lynch continue to attach to the Transferred Assets in the same manner that they attached to the other elements of the Collateral prior to the Fraudulent Transfer;

    c.     grant an award of attorneys' fees and costs in favor of Merrill Lynch and

against the Co-Conspirators to the extent recoverable pursuant to applicable

law; and

d.      grant all other relief that is necessary and appropriate.

**COUNT V:**
**INTENTIONALLY FRAUDULENT TRANSFER AS TO TRANSFERRED ASSETS**

This is an action to recover the Transferred Assets from the Transferee pursuant to <u>Florida</u>

<u>Statutes</u> § 726.105(1)(a), § 56.29(6)(b), and other applicable law.

34.      Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though

fully set forth herein.

35.      With respect to the Transferred Assets:

a.      The Transferee, as recipient of such fraudulent transfer, was an insider of the

Transferor, an alter-ego of the same and of the principals of both;

b.      the Fraudulent Transfer was concealed and was otherwise not disclosed to

Merrill Lynch;

c.      during or about the time period of the Fraudulent Transfer, the existence of

the Bankruptcy Case and other events have rendered the Transferor insolvent

and rendered inevitable the onset of collection efforts by Merrill Lynch and

numerous other creditors of the Transferor;

d.      the Transferor has continuously been insolvent at all relevant times relating

hereto, including during or about the date of the Fraudulent Transfer;

e       the value of the consideration received by the Transferor from the Transferee

was not reasonably equivalent to the value of the Transferred Assets;

f.      at all times relevant to this litigation, the Transferor's obligations to Merrill

Lynch and others have rendered it effectively insolvent, a fact that clearly motivated the Fraudulent Transfer of the Transferred Assets; and

g.   the Fraudulent Transfer of the Transferred Assets constituted a transfer of a substantial portion of the Transferor's assets that would have been otherwise available for execution, and that constituted collateral of Merrill Lynch.

36.   Based upon the foregoing, the transfer of the Transferred Assets was clearly fraudulent as to Merrill Lynch, in that it was made as a matter of law with actual intent to hinder, delay, and defraud Merrill Lynch.

WHEREFORE, Merrill Lynch requests relief, in its favor and against the Transferee, that shall provide for:

a.   entry of a judgment for avoidance of the Fraudulent Transfer of the Transferred Assets (including all proceeds thereof) to the fullest extent allowable pursuant to Florida Statutes § 726.108(1)(a) and other applicable law, and permitting the additional relief set forth in Florida Statutes § 726.108(2); or

b.   entry of a judgment for damages against the Transferee for the full value of the Transferred Assets, based upon its value at the time of the subject fraudulent transfer, subject to appropriate adjustment as the equities may require as set forth pursuant to Florida Statutes § 726.109(2) and (3), which equities should specifically include the recognition of any rents or other income generated from Transferred Assets  misappropriated since the time of the Fraudulent Transfer;

c.   Merrill Lynch's recovery of all attorneys' fees, court costs, and related

expenses incurred as a result of the Fraudulent Transfer of the Transferred Assets, as set forth in <u>Florida Statutes</u> §§ 57.115 and 56.29(11) and pursuant to the Loan Documents; and

d.    such other or additional relief as is necessary and appropriate.

## COUNT VI:  KNOWINGLY FRAUDULENT
## <u>TRANSFER AS TO THE TRANSFERRED ASSETS</u>

This is an action for avoidance of knowingly fraudulent transfers of the Transferred Assets, and all proceeds of the foregoing, pursuant to <u>Florida Statutes</u> §§ 726.105(1)(b), 56.29(6)(b), and other applicable law.

37.    Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

38.    As alleged above, the Transferor did not receive reasonable and equivalent value in exchange for the transfer of the Transferred Assets.

39.    In addition to the foregoing, the Transferor was engaged in business operations at the time of the Fraudulent Transfer for which its remaining assets were unreasonably small in relation to the extent of its business.  Additionally, the sum of the assets of the Transferor, adjusted to take into consideration liability to Merrill Lynch and the status of the Bankruptcy Case, essentially rendered it insolvent or nearly insolvent during or about the date of the Fraudulent Transfer of the Transferred Assets.

40.    In addition to the undercapitalization of the Transferor on or as of the date of the above-described Fraudulent Transfer, it believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due during or about this time period.

WHEREFORE, Merrill Lynch requests relief, in its favor and against the Transferee, that

shall provide for:

    a.    entry of a judgment for avoidance of the Fraudulent Transfer of the Transferred Assets (including all proceeds thereof) to the extent necessary to satisfy Merrill Lynch, as set forth in <u>Florida Statutes</u> § 726.108(1)(a) and other applicable law, and permitting the additional relief set forth in <u>Florida Statutes</u> § 726.108(2); or

    b.    entry of a judgment for damages against the Transferee for the full value of the Transferred Assets, based upon its value at the time of the subject Fraudulent Transfer, subject to appropriate adjustment as the equities may require as set forth pursuant to <u>Florida Statutes</u> § 726.109(2) and (3), which equities should specifically include the recognition of any rents or other income generated from Transferred Assets misappropriated since the time of the Fraudulent Transfer;

    c.    Merrill Lynch's recovery of all attorneys' fees, court costs, and related expenses incurred as a result of the Fraudulent Transfer of the Transferred Assets, as set forth in <u>Florida Statutes</u> §§ 57.115 and 56.29(11) and pursuant to the Loan Documents; and

    d.    such other or additional relief as is necessary and appropriate.

## COUNT VII: CONSTRUCTIVELY FRAUDULENT TRANSFER AS TO THE TRANSFERRED ASSETS

This is an action for avoidance of a constructively fraudulent transfer of the Transferred Assets, brought pursuant to <u>Florida Statutes</u> §§ 726.106(1), 56.29(6)(b), and other applicable law.

    41.    Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though

fully set forth herein.

42.     As alleged above, the Transferred Assets were transferred to the Transferee without the Transferor's directly receiving reasonably equivalent value in exchange for the same.

43.     During or about the time of the Fraudulent Transfer of the Transferred Assets, the Transferor was insolvent.  Alternatively, it became insolvent as a result of the onset of the Bankruptcy Case and the Fraudulent Transfer made shortly thereafter.

44.     In the event that it is alleged by the Transferee that conveyance of the Transferred Assets was received in connection with an antecedent debt, Merrill Lynch further alleges that the Transferee is an insider of the Transferor.  Additionally, Merrill Lynch would further allege that the Transferor had reasonable cause to believe that it was insolvent as of the date of the Fraudulent Transfer of the Transferred Assets.

WHEREFORE, Merrill Lynch requests relief, in its favor and against the Transferee, that shall provide for:

a.     entry of a judgment for avoidance of the Fraudulent Transfer of the Transferred Assets (including all proceeds thereof) to the extent necessary to satisfy Merrill Lynch, as set forth in Florida Statutes § 726.108(1)(a) and other applicable law, and permitting the additional relief set forth in Florida Statutes § 726.108(2); or

b.     entry of a judgment for damages against the Transferee for the full value of the Transferred Assets, based upon its value at the time of the Fraudulent Transfer, subject to appropriate adjustment as the equities may require as set forth pursuant to Florida Statutes § 726.109(2) and (3), which equities should specifically include the recognition of any rents or other income generated

from Transferred Assets misappropriated since the time of the Fraudulent Transfer;

c.    Merrill Lynch's recovery of all attorneys' fees, court costs, and related expenses incurred as a result of the Fraudulent Transfer of the Transferred Assets, as set forth in <u>Florida Statutes</u> §§ 57.115 and 56.29(11) and pursuant to the Loan Documents; and

d.    such other or additional relief as is necessary and appropriate.

## COUNT VIII: ACCOUNTING

This is a cause of action directed against the Transferee and the Transferee Principals seeking an accounting relating to the Transferred Assets.

45.    Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

46.    The Transferee and the Transferee Principals have converted to their benefit the Transferred Assets, including all or virtually all of the Collateral.

47.    Merrill Lynch requires an accounting of all value derived by the Transferee and the Transferee Principals from their continued withholding of the same, that is properly collateral of Merrill Lynch to be administered by the Examiner.

48.    Merrill Lynch and other creditors have been damaged, but the extent of certain damages cannot be ascertained absent an accounting.

WHEREFORE, Merrill Lynch seeks an accounting by the Transferee and the Transferee Principals of all monies and other items of value generated from the use of the Transferred Assets and the continued withholding of reimbursement of monies rightfully belonging to Merrill Lynch, together with any other additional or related relief as this Court determines to be just and proper.

## COUNT IX
## CONSPIRACY TO COMMIT THEFT

This is an action for conspiracy to commit civil theft as against the Co-Conspiractors.

49.     Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

50.     A conspiracy existed between and among the Co-Conspirators.

51.     The Co-Conspirators combined and conspired to commit a theft in a manner consistent with the definitions set forth in Chapter 812 and Chapter 818, <u>Florida Statutes</u>.

52.     In pursuance of the conspiracy, the Co-Conspirators conducted numerous overt acts, including but not limited to, making the Fraudulent Transfer, all in violation of the foregoing statutes.

53.     As the proximate result of the conspiracy, Merrill Lynch and other creditors for whom the Receiver acts as a fiduciary have suffered damages, including but not limited to the loss of the Collateral, the going concern business operations of the Transferor, and other damages.

54.     The Co-Conspirators are guilty of conspiracy to commit civil theft and related activities in violation of Chapters 812 and 818, <u>Florida Statutes</u>.

WHEREFORE, Merrill Lynch demands judgment against the Co-Conspirators, jointly and severally, for: (1) the value of the Collateral, (2) lost profits associated with the going concern of the Transferor, (3) prejudgment interest, (4) such other and further relief as the Court deems just, and (5) attorneys' fees and costs.

## <u>COUNT X: CONVERSION</u>

This is an action for damages based upon conversion against the Co-Conspirators in excess of $15,000, exclusive of costs and interest.

55.     Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

56.     As set forth in the foregoing allegations, the Co-Conspirators have wrongfully asserted through continued and indefinite possession and deprivation, the rights of Merrill Lynch and the Transferor.

57.     These acts of the Co-Conspirators have been made without authority, causing harm to Merrill Lynch and other creditors.

WHEREFORE, Merrill Lynch requests judgment against the Co-Conspirators for all damages caused by the tortious conduct alleged above, together with pre-judgment and post-judgment interest, court costs, and related expenses, together with any and all additional relief that this Court determines to be just and proper.

## COUNT XI:  CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT

This is an action for theft of trade secrets pursuant to violation of Florida Statute § 817.562. Merrill Lynch is entitled to civil remedies for this criminal act as set forth in Florida Statutes §§ 772.104 and 812.035, where actual damages exceed $15,000.

58.     Merrill Lynch realleges and reincorporates paragraphs 1 through 20 above as though fully set forth herein.

59.     Prior to the service of this Complaint, Merrill Lynch has provided notice to the Co-Conspirators pursuant to Florida Statutes § 772.104 (the "Civil Theft Letter"), a copy of which is attached as Exhibit "F." Accordingly, provided that the Co-Conspirators comply with the request set forth in the Civil Theft Letter, Merrill Lynch shall forthwith dismiss this count with prejudice, failing which this count shall mature into a viable action.

60.     The Co-Conspirators, with the felonious intent to deprive or withhold from Merrill

Lynch the a significant component of its Collateral, stole, embezzled, and without Merrill Lynch's consent or authority, transferred the Collateral from the Transferor to the Transferee, and thus disregarded Merrill Lynch's liens and security interests, and did all of the foregoing in order to induce Merrill Lynch to abandon valuable rights to enforce the Claims pursuant to the Loan Documents.

61.     As a result of this illegal conduct, Merrill Lynch and other creditors relying upon the Transferor's ownership and operation of the Collateral have suffered damages, as set forth above.

WHEREFORE, Merrill Lynch demands judgment against the Co-Conspirators for the following:

a.     compensatory damages, treble damages, interest, costs and attorneys' fees pursuant to Florida Statutes §§ 772.11 and 812.035;

b.     an order requiring appropriate injunctive relief; and

c.     for such other and further relief as this Court deems proper to protect Merrill Lynch's rights.

## COUNT XII
## INJUNCTION: ALL CO-CONSPIRATORS

This is an action for injunctive relief as against the Co-Conspirators with respect to any effort on their part to retain any of the Transferred Assets, and to enforce any claim or interest in the Collateral.

62.     Merrill Lynch realleges and reincorporates paragraphs 1 through 61 above as though fully set forth herein.

63.     Due to the nature of the Co-Conspirators' conduct, the full extent of damages to Merrill Lynch and other creditors cannot be calculated in dollars and cents.

64.     Merrill Lynch and other creditors can demonstrate a clear legal right to the relief sought in this Complaint.

65.     Merrill Lynch and other creditors are likely threatened with irreparable harm in connection with the continuing wrongful acts described above, including in rem and in personam efforts pertaining to the Transferred Assets.

66.     Merrill Lynch and other creditors have no adequate remedy of law for the Co-Conspirators' continuing improper conduct.

WHEREFORE, Merrill Lynch requests that the Court enjoin the Co-Conspirators, take any action in furtherance of the wrongful pattern of conspiratorial, tortious, usurious, and otherwise actionable conduct described above, either during the pendency of or following adjudication of this action.

Dated August 22, 2002.

*I HEREBY CERTIFY that I am admitted to the bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(a).*

**JOHN A. ANTHONY, ESQUIRE**
Florida Bar Number: 0731013
**STEPHENIE M. BIERNACKI, ESQUIRE**
Florida Bar Number: 0127299
Gray, Harris & Robinson, P.A.
Post Office Box 3324
Tampa, Florida 33601
Telephone: 813/273-5000
Telecopier: 813/273-5145
janthony@grayharris.com
Attorneys for Merrill Lynch Business Financial Services Inc.

#534685/ldw

```
       ********************
  ***     TX REPORT     ***
       ********************


  TRANSMISSION OK

  TX/RX NO            1031
  CONNECTION TEL                  913124993252
  CONNECTION ID
  ST. TIME            08/22 16:44
  USAGE T             06'35
  PGS. SENT           21
  RESULT              OK
```

Law Offices of

# **Gray, Harris, Robinson, Shackleford, Farrior**

One Tampa City Center, 201 North Franklin Street, Suite 2200
Tampa, FL 33602

# FAX COVER PAGE

To: Bill Kocolowski

From: John A. Anthony

Client #  366478        Matter #     69

Attorney #  1008

FAX Number: 312/499-3252

Number of Pages: 21
(Including cover page)

Date  August 22, 2002

Message:  Please see attached correspondence

## IF THERE ARE ANY PROBLEMS CONCERNING THE TRANSMISSION OF THIS MATERIAL, PLEASE CALL (813) 273-5200.

Operator: _____

Fax Number: 813-273-5145
Fax operator's voice number: 813-273-5200
Main office number: 813-273-5000

### CONFIDENTIALITY NOTE

The information contained in this facsimile message may be privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or duplication of this communication is strictly prohibited. If you have received this

Law Offices of

# Gray, Harris, Robinson, Shackleford, Farrior

One Tampa City Center, 201 North Franklin Street, Suite 2200
Tampa, FL 33602

# FAX COVER PAGE

To: Bill Kocolowski          From: John A. Anthony

Client #_366478___   Matter #____69____          Attorney #_1008_____

FAX Number: 312/499-3252          Number of Pages: _21_
                                  (Including cover page)

Date _August 22, 2002_

Message: _Please see attached correspondence

## IF THERE ARE ANY PROBLEMS CONCERNING THE TRANSMISSION OF THIS MATERIAL, PLEASE CALL (813) 273-5200.

Operator: _____          Fax Number: 813-273-5145
                          Fax operator's voice number: 813-273-5200
                          Main office number: 813-273-5000

### CONFIDENTIALITY NOTE

The information contained in this facsimile message may be privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or duplication of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at 813-273-5200. Thank you.

EXHIBIT "A"

 **Merrill Lynch**

**WCMA® REDUCING REVOLVER– LOAN AND SECURITY AGREEMENT**

**WCMA REDUCING REVOLVER– LOAN AND SECURITY AGREEMENT NO. 741-07L65** ("Loan Agreement") dated as of March 29, 2000, between **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a corporation organized and existing under the laws of the State of Florida having its principal office at 3041 West McNab Road, Pompano Beach, FL 33069 ("Customer"), and **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.**, a corporation organized and existing under the laws of the State of Delaware having its principal office at 222 North LaSalle Street, Chicago, IL 60601 ("MLBFS").

In accordance with that certain **WORKING CAPITAL MANAGEMENT® ACCOUNT AGREEMENT NO. 741-07L65** ("WCMA Agreement") between Customer and MLBFS' affiliate, **MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED** ("MLPF&S"), Customer has subscribed to the WCMA Program described in the WCMA Agreement. The WCMA Agreement is by this reference incorporated as a part hereof. In conjunction therewith, Customer has requested that MLBFS make a WCMA Reducing Revolver Loan (a "Reducing Revolver") to Customer in the amount and upon the terms hereafter specified, and, subject to the terms and conditions hereafter set forth, MLBFS has agreed to provide a Reducing Revolver for Customer.

A Reducing Revolver is a term credit facility, similar to a conventional term loan, but funded out of a line of credit under the WCMA Program ("WCMA Line of Credit") in the amount of the initial loan. With a Reducing Revolver: (i) interest will generally be charged each month to Customer's WCMA account, and, so long as the WCMA Line of Credit is in effect, paid with an additional loan under the WCMA Line of Credit (i.e., added to the loan balance), (ii) the maximum WCMA Line of Credit will be reduced each month by the amount that would be payable on account of principal if the Reducing Revolver were a conventional term loan amortized over the same term and in the same manner as the Reducing Revolver, and (iii) Customer will be required to make sufficient payments on account of the Reducing Revolver to assure that the outstanding balance of the Reducing Revolver does not at any time exceed the Maximum WCMA Line of Credit, as reduced each month.

Absent a prepayment by Customer, this structure results in required monthly payments for the Reducing Revolver that are substantially the same as the required monthly payments for a conventional term loan with the same term and amortization. However, unlike most conventional term loans, because it is funded out of a line of credit, the Reducing Revolver permits both a prepayment in whole or in part at any time, and, subject to certain conditions, the re-borrowing on a revolving basis of any such prepaid amounts up to the Maximum WCMA Line of Credit, as reduced each month. The structure therefore will enable Customer at its option to use any excess or temporary cash balances that it may have from time to time to prepay the Reducing Revolver and thereby effectively reduce interest expense on the Reducing Revolver without impairing its working capital.

Accordingly, and in consideration of the premises and of the mutual covenants of the parties hereto, Customer and MLBFS hereby agree as follows:

### Article I. DEFINITIONS

**1.1 Specific Terms.** In addition to terms defined elsewhere in this Loan Agreement, when used herein the following terms shall have the following meanings:

(a) "Account Debtor" shall mean any party who is or may become obligated with respect to an Account or Chattel Paper.

(b) "Additional Agreements" shall mean all agreements, instruments, documents and opinions other than this Loan Agreement, whether with or from Customer or any other party, which are contemplated hereby or otherwise reasonably required by MLBFS in connection herewith, or which evidence the creation, guaranty or collateralization of any of the Obligations or the granting or perfection of liens or security interests upon the Collateral or any other collateral for the Obligations.

(c) "Bankruptcy Event" shall mean any of the following: (i) a proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt or receivership law or statute shall be filed or consented to by Customer or any Guarantor; or (ii) any such proceeding shall be filed against Customer or any Guarantor and shall not be dismissed or withdrawn within sixty (60) days after filing; or (iii) Customer or any Guarantor shall make a general assignment for the benefit of creditors; or (iv) Customer or any Guarantor shall generally fail to pay or admit in writing its inability to pay its debts as they become due; or (v) Customer or any Guarantor shall be adjudicated a bankrupt or insolvent.

(d) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or other day on which the New York Stock Exchange is regularly closed.

(e) "Closing Date" shall mean the date upon which all conditions precedent to MLBFS' obligation to make the Loan shall have been met to the satisfaction of MLBFS.

(f) "Collateral" shall mean all Accounts, Chattel Paper, Contract Rights, Inventory, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Assets of Customer, howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located; together with all parts thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds), and the additional collateral described in Section 4.6 (b) hereof.

(g) "Commitment Expiration Date" shall mean April 28, 2000.

(h) "Commitment Fee" shall mean a fee of $2,700.00 due to MLBFS in connection with this Loan Agreement.

(i) "Default" shall mean either an "Event of Default" as defined in Section 4.5 hereof, or an event which with the giving of notice, passage of time, or both, would constitute such an Event of Default.

(j) "General Funding Conditions" shall mean each of the following conditions precedent to the obligation of MLBFS to make the Loan or any Subsequent WCMA Loan hereunder: (i) Customer shall have validly subscribed to and continued to maintain the WCMA Account with MLPF&S, and the WCMA Account shall then be reflected as an active "Commercial" WCMA Account (i.e., one with line of credit capabilities) on MLPF&S' WCMA computer system; (ii) no Default shall have occurred and be continuing or would result from the making of the Loan or such Subsequent WCMA Loan by MLBFS; (iii) there shall not have occurred and be continuing any material adverse change in the business or financial condition of Customer or any Guarantor; (iv) all representations and warranties of Customer or any Guarantor herein or in any Additional Agreements shall then be true and correct in all material respects; (v) MLBFS shall have received this Loan Agreement and all Additional Agreements, duly executed and filed or recorded where applicable, all of which shall be in form and substance reasonably satisfactory to MLBFS; (vi) the Commitment Fee shall have been paid in full; (vii) MLBFS shall have received, as and to the extent applicable, copies of invoices, bills of sale, loan payoff letters and/or other evidence reasonably satisfactory to it that the proceeds of the Loan will satisfy the Loan Purpose; (viii) MLBFS shall have received evidence reasonably satisfactory to it as to the ownership of the Collateral and the perfection and priority of MLBFS' liens and security interests thereon, as well as the ownership of and the perfection and priority of MLBFS' liens and security interests on any other collateral for the Obligations furnished pursuant to any of the Additional Agreements; (ix) MLBFS shall have received evidence reasonably satisfactory to it of the insurance required hereby or by any of the Additional Agreements; and (x) any additional conditions specified in the "WCMA Reducing Revolver Loan Approval" letter executed by MLBFS with respect to the transactions contemplated hereby shall have been met to the reasonable satisfaction of MLBFS.

(k) "Guarantor" shall mean a person or entity who has either guaranteed or provided collateral for any or all of the Obligations.

(l) "Interest Due Date" shall mean the last Business Day of each calendar month during the term hereof (or, if Customer makes special arrangements with MLPF&S, on the last Friday of each calendar month during the term hereof).

(m) "Interest Rate" shall mean a variable per annum rate equal to the sum of (i) 2.40% per annum, and (ii) the interest rate from time to time published in the "Money Rates" section of The Wall Street Journal as the "Dealer Commercial Paper" rate for 30-day high-grade unsecured notes sold through dealers by major corporations (the "30-day Dealer Commercial Paper Rate"). The Interest Rate will change as of the date of publication in The Wall Street Journal of a 30-day Dealer Commercial Paper Rate that is different from that published on the preceding Business Day. In the event that The Wall Street Journal shall, for any reason, fail or cease to publish the 30-day Dealer Commercial Paper Rate, MLBFS will choose a reasonably comparable index or source to use as the basis for the Interest Rate.

(n) "Loan" shall mean the specific Reducing Revolver by MLBFS to Customer pursuant to this Agreement for the Loan Purpose and in the Loan Amount.

(o) "Loan Amount" shall mean an amount equal to the lesser of: (i) 100% of the amount required by Customer to satisfy or fulfill the Loan Purpose, (ii) the aggregate amount which Customer shall request be advanced by MLBFS on account of the Loan Purpose on the Closing Date, or (iii) $270,000.00.

(p) "Loan Purpose" shall mean the purpose for which the proceeds of the Loan will be used; to wit: to refinance an existing term loan with Bank Atlantic.

(q) "Location of Tangible Collateral" shall mean the address of Customer set forth at the beginning of this Loan Agreement, together with any other address or addresses set forth on an exhibit hereto as being a Location of Tangible Collateral.

(r) "Maximum WCMA Line of Credit" shall mean the maximum aggregate line of credit which MLBFS will extend to Customer subject to the terms and conditions hereof, as the same shall be reduced each month in accordance with the terms hereof. On the Closing Date, the Maximum WCMA Line of Credit will equal the Loan Amount.

(s) "Obligations" shall mean all liabilities, indebtedness and other obligations of Customer to MLBFS, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary or joint or several, and, without limiting the foregoing, shall include interest accruing after the filing of any petition in bankruptcy, and all present and future liabilities, indebtedness and obligations of Customer under this Loan Agreement.

(t) "Permitted Liens" shall mean with respect to the Collateral: (i) liens for current taxes not delinquent, other non-consensual liens arising in the ordinary course of business for sums not due, and, if MLBFS' rights to and interest in the Collateral are not materially and adversely affected thereby, any such liens for taxes or other non-consensual liens arising in the ordinary course of business being contested in good faith by appropriate proceedings; (ii) liens in favor of MLBFS; (iii) liens which will be discharged with the proceeds of the initial WCMA Loan; and (iv) any other liens expressly permitted in writing by MLBFS.

(u) "Subsequent WCMA Loan" shall mean each WCMA Loan other than the Loan, including, without limitation, each WCMA Loan to pay accrued interest.

(v) "Termination Date" shall mean the first to occur of: (i) the last Business Day of the thirty-sixth (36th) full calendar month following the Closing Date, or (ii) if earlier, the date of termination of the WCMA Line of Credit pursuant to the terms hereof.

(w) "WCMA Account" shall mean and refer to the Working Capital Management Account of Customer with MLPF&S identified as WCMA Account No. 741-07L65 and any successor Working Capital Management Account of Customer with MLPF&S.

(x) "WCMA Loan" shall mean each advance made by MLBFS pursuant to the WCMA Line of Credit, including the Loan and each Subsequent WCMA Loan.

(y) "WCMA Loan Balance" shall mean an amount equal to the aggregate unpaid principal balance of all WCMA Loans.

1.2 **Other Terms.** Except as otherwise defined herein: (i) all terms used in this Loan Agreement which are defined in the Uniform Commercial Code of Illinois ("UCC") shall have the meanings set forth in the UCC, and (ii) capitalized terms used herein which are defined in the WCMA Agreement (including, without limitation, "Money Accounts", "Minimum Money Accounts Balance", "WCMA Directed Reserve Program" and "WCMA Program") shall have the meanings set forth in the WCMA Agreement.

### Article II. THE LOAN

2.1 **Commitment.** Subject to the terms and conditions hereof, MLBFS hereby agrees to make the Loan to Customer, and Customer hereby agrees to borrow the Loan from MLBFS. Except as otherwise provided in Section 3.1 hereof, the entire proceeds of the Loan will be disbursed by MLBFS out of the WCMA Line of Credit either directly to the applicable third party or parties on account of the Loan Purpose or to reimburse Customer for amounts directly expended by it for the Loan Purpose; all as directed by Customer in a Closing Certificate to be executed and delivered to MLBFS prior to the date of funding.

2.2 **Conditions of MLBFS' Obligation.** The Closing Date and MLBFS' obligations to activate the WCMA Line of Credit, as hereafter set forth, and make the Loan on the Closing Date are subject to the prior fulfillment of each of the following conditions: (a) not less than two Business Days prior to any requested funding date, MLBFS shall have received a Closing Certificate, duly executed by Customer, setting forth, among other things, the amount of the Loan and the method of payment and payee(s) of the proceeds thereof; (b) after giving effect to the Loan, the WCMA Loan Balance will not exceed either the Maximum WCMA Line of Credit or the Loan Amount; (c) the Commitment Expiration Date shall not then have occurred; and (d) each of the General Funding Conditions shall have been met or satisfied to the reasonable satisfaction of MLBFS.

2.3 **Commitment Fee.** In consideration of the agreement by MLBFS to extend the Loan and any Subsequent WCMA Loans to Customer in accordance with and subject to the terms hereof, Customer has paid or shall, on or before the Closing Date pay, the Commitment Fee to MLBFS. Customer acknowledges and agrees that the Commitment Fee has been fully earned by MLBFS, and that it will not under any circumstances be refundable.

2.4 **Use of Loan Proceeds.** Unless otherwise agreed by MLBFS in writing, the proceeds of the Loan shall be used solely for the Loan Purpose. The Proceeds of each Subsequent WCMA Loan initiated by Customer shall be used by Customer solely for working capital in the ordinary course of its business, or, with the prior written consent of MLBFS, for other lawful business purposes of Customer not prohibited hereby. **Customer agrees that under no circumstances will the proceeds of the Loan or any Subsequent WCMA Loan be used: (i) for personal, family or household purposes of any person whatsoever, or (ii) to purchase, carry or trade in securities, or repay debt incurred to purchase, carry or trade in securities, whether in or in connection with the WCMA Account, another account of Customer with MLPF&S or an account of Customer at any other broker or dealer in securities, or (iii) unless otherwise consented to in writing by MLBFS, to pay any amount to Merrill Lynch and Co., Inc. or any of its subsidiaries, other than Merrill Lynch Bank USA, Merrill Lynch Bank & Trust Co. or any subsidiary of either of them (including MLBFS and Merrill Lynch Credit Corporation).**

### Article III. THE WCMA LINE OF CREDIT

3.1 **Activation of the WCMA Line of Credit.** Subject to the terms and conditions hereof, on the Closing Date MLBFS will activate a WCMA Line of Credit for Customer in the Loan Amount. The Loan will be funded out of the WCMA Line of Credit immediately after such activation (or, if and to the extent otherwise expressly contemplated in the definition of Loan Purpose or otherwise directed in the Closing Certificate and hereafter expressly agreed by MLBFS, all or part of the Loan may be made available as a WCMA Line of Credit and funded by Customer.)

3.2 **Subsequent WCMA Loans.** Subject to the terms and conditions hereof, during the period from and after the Closing Date to the Termination Date: (a) Customer may repay the WCMA Loan Balance in whole or in part at any time without premium or penalty (except, as hereafter set forth, upon a refinancing by another lender), and request a re-borrowing of amounts repaid on a revolving basis, and (b) in addition to Subsequent WCMA Loans made automatically to pay accrued interest, as hereafter provided, MLBFS will make such Subsequent WCMA Loans as Customer may from time to time request or be deemed to have requested in accordance with the terms hereof. Customer may request Subsequent WCMA Loans by use of WCMA Checks, FTS, Visa® charges, wire transfers, or such other means of access to the WCMA Line of Credit as may be permitted by MLBFS from time to time; it being understood that so long as the WCMA Line of Credit shall be in effect, any charge or debit to the WCMA Account which but for the WCMA Line of Credit would under the terms of the WCMA Agreement result in an overdraft, shall be deemed a request by Customer for a Subsequent WCMA Loan.

3.3 **Conditions of Subsequent WCMA Loans.** Notwithstanding the foregoing, MLBFS shall not be obligated to make any Subsequent WCMA Loan, and may without notice refuse to honor any such request by Customer, if at the time of receipt by MLBFS of Customer's request: (a) the making of such Subsequent WCMA Loan would cause the Maximum WCMA Line of Credit, as reduced pursuant to the provisions of Section 3.6 hereof, to be exceeded; or (b) the Termination Date shall have occurred; or (c) an event shall have occurred and be continuing which shall have caused any of the General Funding Conditions to not then be met or satisfied to the reasonable satisfaction of MLBFS. The making by MLBFS of any Subsequent WCMA Loan (including, without limitation, the making of a Subsequent WCMA Loan to pay accrued interest or late charges, as hereafter provided) at a time when any one or more of said conditions shall not have been met shall not in any event be construed as a waiver of said condition or conditions or of any Default, and shall not prevent MLBFS at any time thereafter while any condition shall not have been met from refusing to honor any request by Customer for a Subsequent WCMA Loan.

3.4 **WCMA Note.** Customer hereby promises to pay to the order of MLBFS, at the times and in the manner set forth in this Loan Agreement, or in such other manner and at such place as MLBFS may hereafter designate in writing: (a) the WCMA Loan Balance; (b) interest at the Interest Rate on the outstanding WCMA Loan Balance (computed for the actual number of days elapsed on the basis of a year consisting of 360 days), from and including the date on which the Loan is made until the date of payment of all WCMA Loans in full; and (c) on demand, all other sums payable pursuant to this Loan Agreement, including, but not limited to, any late charges. Except as otherwise expressly set forth herein, Customer hereby waives presentment, demand for payment,

protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and formalities in connection with this WCMA Note and this Loan Agreement.

3.5 **Interest.** (a) An amount equal to accrued interest on the WCMA Loan Balance shall be payable by Customer monthly on each Interest Due Date, commencing with the Interest Due Date occurring in the calendar month in which the Closing Date shall occur. Unless otherwise hereafter directed in writing by MLBFS on or after the Termination Date, such interest will be automatically charged to the WCMA Account on the applicable Interest Due Date, and, to the extent not paid with free credit balances or the proceeds of sales of any Money Accounts then in the WCMA Account, as hereafter provided, such interest will be paid by a Subsequent WCMA Loan and added to the WCMA Loan Balance. All interest shall be computed for the actual number of days elapsed on the basis of a year consisting of 360 days.

(b) Notwithstanding any provision to the contrary in this Agreement or any of the Additional Agreements, no provision of this Agreement or any of the Additional Agreements shall require the payment or permit the collection of any amount in excess of the maximum amount of interest permitted to be charged by law ("Excess Interest"). If any Excess Interest is provided for, or is adjudicated as being provided for, in this Agreement or any of the Additional Agreements, then: (i) Customer shall not be obligated to pay any Excess Interest; and (ii) any Excess Interest that MLBFS may have received hereunder or under any of the Additional Agreements shall, at the option of MLBFS, be either applied as a credit against the then WCMA Loan Balance, or refunded to the payer thereof.

3.6 **Periodic Reduction of Maximum WCMA Line of Credit.** Commencing on the last Business Day of the first full calendar month following the Closing Date, and continuing on the last Business Day of each calendar month thereafter to and including the last Business Day of the thirty-fifth (35th) such calendar month, the Maximum WCMA Line of Credit shall be reduced by an amount equal to one-thirty-sixth (1/36th) of the Loan Amount per month. Unless the WCMA Line of Credit shall have been earlier terminated pursuant to the terms hereof, on the last Business Day of the thirty-sixth (36th) calendar month following the Closing Date, the WCMA Line of Credit shall, without further action of either of the parties hereto, be terminated, Customer shall pay to MLBFS the entire WCMA Loan Balance, if any, and all other Obligations, and the WCMA Account, at the option of Customer, will either be converted to a WCMA Cash Account (subject to any requirements of MLPF&S) or terminated. No failure or delay on the part of MLBFS in entering into the WCMA computer system any scheduled reduction in the Maximum WCMA Line of Credit pursuant to this Section shall have the effect of preventing or delaying such reduction.

3.7 **Mandatory Payments.** CUSTOMER AGREES THAT IT WILL, WITHOUT DEMAND, INVOICING OR THE REQUEST OF MLBFS, FROM TIME TO TIME MAKE SUFFICIENT PAYMENTS ON ACCOUNT OF THE WCMA LOAN BALANCE TO ASSURE THAT THE WCMA LOAN BALANCE WILL NOT AT ANY TIME EXCEED THE MAXIMUM WCMA LINE OF CREDIT, AS REDUCED EACH MONTH PURSUANT TO SECTION 3.6 HEREOF.

3.8 **Method of Making Payments.** All payments required or permitted to be made pursuant to this Loan Agreement shall be made in lawful money of the United States. Unless otherwise hereafter directed by MLBFS, such payments may be made by the delivery of checks (other than WCMA Checks), or by means of FTS or wire transfer of funds (other than funds from the WCMA Line of Credit) to MLPF&S for credit to the WCMA Account. Payments to MLBFS from funds in the WCMA Account shall be deemed to be made by Customer upon the same basis and schedule as funds are made available for investment in the Money Accounts in accordance with the terms of the WCMA Agreement. The acceptance by or on behalf of MLBFS of a check or other payment for a lesser amount than shall be due from Customer, regardless of any endorsement or statement thereon or transmitted therewith, shall not be deemed an accord and satisfaction or anything other than a payment on account, and MLBFS or anyone acting on behalf of MLBFS may accept such check or other payment without prejudice to the rights of MLBFS to recover the balance actually due or to pursue any other remedy under this Loan Agreement or applicable law for such balance. All checks accepted by or on behalf of MLBFS in connection with this Loan Agreement are subject to final collection.

3.9 **Irrevocable Instructions to MLPF&S.** In order to minimize the WCMA Loan Balance, Customer hereby irrevocably authorizes and directs MLPF&S, effective on the Closing Date and continuing thereafter so long as this Agreement shall be in effect: (a) to immediately and prior to application for any other purpose pay to MLBFS to the extent of any WCMA Loan Balance or other amounts payable by Customer hereunder all available free credit balances from time to time in the WCMA Account; and (b) if such available free credit balances are insufficient to pay the WCMA Loan Balance and such other amounts, and there are in the WCMA Account at any time any investments in Money Accounts (other than any investments constituting any Minimum Money Accounts Balance under the WCMA Directed Reserve Program), to immediately liquidate such investments and pay to MLBFS to the extent of any WCMA Loan Balance and such other amounts the available proceeds from the liquidation of any such Money Accounts.

3.10 **Late Charge.** Any payment or deposit required to be made by Customer pursuant to this Loan Agreement or any of the Additional Agreements not paid or made within ten (10) days of the applicable due date shall be subject to a late charge in an amount equal to the lesser of: (a) 5% of the overdue amount, or (b) the maximum amount permitted by applicable law. Such late charge shall be payable on demand, or, without demand, may in the sole discretion of MLBFS be paid by a Subsequent WCMA Loan and added to the WCMA Loan Balance in the same manner as provided herein for accrued interest with respect to the WCMA Line of Credit.

3.11 **Prepayment.** Customer may prepay the Loan and any Subsequent WCMA Loan at any time in whole or in part without premium or penalty; provided, however, that any refinancing of the WCMA Loan Balance by another financial institution shall: (a) if such refinancing shall occur prior to the first anniversary of the Closing Date, be accompanied by a premium in an amount equal to 3% of the amount prepaid by such refinancing; (b) if such refinancing shall occur thereafter, but prior to the second anniversary of the Closing Date, be accompanied by a premium in an amount equal to 2% of the amount prepaid by such refinancing; and (c) if such refinancing shall occur on or at any time after the second anniversary of the Closing Date, be accompanied by a premium in an amount equal to 1% of the amount prepaid by such refinancing.

3.12 **Option of Customer to Terminate.** Customer will have the option to terminate the WCMA Line of Credit at any time upon written notice to MLBFS. Concurrently with any such termination, Customer shall pay to MLBFS the entire WCMA Loan Balance and all other Obligations.

-4-

3.13 **Limitation of Liability.** MLBFS shall not be responsible, and shall have no liability to Customer or any other party, for any delay or failure of MLBFS to honor any request of Customer for a WCMA Loan or any other act or omission of MLBFS, MLPF&S or any of their affiliates due to or resulting from any system failure, error or delay in posting or other clerical error, loss of power, fire, Act of God or other cause beyond the reasonable control of MLBFS, MLPF&S or any of their affiliates unless directly arising out of the willful wrongful act or active gross negligence of MLBFS. In no event shall MLBFS be liable to Customer or any other party for any incidental or consequential damages arising from any act or omission by MLBFS, MLPF&S or any of their affiliates in connection with the WCMA Line of Credit or this Loan Agreement.

3.14 **Statements.** MLPF&S will include in each monthly statement it issues under the WCMA Program information with respect to WCMA Loans and the WCMA Loan Balance. Any questions that Customer may have with respect to such information or the Loan should be directed to MLBFS; and any questions with respect to any other matter in such statements or about or affecting the WCMA Program should be directed to MLPF&S.

### Article IV. GENERAL PROVISIONS

4.1 **Representations and Warranties.**

Customer represents and warrants to MLBFS that:

(a) **Organization and Existence.** Customer is a corporation, duly organized and validly existing in good standing under the laws of the State of Florida and is qualified to do business and in good standing in each other state where the nature of its business or the property owned by it make such qualification necessary.

(b) **Execution, Delivery and Performance.** The execution, delivery and performance by Customer of this Loan Agreement and by Customer and each Guarantor of such of the Additional Agreements to which it is a party: (i) have been duly authorized by all requisite action, (ii) do not and will not violate or conflict with any law or other governmental requirement, or any of the agreements, instruments or documents which formed or govern Customer or any such Guarantor, and (iii) do not and will not breach or violate any of the provisions of, and will not result in a default by Customer or any such Guarantor under, any other agreement, instrument or document to which it is a party or by which it or its properties are bound.

(c) **Notices and Approvals.** Except as may have been given or obtained, no notice to or consent or approval of any governmental body or authority or other third party whatsoever (including, without limitation, any other creditor) is required in connection with the execution, delivery or performance by Customer or any Guarantor of such of this Loan Agreement and the Additional Agreements to which it is a party.

(d) **Enforceability.** This Loan Agreement and such of the Additional Agreements to which Customer or any Guarantor is a party are the respective legal, valid and binding obligations of Customer and such Guarantor, enforceable against it or them, as the case may be, in accordance with their respective terms, except as enforceability may be limited by bankruptcy and other similar laws affecting the rights of creditors generally or by general principles of equity.

(e) **Collateral.** Except for any Permitted Liens: (i) Customer has good and marketable title to the Collateral, (ii) none of the Collateral is subject to any lien, encumbrance or security interest, and (iii) upon the filing of all Uniform Commercial Code financing statements executed by Customer with respect to the Collateral in the appropriate jurisdiction(s) and/or the completion of any other action required by applicable law to perfect its liens and security interests, MLBFS will have valid and perfected first liens and security interests upon all of the Collateral.

(f) **Financial Statements.** Except as expressly set forth in Customer's financial statements, all financial statements of Customer furnished to MLBFS have been prepared in conformity with generally accepted accounting principles, consistently applied, are true and correct in all material respects, and fairly present the financial condition of it as at such dates and the results of its operations for the periods then ended (subject, in the case of interim unaudited financial statements, to normal year-end adjustments); and since the most recent date covered by such financial statements, there has been no material adverse change in any such financial condition or operation. All financial statements furnished to MLBFS of any Guarantor are true and correct in all material respects, and fairly represent such Guarantor's financial condition as of the date of such financial statements, and since the most recent date of such financial statements, there has been no material adverse change in such financial condition.

(g) **Litigation.** No litigation, arbitration, administrative or governmental proceedings are pending or, to the knowledge of Customer, threatened against Customer or any Guarantor, which would, if adversely determined, materially and adversely affect the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any such Guarantor or the continued operations of Customer.

(h) **Tax Returns.** All federal, state and local tax returns, reports and statements required to be filed by Customer and each Guarantor have been filed with the appropriate governmental agencies and all taxes due and payable by Customer and each Guarantor have been timely paid (except to the extent that any such failure to file or pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer).

(i) **Collateral Location.** All of the tangible Collateral is located at a Location of Tangible Collateral.

(j) **No Outside Broker.** Except for employees of MLBFS, MLPF&S or one of their affiliates, Customer has not in connection with the transactions contemplated hereby directly or indirectly engaged or dealt with, and was not introduced or referred to MLBFS by, any broker or other loan arranger.

Each of the foregoing representations and warranties: (i) has been and will be relied upon as an inducement to MLBFS to make the Loan and each Subsequent WCMA Loan, and (ii) is continuing and shall be deemed remade by Customer on the Closing Date, and concurrently with each request by Customer for a Subsequent WCMA Loan.

**4.2 Financial and Other Information.**

(a)   Customer shall furnish or cause to be furnished to MLBFS during the term of this Loan Agreement all of the following:

(i)   **Annual Financial Statements.** Within 120 days after the close of each fiscal year of Customer, a copy of the annual reviewed financial statements of Customer, including in reasonable detail, a balance sheet and statement of retained earnings as at the close of such fiscal year and statements of profit and loss and cash flow for such fiscal year;

(ii)   **Interim Financial Statements.** Within 45 days after the close of each fiscal quarter of Customer, a copy of the interim financial statements of Customer for such fiscal quarter (including in reasonable detail both a balance sheet as of the close of such fiscal period, and statement of profit and loss for the applicable fiscal period);

(iii)   **Tax Returns.** Not later than 15 days after the date filed with the Internal Revenue Service, a copy of each annual Federal Income Tax Return of Customer and each individual Guarantor;

(iv)   **A/R Agings.** Within 15 days after the close of each fiscal month of Customer, a copy of the Accounts Receivable Aging of Customer as of the end of such fiscal month;

(v)   **Inventory Reports.** Within 15 days after the close of each fiscal month of Customer, a copy of the Inventory Report (as and to the extent applicable, breaking out Inventory by location, and separately reporting any work in process) of Customer as of the end of such fiscal month; and

(vi)   **Other Information.** Such other information as MLBFS may from time to time reasonably request relating to Customer, any Guarantor or the Collateral.

(b)   **General Agreements With Respect to Financial Information.** Customer agrees that except as otherwise specified herein or otherwise agreed to in writing by MLBFS: (i) all annual financial statements required to be furnished by Customer to MLBFS hereunder will be prepared by either the current independent accountants for Customer or other independent accountants reasonably acceptable to MLBFS, and (ii) all other financial information required to be furnished by Customer to MLBFS hereunder will be certified as correct in all material respects by the party who has prepared such information, and, in the case of internally prepared information with respect to Customer, certified as correct by its chief financial officer.

**4.3 Other Covenants.** Customer further covenants and agrees during the term of this Loan Agreement that:

(a)   **Financial Records; Inspection.** Customer will: (i) maintain at its principal place of business complete and accurate books and records, and maintain all of its financial records in a manner consistent with the financial statements heretofore furnished to MLBFS, or prepared on such other basis as may be approved in writing by MLBFS; and (ii) permit MLBFS or its duly authorized representatives, upon reasonable notice and at reasonable times, to inspect its properties (both real and personal), operations, books and records.

(b)   **Taxes.** Customer and each Guarantor will pay when due all taxes, assessments and other governmental charges, howsoever designated, and all other liabilities and obligations, except to the extent that any such failure to pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor or the continued operations of Customer.

(c)   **Compliance With Laws and Agreements.** Neither Customer nor any Guarantor will violate any law, regulation or other governmental requirement, any judgment or order of any court or governmental agency or authority, or any agreement, instrument or document to which it is a party or by which it is bound, if any such violation will materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer.

(d)   **No Use of Merrill Lynch Name.** Except upon the prior written consent of MLBFS, neither Customer nor any Guarantor will directly or indirectly publish, disclose or otherwise use in any advertising or promotional material, or press release or interview, the name, logo or any trademark of MLBFS, MLPF&S, Merrill Lynch and Co., Incorporated or any of their affiliates.

(e)   **Notification By Customer.** Customer shall provide MLBFS with prompt written notification of: (i) any Default; (ii) any materially adverse change in the business, financial condition or operations of Customer; (iii) any information which indicates that any financial statements of Customer or any Guarantor fail in any material respect to present fairly the financial condition and results of operations purported to be presented in such statements; and (iv) any change in Customer's outside accountants. Each notification by Customer pursuant hereto shall specify the event or information causing such notification, and, to the extent applicable, shall specify the steps being taken to rectify or remedy such event or information.

(f)   **Notice of Change.** Customer shall give MLBFS not less than 30 days prior written notice of any change in the name (including any fictitious name) or principal place of business or residence of Customer or any Guarantor.

(g)   **Continuity.** Except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld: (i) Customer shall not be a party to any merger or consolidation with, or purchase or otherwise acquire all or substantially all of the assets of, or any material stock, partnership, joint venture or other equity interest in, any person or entity, or sell, transfer or lease all or any substantial part of its assets, if any such action would result in either: (A) a material change in the principal business, ownership or control of Customer, or (B) a material adverse change in the financial condition of Customer; (ii) Customer shall preserve its existence and good standing in the jurisdiction(s) of establishment and operation; (iii) Customer shall not engage in any material business substantially different from its business in effect as of the date of application by Customer for credit from MLBFS, or cease operating any such

material business; (iv) Customer shall not cause or permit any other person or entity to assume or succeed to any material business or operations of Customer; and (v) Customer shall not cause or permit any material change in its controlling ownership.

(h) **Minimum Tangible Net Worth.** Customer's "tangible net worth" shall at all times exceed $2,000,000.00. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(i) **Debt to Tangible Net Worth.** The ratio of Customer's total debt to Customer's tangible net worth shall not at any time exceed 2.0 to 1.

### 4.4 Collateral

(a) **Pledge of Collateral.** To secure payment and performance of the Obligations, Customer hereby pledges, assigns, transfers and sets over to MLBFS, and grants to MLBFS first liens and security interests in and upon all of the Collateral, subject only to Permitted Liens.

(b) **Liens.** Except upon the prior written consent of MLBFS, Customer shall not create or permit to exist any lien, encumbrance or security interest upon or with respect to any Collateral now owned or hereafter acquired other than Permitted Liens.

(c) **Performance of Obligations.** Customer shall perform all of its obligations owing on account of or with respect to the Collateral; it being understood that nothing herein, and no action or inaction by MLBFS, under this Loan Agreement or otherwise, shall be deemed an assumption by MLBFS of any of Customer's said obligations.

(d) **Sales and Collections.** So long as no Event of Default shall have occurred and be continuing, Customer may in the ordinary course of its business: (i) sell any Inventory normally held by Customer for sale, (ii) use or consume any materials and supplies normally held by Customer for use or consumption, and (iii) collect all of its Accounts. Customer shall take such action with respect to protection of its Inventory and the other Collateral and the collection of its Accounts as MLBFS may from time to time reasonably request.

(e) **Account Schedules.** Upon the request of MLBFS, made now or at any reasonable time or times hereafter, Customer shall deliver to MLBFS, in addition to the other information required hereunder, a schedule identifying, for each Account and all Chattel Paper subject to MLBFS' security interests hereunder, each Account Debtor by name and address and amount, invoice or contract number and date of each invoice or contract. Customer shall furnish to MLBFS such additional information with respect to the Collateral, and amounts received by Customer as proceeds of any of the Collateral, as MLBFS may from time to time reasonably request.

(f) **Location.** Except for movements required in the ordinary course of Customer's business, Customer shall give MLBFS 30 days' prior written notice of the placing at or movement of any tangible Collateral to any location other than a Location of Tangible Collateral. In no event shall Customer cause or permit any material tangible Collateral to be removed from the United States without the express prior written consent of MLBFS.

(g) **Insurance.** Customer shall insure all of the tangible Collateral under a policy or policies of physical damage insurance providing that losses will be payable to MLBFS as its interests may appear pursuant to a Lender's Loss Payable Endorsement and containing such other provisions as may be reasonably required by MLBFS. Customer shall further provide and maintain a policy or policies of comprehensive public liability insurance naming MLBFS as an additional party insured. Customer shall maintain such other insurance as may be required by law or is customarily maintained by companies in a similar business or otherwise reasonably required by MLBFS. All such insurance policies shall provide that MLBFS will receive not less than 10 days prior written notice of any cancellation, and shall otherwise be in form and amount and with an insurer or insurers reasonably acceptable to MLBFS. Customer shall furnish MLBFS with a copy or certificate of each such policy or policies and, prior to any expiration or cancellation, each renewal or replacement thereof.

(h) **Event of Loss.** Customer shall at its expense promptly repair all repairable damage to any tangible Collateral. In the event that any tangible Collateral is damaged beyond repair, lost, totally destroyed or confiscated (an "Event of Loss") and such Collateral had a value prior to such Event of Loss of $25,000.00 or more, then, on or before the first to occur of (i) 90 days after the occurrence of such Event of Loss, or (ii) 10 Business Days after the date on which either Customer or MLBFS shall receive any proceeds of insurance on account of such Event of Loss, or any underwriter of insurance on such Collateral shall advise either Customer or MLBFS that it disclaims liability in respect of such Event of Loss, Customer shall, at Customer's option, either replace the Collateral subject to such Event of Loss with comparable Collateral free of all liens other than Permitted Liens (in which event Customer shall be entitled to utilize the proceeds of insurance on account of such Event of Loss for such purpose, and may retain any excess proceeds of such insurance), or permanently prepay the Loan by an amount equal to the actual cash value of such Collateral as determined by either the insurance company's payment (plus any applicable deductible) or, in absence of insurance company payment, as reasonably determined by MLBFS; it being further understood that any such permanent prepayment shall be accompanied by a like permanent reduction in the Maximum WCMA Line of Credit. Notwithstanding the foregoing, if at the time of occurrence of such Event of Loss or any time thereafter prior to replacement or line reduction, as aforesaid, an Event of Default shall have occurred and be continuing hereunder, then MLBFS may at its sole option, exercisable at any time while such Event of Default shall be continuing, require Customer to either replace such Collateral or prepay the Loan and reduce the Maximum WCMA Line of Credit, as aforesaid.

(i) **Notice of Certain Events.** Customer shall give MLBFS immediate notice of any attachment, lien, judicial process, encumbrance or claim affecting or involving $25,000.00 or more of the Collateral.

(j) **Indemnification.** Customer shall indemnify, defend and save MLBFS harmless from and against any and all claims, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any nature whatsoever which may be asserted against or incurred by MLBFS arising out of or in any manner occasioned by (i) the ownership, collection, possession, use or operation of any Collateral, or (ii) any failure by Customer to perform any of its obligations hereunder; excluding, however, from said indemnity any such claims, liabilities, etc. arising directly out of the

willful wrongful act or active gross negligence of MLBFS. This indemnity shall survive the expiration or termination of this Loan Agreement as to all matters arising or accruing prior to such expiration or termination.

**4.5 Events of Default.**

The occurrence of any of the following events shall constitute an "Event of Default" under this Loan Agreement:

(a) **Failure to Pay.** (i) Customer shall fail to deposit into the WCMA Account an amount sufficient to assure that the WCMA Loan Balance does not exceed the Maximum WCMA Line of Credit, as reduced in accordance with the provisions hereof, or (ii) Customer shall fail to pay to MLBFS or deposit into the WCMA Account when due any other amount owing or required to be paid or deposited by Customer under this Loan Agreement, or (iii) Customer shall fail to pay when due any other Obligations; and any such failure shall continue for more than five (5) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(b) **Failure to Perform.** Customer or any Guarantor shall default in the performance or observance of any covenant or agreement on its part to be performed or observed under this Loan Agreement or any of the Additional Agreements (not constituting an Event of Default under any other clause of this Section), and such default shall continue unremedied for ten (10) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(c) **Breach of Warranty.** Any representation or warranty made by Customer or any Guarantor contained in this Loan Agreement or any of the other Additional Agreements shall at any time prove to have been incorrect in any material respect when made.

(d) **Default Under Other Agreement.** A default or Event of Default by Customer or any Guarantor shall occur under the terms of any other agreement, instrument or document with or intended for the benefit of MLBFS, MLPF&S or any of their affiliates, and any required notice shall have been given and required passage of time shall have elapsed.

(e) **Bankruptcy Event.** Any Bankruptcy Event shall occur.

(f) **Material Impairment.** Any event shall occur which shall reasonably cause MLBFS to in good faith believe that the prospect of full payment or performance by Customer or any Guarantor of any of their respective liabilities or obligations under this Loan Agreement or, any of the Additional Agreements to which Customer or such Guarantor is a party has been materially impaired. The existence of such a material impairment shall be determined in a manner consistent with the intent of Section 1-208 of the UCC.

(g) **Acceleration of Debt to Other Creditors.** Any event shall occur which results in the acceleration of the maturity of any indebtedness of $100,000.00 or more of Customer or any Guarantor to another creditor under any indenture, agreement, undertaking, or otherwise.

(h) **Seizure or Abuse of Collateral.** The Collateral, or any material part thereof, shall be or become subject to any material abuse or misuse, or any levy, attachment, seizure or confiscation which is not released within ten (10) Business Days.

**4.6 Remedies.**

(a) **Remedies Upon Default.** Upon the occurrence and during the continuance of any Event of Default, MLBFS may at its sole option do any one or more or all of the following, at such time and in such order as MLBFS may in its sole discretion choose:

(i) **Termination.** MLBFS may without notice terminate its obligation to make the Loan (if the Loan has not then been funded), terminate the WCMA Line of Credit, and terminate any obligation to make any Subsequent WCMA Loan (including, without limitation, any Subsequent WCMA Loan to pay accrued interest) or otherwise extend any credit to or for the benefit of Customer (it being understood that upon the occurrence of any Bankruptcy Event the WCMA Line of Credit and all such obligations shall automatically terminate without any action on the part of MLBFS); and upon any such termination MLBFS shall be relieved of all such obligations.

(ii) **Acceleration.** MLBFS may declare the WCMA Loan Balance and all other Obligations to be forthwith due and payable, whereupon all such amounts shall be immediately due and payable, without presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate or other notice or formality of any kind, all of which are hereby expressly waived; provided, however, that upon the occurrence of any Bankruptcy Event the WCMA Loan Balance and other Obligations shall automatically become due and payable without any action on the part of MLBFS.

(iii) **Exercise Other Rights.** MLBFS may exercise any or all of the remedies of a secured party under applicable law, including, but not limited to, the UCC, and any or all of its other rights and remedies under this Loan Agreement and the Additional Agreements.

(iv) **Possession.** MLBFS may require Customer to make the Collateral and the records pertaining to the Collateral available to MLBFS at a place designated by MLBFS which is reasonably convenient to Customer, or may take possession of the Collateral and the records pertaining to the Collateral without the use of any judicial process and without any prior notice to Customer.

(v) **Sale.** MLBFS may sell any or all of the Collateral at public or private sale upon such terms and conditions as MLBFS may reasonably deem proper. MLBFS may purchase any Collateral at any such public sale. The net proceeds of any such public or private sale and all other amounts actually collected or received by MLBFS pursuant hereto, after deducting all costs and expenses incurred at any time in the collection of the Obligations and in the protection,

collection and sale of the Collateral, will be applied to the payment of the Obligations, with any remaining proceeds paid to Customer or whoever else may be entitled thereto, and with Customer and each Guarantor remaining jointly and severally liable for any amount remaining unpaid after such application.

(vi) **Delivery of Cash, Checks, Etc.** MLBFS may require Customer to forthwith upon receipt, transmit and deliver to MLBFS in the form received, all cash, checks, drafts and other instruments for the payment of money (properly endorsed, where required, so that such items may be collected by MLBFS) which may be received by Customer at any time in full or partial payment of any Collateral, and require that Customer not commingle any such items which may be so received by Customer with any other of its funds or property but instead hold them separate and apart and in trust for MLBFS until delivery is made to MLBFS.

(vii) **Notification of Account Debtors.** MLBFS may notify any Account Debtor that its Account or Chattel Paper has been assigned to MLBFS and direct such Account Debtor to make payment directly to MLBFS of all amounts due or becoming due with respect to such Account or Chattel Paper; and MLBFS may enforce payment and collect, by legal proceedings or otherwise, such Account or Chattel Paper.

(viii) **Control of Collateral.** MLBFS may otherwise take control in any lawful manner of any cash or non-cash items of payment or proceeds of Collateral and of any rejected, returned, stopped in transit or repossessed goods included in the Collateral and endorse Customer's name on any item of payment on or proceeds of the Collateral.

(b) **Set-Off.** MLBFS shall have the further right upon the occurrence and during the continuance of an Event of Default to set-off, appropriate and apply toward payment of any of the Obligations, in such order of application as MLBFS may from time to time and at any time elect, any cash, credit, deposits, accounts, financial assets, investment property, securities and any other property of Customer which is in transit to or in the possession, custody or control of MLBFS, MLPF&S or any agent, bailee, or affiliate of MLBFS or MLPF&S. Customer hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional Collateral.

(c) **Power of Attorney.** Effective upon the occurrence and during the continuance of an Event of Default, Customer hereby irrevocably appoints MLBFS as its attorney-in-fact, with full power of substitution, in its place and stead and in its name or in the name of MLBFS, to from time to time in MLBFS' sole discretion take any action and to execute any instrument which MLBFS may deem necessary or advisable to accomplish the purposes of this Loan Agreement, including, but not limited to, to receive, endorse and collect all checks, drafts and other instruments for the payment of money made payable to Customer included in the Collateral.

(d) **Remedies are Severable and Cumulative.** All rights and remedies of MLBFS herein are severable and cumulative and in addition to all other rights and remedies available in the Additional Agreements, at law or in equity, and any one or more of such rights and remedies may be exercised simultaneously or successively.

(e) **Notices.** To the fullest extent permitted by applicable law, Customer hereby irrevocably waives and releases MLBFS of and from any and all liabilities and penalties for failure of MLBFS to comply with any statutory or other requirement imposed upon MLBFS relating to notices of sale, holding of sale or reporting of any sale, and Customer waives all rights of redemption or reinstatement from any such sale. Any notices required under applicable law shall be reasonably and properly given to Customer if given by any of the methods provided herein at least 5 Business Days prior to taking action. MLBFS shall have the right to postpone or adjourn any sale or other disposition of Collateral at any time without giving notice of any such postponed or adjourned date. In the event MLBFS seeks to take possession of any or all of the Collateral by court process, Customer further irrevocably waives to the fullest extent permitted by law any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession, and any demand for possession prior to the commencement of any suit or action.

**4.7 Miscellaneous.**

(a) **Non-Waiver.** No failure or delay on the part of MLBFS in exercising any right, power or remedy pursuant to this Loan Agreement or any of the Additional Agreements shall operate as a waiver thereof, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy. Neither any waiver of any provision of this Loan Agreement or any of the Additional Agreements, nor any consent to any departure by Customer therefrom, shall be effective unless the same shall be in writing and signed by MLBFS. Any waiver of any provision of this Loan Agreement or any of the Additional Agreements and any consent to any departure by Customer from the terms thereof shall be effective only in the specific instance and for the specific purpose for which given. Except as otherwise expressly provided herein, no notice to or demand on Customer shall in any case entitle Customer to any other or further notice or demand in similar or other circumstances.

(b) **Disclosure.** Customer hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Customer.

(c) **Communications.** All notices and other communications required or permitted hereunder or in connection with any of the Additional Agreements shall be in writing, and shall be either delivered personally, mailed by postage prepaid certified mail or sent by express overnight courier or by facsimile. Such notices and communications shall be deemed to be given on the date of personal delivery, facsimile transmission or actual delivery of certified mail, or one Business Day after delivery to an express overnight courier. Unless otherwise specified in a notice sent or delivered in accordance with the terms hereof, notices and other communications in writing shall be given to the parties hereto at their respective addresses set forth at the beginning of this Loan Agreement, or, in the case of facsimile transmission, to the parties at their respective regular facsimile telephone number.

(d) **Fees, Expenses and Taxes.** Customer shall pay or reimburse MLBFS for: (i) all Uniform Commercial Code filing and search fees and expenses incurred by MLBFS in connection with the verification, perfection or preservation of MLBFS' rights hereunder or in the Collateral or any other collateral for the Obligations; (ii) any and all stamp, transfer and other taxes and fees payable or determined to be payable in connection with the execution, delivery and/or

recording of this Loan Agreement or any of the Additional Agreements; and (iii) all reasonable fees and out-of-pocket expenses (including, but not limited to, reasonable fees and expenses of outside counsel) incurred by MLBFS in connection with the collection of any sum payable hereunder or under any of the Additional Agreements not paid when due, the enforcement of this Loan Agreement or any of the Additional Agreements and the protection of MLBFS' rights hereunder or thereunder, excluding, however, salaries and normal overhead attributable to MLBFS' employees. Customer hereby authorizes MLBFS, at its option, to either cause any and all such fees, expenses and taxes to be paid with a WCMA Loan, or invoice Customer therefor (in which event Customer shall pay all such fees, expenses and taxes within 5 Business Days after receipt of such invoice). The obligations of Customer under this paragraph shall survive the expiration or termination of this Loan Agreement and the discharge of the other Obligations.

(e) **Right to Perform Obligations.** If Customer shall fail to do any act or thing which it has covenanted to do under this Loan Agreement or any representation or warranty on the part of Customer contained in this Loan Agreement shall be breached, MLBFS may, in its sole discretion, after 5 Business Days written notice is sent to Customer (or such lesser notice, including no notice, as is reasonable under the circumstances), do the same or cause it to be done or remedy any such breach, and may expend its funds for such purpose. Any and all reasonable amounts so expended by MLBFS shall be repayable to MLBFS by Customer upon demand, with interest at the Interest Rate during the period from and including the date funds are so expended by MLBFS to the date of repayment, and all such amounts shall be additional Obligations. The payment or performance by MLBFS of any of Customer's obligations hereunder shall not relieve Customer of said obligations or of the consequences of having failed to pay or perform the same, and shall not waive or be deemed a cure of any Default.

(f) **Further Assurances.** Customer agrees to do such further acts and things and to execute and deliver to MLBFS such additional agreements, instruments and documents as MLBFS may reasonably require or deem advisable to effectuate the purposes of this Loan Agreement or any of the Additional Agreements, or to establish, perfect and maintain MLBFS' security interests and liens upon the Collateral, including, but not limited to: (i) executing financing statements or amendments thereto when and as reasonably requested by MLBFS; and (ii) if in the reasonable judgment of MLBFS it is required by local law, causing the owners and/or mortgagees of the real property on which any Collateral may be located to execute and deliver to MLBFS waivers or subordinations reasonably satisfactory to MLBFS with respect to any rights in such Collateral.

(g) **Binding Effect.** This Loan Agreement and the Additional Agreements shall be binding upon, and shall inure to the benefit of MLBFS, Customer and their respective successors and assigns. Customer shall not assign any of its rights or delegate any of its obligations under this Loan Agreement or any of the Additional Agreements without the prior written consent of MLBFS. Unless otherwise expressly agreed to in a writing signed by MLBFS, no such consent shall in any event relieve Customer of any of its obligations under this Loan Agreement or any of the Additional Agreements.

(h) **Headings.** Captions and section and paragraph headings in this Loan Agreement are inserted only as a matter of convenience, and shall not affect the interpretation hereof.

(i) **Governing Law.** This Loan Agreement and, unless otherwise expressly provided therein, each of the Additional Agreements, shall be governed in all respects by the laws of the State of Illinois.

(j) **Severability of Provisions.** Whenever possible, each provision of this Loan Agreement and the Additional Agreements shall be interpreted in such manner as to be effective and valid under applicable law. Any provision of this Loan Agreement or any of the Additional Agreements which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Loan Agreement and the Additional Agreements or affecting the validity or enforceability of such provision in any other jurisdiction.

(k) **Term.** This Loan Agreement shall become effective on the date accepted by MLBFS at its office in Chicago, Illinois, and, subject to the terms hereof, shall continue in effect so long thereafter as: (i) MLBFS shall be obligated to make the Loan, (ii) the WCMA Line of Credit shall be in effect, (iii) there shall be any moneys outstanding under this Loan Agreement, or (iv) there shall be any other Obligations outstanding.

(l) **Counterparts.** This Loan Agreement may be executed in one or more counterparts which, when taken together, constitute one and the same agreement.

(m) **Jurisdiction; Waiver.** CUSTOMER ACKNOWLEDGES THAT THIS LOAN AGREEMENT IS BEING ACCEPTED BY MLBFS IN PARTIAL CONSIDERATION OF MLBFS' RIGHT AND OPTION, IN ITS SOLE DISCRETION, TO ENFORCE THIS LOAN AGREEMENT AND THE ADDITIONAL AGREEMENTS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE CUSTOMER OR ANY COLLATERAL FOR THE OBLIGATIONS MAY BE LOCATED. CUSTOMER IRREVOCABLY SUBMITS ITSELF TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND CUSTOMER WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM, AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT. CUSTOMER FURTHER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS. MLBFS AND CUSTOMER HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LOAN, THIS LOAN AGREEMENT, ANY ADDITIONAL AGREEMENTS AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS LOAN AGREEMENT. CUSTOMER FURTHER WAIVES THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS.

(n) **Integration.** THIS LOAN AGREEMENT, TOGETHER WITH THE ADDITIONAL AGREEMENTS, CONSTITUTES THE ENTIRE UNDERSTANDING AND REPRESENTS THE FULL AND FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR WRITTEN AGREEMENTS OR PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS OF THE PARTIES. WITHOUT LIMITING THE FOREGOING, CUSTOMER ACKNOWLEDGES THAT: (i) NO PROMISE OR COMMITMENT HAS BEEN MADE TO IT BY MLBFS, MLPF&S OR ANY OF THEIR

RESPECTIVE EMPLOYEES, AGENTS OR REPRESENTATIVES TO MAKE THE LOAN OR ANY SUBSEQUENT WCMA LOAN ON ANY TERMS OTHER THAN AS EXPRESSLY SET FORTH HEREIN, OR TO MAKE ANY OTHER LOAN OR OTHERWISE EXTEND ANY OTHER CREDIT TO CUSTOMER OR ANY OTHER PARTY; AND (II) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THIS LOAN AGREEMENT SUPERSEDES AND REPLACES ANY AND ALL PROPOSALS, LETTERS OF INTENT AND APPROVAL AND COMMITMENT LETTERS FROM MLBFS TO CUSTOMER, NONE OF WHICH SHALL BE CONSIDERED AN ADDITIONAL AGREEMENT. NO AMENDMENT OR MODIFICATION OF THIS AGREEMENT OR ANY OF THE ADDITIONAL AGREEMENTS TO WHICH CUSTOMER IS A PARTY SHALL BE EFFECTIVE UNLESS IN A WRITING SIGNED BY BOTH MLBFS AND CUSTOMER.

IN WITNESS WHEREOF, this Loan Agreement has been executed as of the day and year first above written.

SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST

By: _____          _____
            Signature (1)                                    Signature (2)

C. Leo Smith                                    _____
            Printed Name                                     Printed Name

President                                       _____
            Title                                            Title


STATE OF GEORGIA        }
                        } SS.
COUNTY OF CLAYTON       }


The foregoing instrument was acknowledged before me this day of 5th APRIL, AD, 2000 by CHRISTIAN L. SMITH of SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST, a Florida corporation, on behalf of the corporation. Said person is personally known to me or has produced FLORIDA DRIVER LICENSE as identification.

_____
NOTARY PUBLIC

SHERRY W. WATKINS
PRINTED NAME OF NOTARY PUBLIC


My Commission Expires:  10-08-01

Notary Public, Clayton County, Georgia
My Commission Expires October 8, 2001
            [S E A L]


Accepted at Chicago, Illinois:
MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.

By: _____

## EXHIBIT A

**ATTACHED TO AND HEREBY MADE A PART OF WCMA REDUCING REVOLVER™ LOAN AND SECURITY AGREEMENT NO. 741-07L65 BETWEEN MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. AND SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**

**Additional Locations of Tangible Collateral:**

3141 W. McNab Road
Pompano Beach, FL  33069

768 NW 57th Court
Fort Lauderdale, FL  33309

# Merrill Lynch

**SECRETARY'S CERTIFICATE**

*Date*

The undersigned hereby certifies to **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.** that the undersigned is the duly appointed and acting Secretary (or Assistant Secretary) of **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a corporation duly organized, validly existing and in good standing under the laws of the State of Florida; and that the following is a true, accurate and compared transcript of resolutions duly, validly and lawfully adopted on the ___3___ day of __April__, 2000 by the Board of Directors of said Corporation acting in accordance with the laws of the state of incorporation and the charter and by-laws of said Corporation:

"RESOLVED, that this Corporation is authorized and empowered, now and from time to time hereafter, to borrow and/or obtain credit from, and/or enter into other financial arrangements with, **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.** ("MLBFS"), and in connection therewith to grant to MLBFS liens and security interests on any or all property belonging to this Corporation; all such transactions to be on such terms and conditions as may be mutually agreed from time to time between this Corporation and MLBFS; and

"FURTHER RESOLVED, that the President, any Vice President, Treasurer, Secretary or other officer of this Corporation, or any one or more of them, be and each of them hereby is authorized and empowered to: (a) execute and deliver to MLBFS on behalf of this Corporation any and all loan agreements, promissory notes, security agreements, pledge agreements, financing statements, mortgages, deeds of trust, leases and/or other agreements, instruments and documents required by MLBFS in connection therewith, and any present or future extensions, amendments, supplements, modifications and restatements thereof; all in such form as any such officer shall approve, as conclusively evidenced by his or her signature thereon, and (b) do and perform all such acts and things deemed by any such officer to be necessary or advisable to carry out and perform the undertakings and agreements of this Corporation in connection therewith; and any and all prior acts of each of said officers in these premises are hereby ratified and confirmed in all respects; and

"FURTHER RESOLVED, that MLBFS is authorized to rely upon the foregoing resolutions until it receives written notice of any change or revocation from an authorized officer of this Corporation, which change or revocation shall not in any event affect the obligations of this Corporation with respect to any transaction conditionally agreed or committed to by MLBFS or having its inception prior to the receipt of such notice by MLBFS."

The undersigned further certifies that: (a) the foregoing resolutions have not been rescinded, modified or repealed in any manner, are not in conflict with any agreement of said Corporation and are in full force and effect as of the date of this Certificate, and (b) the following individuals are now the duly elected and acting officers of said Corporation and the signatures set forth below are the true signatures of said officers:

President: X _____

Vice President: X _____

Treasurer: X _____

Secretary: X _____

Additional Title: _____

*Date*

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate and has affixed the seal of said Corporation hereto, pursuant to due authorization, all as of this ___3___ day of __April__, 2000.

(Corporate Seal)

_____
Secretary

Printed Name: _____ Leo Smith.



Private Client Group

**Merrill Lynch Business**
**Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

November 2, 2000

Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

**Re: Amendment to Loan Documents**

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L65** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) Customer's "tangible net worth" shall at all times exceed $1,800,000.00. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to: (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(b) The ratio of Customer's total debt to Customer's tangible net worth, determined as aforesaid, shall not at any time exceed 2.5 to 1.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date

ME    .YNCH BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc. d/b/a Ameriplast
November 2, 2000
Page No. 2

hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

**MLBFS requests that as soon as feasible Customer furnish to MLBFS the following item (however, the Effective Date of this Letter Agreement is not conditioned upon the receipt of the such item):**

> ### A UCC-3 termination from BankAtlantic

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) an officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
Stewart T. Newman
Senior Relationship Manager

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name: _____C. Leo Smith_____

Title: _____PRESIDENT_____

Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253


**Merrill Lynch**

April 20, 2001

Mr. Steve Meistle
Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

Re: **Amendment To Loan Documents**

Dear Mr. Meistle,

Enclosed herewith is a Letter Agreement amending the documents evidencing our loans or extensions of credit.

Please note that, among other conditions in said Letter Agreement, in order for this amendment to become effective, one copy of the enclosed Letter Agreement must be fully executed and returned to me within 14 days from the date hereof.

If you have any questions, please call me at (312) 499-3306.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
Stewart T. Newman
Senior Relationship Manager

cc: Rob Dixon

1) EVIDENCE OF INSURANCE

Smith International Enterprises, Inc. d/b/a Ameriplast
November 2, 2000
Page No. 3

*Approved:*

_____
C. Leo Smith

_____
Pilar Concha

g:\word\admin\tay\portfolio\smith international enterprises (amndt 1).doc

Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

 **Merrill Lynch**

April 20, 2001

Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

### Re: Amendment to Loan Documents

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA REDUCING REVOLVER LOAN AND SECURITY AGREEMENT NO. 741-07L65** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) Customer's "tangible net worth" shall at all times exceed $1,750,000.00. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to: (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(b) The ratio of Customer's total debt to Customer's tangible net worth, determined as aforesaid, shall not at any time exceed 4.25 to 1.

(c) The "Net Cash Flow" of Customer as of the end of each of its fiscal years shall not be less than $100,000.00. As used herein, "Net Cash Flow" shall mean the (i) the sum of Customer's annual net after-tax income, any non-recurring expenses and depreciation and similar non-cash charges, less (ii) the sum of the current portion of Customer's long term debt, any non-recurring income and any dividends or other distributions to its owners; all as set forth on Customer's regular annual financial statements prepared in a manner consistent with the terms hereof.

(d) In addition to existing requirements, Customer shall provide to MLBFS:

Within 120 days after the close of each fiscal year of Customer, a copy of the annual audited financial statements of Customer, including in reasonable detail, a balance sheet and statement of retained earnings as at the close of such fiscal year and statements of profit and loss and cash flow for such fiscal year.

Smith International Enterprises, Inc. d/b/a Ameriplast
April 20, 2001
Page No. 2

(e) Customer is no longer required to submit Corporate Tax Returns to MLBFS.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

**MLBFS requests that as soon as feasible Customer furnish to MLBFS the following item (however, the Effective Date of this Letter Agreement is not conditioned upon the receipt of the such item):**

A copy of each individual Guarantor's current personal financial statement and 2000 personal tax returns.

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) an officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
      Stewart T. Newman
      Senior Relationship Manager

MERRILL      CH BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc. d/b/a Ameriplast
April 20, 2001
Page No. 3

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name: _____

Title: _____

*Approved:*

_____
C. Leo Smith

_____
Pilar Concha

g:\word\administ\documentation\renewal letters\smith international enterprises coven-amend2.doc

Private Client Group

**Merrill Lynch Business Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312)845-9093

 **Merrill Lynch**

June 22, 2001

Smith International Enterprises, Inc. d/b/a Ameriplast
6290 NW 27th Way
Fort Lauderdale, FL 33309

### Re: Amendment to Loan Documents

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA REDUCING REVOLVER LOAN AND SECURITY AGREEMENT NO. 741-07L65** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) The ratio of Customer's total debt to Customer's tangible net worth shall not at any time exceed 5 to 1. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(b) "Obligations" shall mean all liabilities, indebtedness and other obligations of Customer to MLBFS, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary or joint or several, and, without limiting the foregoing, shall include interest accruing after the filing of any petition in bankruptcy, and all present and future liabilities, indebtedness and obligations of Customer under this Loan Agreement and under that certain WCMA Loan and Security Agreement No. 741-07L64.

(c) For all purposes of the Loan Documents, Customer's address shall be 6290 NW 27th Way, Fort Lauderdale, FL 33309.

Smith International Enterprises, Inc. d/b/a Ameriplast
June 22, 2001
Page No. 2

(d) In addition to existing requirements, Customer shall provide to MLBFS:

• Not later than 120 days after the close of each fiscal year of Customer, a current signed financial statement of each individual Guarantor.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) an officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____

  Stewart T. Newman
  Senior Relationship Manager

Smith International Enterprises, Inc. d/b/a Ameriplast
June 22, 2001
Page No. 3

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name: _____

Title: _____

*Approved:*

_____
**C. Leo Smith**

_____
**Pilar Concha**

g:\word\admin\sy\portfolio\smith international enterprises (amdnt rr).doc



**Merrill Lynch**

**UNCONDITIONAL GUARANTY**

**FOR VALUE RECEIVED**, and in order to induce **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.** ("MLBFS") to advance moneys or extend or continue to extend credit or lease property to or for the benefit of, or modify its credit relationship with, or enter into any other financial accommodations with **SMITH INTERNATIONAL ENTERPRISES, INC.** D/B/A **AMERIPLAST**, a corporation organized and existing under the laws of the State of Florida (with any successor in interest, including, without limitation, any successor by merger or by operation of law, herein collectively referred to as "Customer") under: (a) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L84** between MLBFS and Customer; (b) that certain **WCMA REDUCING REVOLVER LOAN AND SECURITY AGREEMENT NO. 741-07L85** between MLBFS and Customer (collectively, the "Loan Agreements"); (c) any "Additional Agreements", as that term is defined in the Loan Agreements; and (d) all present and future amendments, restatements, supplements and other evidences of any extensions, increases, renewals, modifications and other changes of or to the Loan Agreements or Additional Agreements (collectively, the "Guaranteed Documents"), the undersigned (individually, "Guarantor", and collectively "Guarantors") hereby jointly and severally unconditionally guarantee to MLBFS (subject, however, to the limitation of liability hereinafter set forth): (i) the prompt and full payment when due, by acceleration or otherwise, of all sums now or any time hereafter due from Customer to MLBFS under the Guaranteed Documents, (ii) the prompt, full and faithful performance and discharge by Customer of each and every other covenant and warranty of Customer set forth in the Guaranteed Documents, and (iii) the prompt and full payment and performance of all other indebtedness, liabilities and obligations of Customer to MLBFS, howsoever created or evidenced, and whether now existing or hereafter arising (collectively, the "Obligations"). Guarantors further agree to pay all reasonable costs and expenses (including, but not limited to, court costs and reasonable attorneys' fees) paid or incurred by MLBFS in endeavoring to collect or enforce performance of any of the Obligations, or in enforcing this Guaranty. Guarantors acknowledge that MLBFS is relying on the execution and delivery of this Guaranty in advancing moneys or extending or continuing to extend credit to or for the benefit of Customer.

This Guaranty is absolute, unconditional and continuing and shall remain in effect until all of the Obligations shall have been fully and indefeasibly paid, performed and discharged. Upon the occurrence and during the continuance of any default or Event of Default under any of the Guaranteed Documents, any or all of the Indebtedness guaranteed then existing shall, at the option of MLBFS, become immediately due and payable from Guarantors (if not sooner payable, including upon the occurrence of any "Bankruptcy Event", as defined in the Loan Agreements), all such Indebtedness automatically become due and payable without action on the part of MLBFS). Notwithstanding the occurrence of any such event, this Guaranty shall continue and remain in full force and effect. To the extent MLBFS receives payment with respect to the Obligations, and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, required to be repaid by MLBFS or is repaid by MLBFS pursuant to a settlement agreement, to a trustee, receiver or any other person or entity, whether under any Bankruptcy law or otherwise (a "Returned Payment"), this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by MLBFS, and the Indebtedness or part thereof intended to be satisfied by such Returned Payment shall be revived and continued in full force and effect as if said Returned Payment had not been made.

The liability of Guarantors hereunder shall in no event be affected or impaired by any of the following, any of which may be done or omitted by MLBFS from time to time, without notice to or the consent of any Guarantor: (a) any renewals, amendments, modifications or supplements of or to any of the Guaranteed Documents, or any extensions, forbearances, compromises or releases of any of the Obligations or any of MLBFS' rights under any of the Guaranteed Documents; (b) any acceptance by MLBFS of any collateral or security for, or other guarantees of, any of the Obligations; (c) any failure, neglect or omission on the part of MLBFS to realize upon or protect any of the Obligations, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of Customer or any other guarantor, possessed by or under the control of MLBFS or any of its affiliates, toward the liquidation or reduction of the Obligations; (d) any invalidity, irregularity or unenforceability of all or any part of the Obligations, or of any collateral security for the Obligations, or the Guaranteed Documents; (e) any application of payments or credits by MLBFS; (f) the granting of credit from time to time by MLBFS to Customer in excess of the amount set forth in the Guaranteed Documents; or (g) any other act of commission or omission of any kind or at any time upon the part of MLBFS or any of its affiliates or any of their respective employees or agents with respect to any matter whatsoever. MLBFS shall not be required at any time, as a condition of Guarantors' obligations hereunder, to resort to payment from Customer or other persons or entities whatsoever, or any of their properties or estates, or resort to any collateral security or pursue or exhaust any other rights or remedies whatsoever.

No release or discharge in whole or in part of any one or more of the Guarantors or any other guarantor of the Obligations shall release or discharge any of the other Guarantors or any other guarantor, unless and until all of the Obligations shall have been indefeasibly fully paid and discharged. Guarantors expressly waive presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of advancement of funds under the Guaranteed Documents and all other notices and formalities to which Customer or Guarantors might be entitled, by statute or otherwise, and, so long as there are any Obligations or MLBFS is committed to extend credit to Customer, Guarantors waive any right to revoke or terminate this Guaranty without the express written consent of MLBFS.

So long as there are any Obligations, Guarantors shall not have any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right, or remedy of MLBFS against Customer or any security which MLBFS now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise.

MLBFS is hereby irrevocably authorized by Guarantors at any time during the continuance of an Event of Default under any of the Loan Agreements or any other of the Guaranteed Documents or in respect of any of the Obligations, in its sole discretion and without demand or notice of any kind, to appropriate, hold, set off and apply toward the payment of any amount due hereunder, in such order of application as MLBFS may elect, all cash, credits, deposits, accounts, financial assets, investment property, securities and any other property of any Guarantor which is in transit to or in the possession, custody or control of MLBFS or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") or any of their respective agents, bailees or affiliates. Guarantors hereby collaterally assign and grant to MLBFS a continuing security interest in all such property as additional security for the Obligations. Upon the

occurrence and during the continuance of an Event of Default, MLBFS shall have all rights in such property available to collateral assignees and secured parties under all applicable laws, including, without limitation, the Uniform Commercial Code.

Each Guarantor agrees to furnish to MLBFS such financial information concerning Guarantor as may be required by any of the Guaranteed Documents or as MLBFS may otherwise from time to time reasonably request. Guarantors further hereby irrevocably authorize MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about any Guarantors.

Each Guarantor severally warrants and agrees that: (a) unless clearly stated or noted, no material assets shown on any financial statements of such Guarantor heretofore or hereafter furnished to MLBFS are or will be held in an irrevocable trust, pension trust, retirement trust, IRA or other trust or form of ownership exempt from execution by creditors of such Guarantor; and, (b) except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld, such Guarantor will not hereafter transfer any material assets of such Guarantor to any trust or third party if the effect thereof will be to cause such assets to be exempt from execution by creditors of such Guarantor (excluding, however, normal and reasonable contributions to pension plans, retirement plans, etc., and IRA rollovers).

No delay on the part of MLBFS in the exercise of any right or remedy under any of the Guaranteed Documents, this Guaranty or any other agreement shall operate as a waiver thereof, and, without limiting the foregoing, no delay in the enforcement of any security interest, and no single or partial exercise by MLBFS of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. This Guaranty may be executed in any number of counterparts, each of which counterparts, once they are executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Guaranty. This Guaranty shall be binding upon Guarantors and their respective heirs and personal representatives, and shall inure to the benefit of MLBFS and its successors and assigns. All obligations of the Guarantors hereunder are joint and several.

This Guaranty shall be governed by the laws of the State of Illinois. WITHOUT LIMITING THE RIGHT OF MLBFS TO ENFORCE THIS GUARANTY IN ANY JURISDICTION AND VENUE PERMITTED BY APPLICABLE LAW: (i) GUARANTORS AGREE THAT THIS GUARANTY MAY AT THE OPTION OF MLBFS BE ENFORCED BY MLBFS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE ANY GUARANTOR, OR ANY COLLATERAL FOR THE OBLIGATIONS OF GUARANTORS, MAY BE LOCATED; (ii) GUARANTORS IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY COURT IN THE STATE OF ILLINOIS, AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND GUARANTORS WAIVE ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM, AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT; GUARANTORS FURTHER WAIVE ANY RIGHT TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS; AND (iii) GUARANTORS HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS GUARANTY. GUARANTORS FURTHER WAIVE THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS. Wherever possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. No modification or waiver of any of the provisions of this Guaranty shall be effective unless in writing and signed by Guarantors and an officer of MLBFS.

Dated as of March 29, 2000.

Guarantor:                                                      Address:


_____
C. LEO SMITH


_____
PILAR CONCHA


Witness: _____


Printed Name: _ROBERT A. DIXON_____

-2-

**Merrill Lynch**

**WCMA° LOAN AND SECURITY AGREEMENT**

**WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64** ("Loan Agreement") dated as of March 29, 2000, between **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a corporation organized and existing under the laws of the State of Florida having its principal office at 3041 West McNab Road, Pompano Beach, FL 33069 ("Customer"), and **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.**, a corporation organized and existing under the laws of the State of Delaware having its principal office at 222 North LaSalle Street, Chicago, IL 60601 ("MLBFS").

In accordance with that certain **WORKING CAPITAL MANAGEMENT° ACCOUNT AGREEMENT NO. 741-07L64** ("WCMA Agreement") between Customer and MLBFS' affiliate, **MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED** ("MLPF&S"), Customer has subscribed to the WCMA Program described in the WCMA Agreement. The WCMA Agreement is by this reference incorporated as a part hereof. In conjunction therewith and as part of the WCMA Program, Customer has requested that MLBFS provide, and subject to the terms and conditions herein set forth MLBFS has agreed to provide. a commercial line of credit for Customer (the "WCMA Line of Credit").

Accordingly, and in consideration of the premises and of the mutual covenants of the parties hereto, Customer and MLBFS hereby agree as follows:

**Article I. DEFINITIONS**

**1.1 Specific Terms.** In addition to terms defined elsewhere in this Loan Agreement, when used herein the following terms shall have the following meanings:

(a) "Account Debtor" shall mean any party who is or may become obligated with respect to an Account or Chattel Paper.

(b) "Activation Date" shall mean the date upon which MLBFS shall cause the WCMA Line of Credit to be fully activated under MLPF&S' computer system as part of the WCMA Program.

(c) "Additional Agreements" shall mean all agreements, instruments, documents and opinions other than this Loan Agreement, whether with or from Customer or any other party, which are contemplated hereby or otherwise reasonably required by MLBFS in connection herewith, or which evidence the creation, guaranty or collateralization of any of the Obligations or the granting or perfection of liens or security interests upon the Collateral or any other collateral for the Obligations.

(d) "Bankruptcy Event" shall mean any of the following: (i) a proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt or receivership law or statute shall be filed or consented to by Customer or any Guarantor; or (ii) any such proceeding shall be filed against Customer or any Guarantor and shall not be dismissed or withdrawn within sixty (60) days after filing; or (iii) Customer or any Guarantor shall make a general assignment for the benefit of creditors; or (iv) Customer or any Guarantor shall generally fail to pay or admit in writing its inability to pay its debts as they become due; or (v) Customer or any Guarantor shall be adjudicated a bankrupt or insolvent.

(e) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or other day on which the New York Stock Exchange is regularly closed.

(f) "Collateral" shall mean all Accounts, Chattel Paper, Contract Rights, Inventory, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Assets of Customer, howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located; together with all parts thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds), and the additional collateral described in Section 3.6 (b) hereof.

(g) "Commitment Expiration Date" shall mean April 28, 2000.

(h) "Default" shall mean either an "Event of Default" as defined in Section 3.5 hereof, or an event which with the giving of notice, passage of time, or both, would constitute such an Event of Default.

(i) "Default Interest Rate" shall mean a rate equal to the sum of the "Interest Rate", as determined below, plus two percent (2%) per annum.

(j) "General Funding Conditions" shall mean each of the following conditions to any WCMA Loan by MLBFS hereunder: (i) no Default shall have occurred and be continuing or would result from the making of any WCMA Loan hereunder by MLBFS; (ii) there shall not have occurred and be continuing any material adverse change in the business or financial condition of Customer or any Guarantor; (iii) all representations and warranties of Customer or any Guarantor herein or in any Additional Agreements shall then be true and correct in all material respects; (iv) MLBFS shall have received this Loan Agreement and all of the Additional Agreements, duly executed and filed or recorded where applicable, all of which shall be in form and substance reasonably satisfactory to MLBFS; (v) MLBFS shall have received evidence reasonably satisfactory to it as to the ownership of the Collateral and the perfection and priority of MLBFS' liens and security interests thereon, as well as the ownership of and the perfection and priority of MLBFS' liens and security interests on any other collateral for the Obligations furnished pursuant to any of the Additional Agreements; (vi) MLBFS shall have received evidence reasonably satisfactory to it of the insurance required hereby or by any of the Additional Agreements; and (vii) any additional conditions specified in the "WCMA Line of Credit Approval" letter executed by MLBFS with respect to the transactions contemplated hereby shall have been met to the reasonable satisfaction of MLBFS.

(k) "Guarantor" shall mean a person or entity who has either guaranteed or provided collateral for any or all of the Obligations.

(l) "Initial Maturity Date" shall mean the first date upon which the WCMA Line of Credit will expire (subject to renewal in accordance with the terms hereof); to wit: April 30, 2001.

(m) "Interest Due Date" shall mean the last Business Day of each calendar month during the term hereof (or, if Customer makes special arrangements with MLPF&S, the last Friday of each calendar month during the term hereof).

(n) "Interest Rate" shall mean a variable per annum rate of interest equal to the sum of 2.40% and the 30-day Dealer Commercial Paper Rate. The "30-day Dealer Commercial Paper Rate" shall mean, as of the date of any determination, the interest rate from time to time published in the "Money Rates" section of *The Wall Street Journal* as the "Dealer Commercial Paper" rate for 30-day high-grade unsecured notes sold through dealers by major corporations. The Interest Rate will change as of the date of publication in *The Wall Street Journal* of a 30-day Dealer Commercial Paper Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the 30-day Dealer Commercial Paper Rate, MLBFS will choose a reasonably comparable index or source to use as the basis for the Interest Rate. Upon the occurrence and during the continuance of a Default, the Interest Rate with respect the WCMA Line of Credit may be increased to the "Default Interest Rate", as herein provided.

(o) "Line Fee" shall mean a fee of $12,975.00 payable periodically by Customer to MLBFS in accordance with the provisions of Section 2.2 (k) hereof.

(p) "Location of Tangible Collateral" shall mean the address of Customer set forth at the beginning of this Loan Agreement, together with any other address or addresses set forth on an exhibit hereto as being a Location of Tangible Collateral.

(q) "Maturity Date" shall mean the date of expiration of the WCMA Line of Credit.

(r) "Maximum WCMA Line of Credit" shall mean, as of any date of determination thereof, an amount equal to the lesser of: (A) $1,730,000, or (B) 80% of Customer's Accounts and Chattel Paper, as shown on its regular books and records (excluding Accounts over 90 days old, directly or indirectly due from any person or entity not domiciled in the United States or from any shareholder, officer or employee of Customer or any affiliated entity), and 50% of Customer's Inventory as shown on its regular books and records, less the aggregate outstanding balance as of such date of determination of the Reducing Revolver Loan No. 741-07L65.

(s) "Obligations" shall mean all liabilities, indebtedness and other obligations of Customer to MLBFS, howsoever created, arising or evidenced. whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary or joint or several and, without limiting the foregoing, shall include interest accruing after the filing of any petition in bankruptcy, and all present and future liabilities, indebtedness and obligations of Customer under this Loan Agreement.

(t) "Permitted Liens" shall mean with respect to the Collateral: (i) liens for current taxes not delinquent, other non-consensual liens arising in the ordinary course of business for sums not due, and, if MLBFS' rights to and interest in the Collateral are not materially and adversely affected thereby, any such liens for taxes or other non-consensual liens arising in the ordinary course of business being contested in good faith by appropriate proceedings; (ii) liens in favor of MLBFS; (iii) liens which will be discharged with the proceeds of the initial WCMA Loan; and (iv) any other liens expressly permitted in writing by MLBFS.

(u) "Renewal Year" shall mean and refer to the 12-month period immediately following the Initial Maturity Date and each 12-month period thereafter.

(v) "WCMA Account" shall mean and refer to the Working Capital Management Account of Customer with MLPF&S identified as Account No. 741-07L64 and any successor Working Capital Management Account of Customer with MLPF&S.

(w) "WCMA Loan" shall mean each advance made by MLBFS pursuant to this Loan Agreement.

(x) "WCMA Loan Balance" shall mean an amount equal to the aggregate unpaid principal amount of all WCMA Loans.

1.2 **Other Terms.** Except as otherwise defined herein: (i) all terms used in this Loan Agreement which are defined in the Uniform Commercial Code of Illinois ("UCC") shall have the meanings set forth in the UCC. and (ii) capitalized terms used herein which are defined in the WCMA Agreement shall have the meanings set forth in the WCMA Agreement.

## ARTICLE II. THE WCMA LINE OF CREDIT

2.1 **WCMA PROMISSORY NOTE.** FOR VALUE RECEIVED. Customer hereby promises to pay to the order of MLBFS, at the times and in the manner set forth in this Loan Agreement, or in such other manner and at such place as MLBFS may hereafter designate in writing, the following: (a) on the Maturity Date, or if earlier, on the date of termination of the WCMA Line of Credit, the WCMA Loan Balance; (b) interest at the Interest Rate (or, if applicable, at the Default Interest Rate) on the outstanding WCMA Loan Balance, from and including the date on which the initial WCMA Loan is made until the date of payment of all WCMA Loans in full; and (c) on demand, all other sums payable pursuant to this Loan Agreement, including, but not limited to, the periodic Line Fee. Except as otherwise expressly set forth herein, Customer hereby waives presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and formalities in connection with this WCMA Promissory Note and this Loan Agreement.

## 2.2 WCMA LOANS

(a) **Activation Date.** Provided that: (i) the Commitment Expiration Date shall not then have occurred, and (ii) Customer shall have subscribed to the WCMA Program and its subscription to the WCMA Program shall then be in effect, the Activation Date shall occur on or promptly after the date, following the acceptance of this Loan Agreement by MLBFS at its office in Chicago, Illinois, upon which each of the General Funding Conditions shall have been met or satisfied to the reasonable satisfaction of MLBFS. No activation by MLBFS of the WCMA Line of Credit for a nominal amount shall be deemed evidence of the satisfaction of any of the conditions herein set forth, or a waiver of any of the terms or conditions hereof. Customer hereby authorizes MLBFS to pay out of and charge to Customer's WCMA Account on the Activation Date any and all amounts necessary to fully pay off any bank or other financial institution having a lien upon any of the Collateral other than a Permitted Lien.

(b) **WCMA Loans.** Subject to the terms and conditions hereof, during the period from and after the Activation Date to the first to occur of the Maturity Date or the date of termination of the WCMA Line of Credit pursuant to the terms hereof, and in addition to WCMA Loans automatically made to pay accrued interest, as hereafter provided: (i) MLBFS will make WCMA Loans to Customer in such amounts as Customer may from time to time request in accordance with the terms hereof, up to an aggregate outstanding amount not to exceed the Maximum WCMA Line of Credit, and (ii) Customer may repay any WCMA Loans in whole or in part at any time, and request a re-borrowing of amounts repaid on a revolving basis. Customer may request such WCMA Loans by use of WCMA Checks, FTS, Visa® charges, wire transfers, or such other means of access to the WCMA Line of Credit as may be permitted by MLBFS from time to time; it being understood that so long as the WCMA Line of Credit shall be in effect, any charge or debit to the WCMA Account which but for the WCMA Line of Credit would under the terms of the WCMA Agreement result in an overdraft, shall be deemed a request by Customer for a WCMA Loan.

(c) **Conditions of WCMA Loans.** Notwithstanding the foregoing, MLBFS shall not be obligated to make any WCMA Loan, and may without notice refuse to honor any such request by Customer, if at the time of receipt by MLBFS of Customer's request: (i) the making of such WCMA Loan would cause the Maximum WCMA Line of Credit to be exceeded; or (ii) the Maturity Date shall have occurred, or the WCMA Line of Credit shall have otherwise been terminated in accordance with the terms hereof; or (iii) Customer's subscription to the WCMA Program shall have been terminated; or (iv) an event shall have occurred and be continuing which shall have caused any of the General Funding Conditions to not then be met or satisfied to the reasonable satisfaction of MLBFS. The making by MLBFS of any WCMA Loan at a time when any one or more of said conditions shall not have been met shall not in any event be construed as a waiver of said condition or conditions or of any Default, and shall not prevent MLBFS at any time thereafter while any condition shall not have been met from refusing to honor any request by Customer for a WCMA Loan.

(d) **Limitation of Liability.** MLBFS shall not be responsible, and shall have no liability to Customer or any other party, for any delay or failure of MLBFS to honor any request of Customer for a WCMA Loan or any other act or omission of MLBFS, MLPF&S or any of their affiliates due to or resulting from any system failure, error or delay in posting or other clerical error, loss of power, fire, Act of God or other cause beyond the reasonable control of MLBFS, MLPF&S or any of their affiliates unless directly arising out of the willful wrongful act or active gross negligence of MLBFS. In no event shall MLBFS be liable to Customer or any other party for any incidental or consequential damages arising from any act or omission by MLBFS, MLPF&S or any of their affiliates in connection with the WCMA Line of Credit or this Loan Agreement.

(e) **Interest.** (i) An amount equal to accrued interest on the WCMA Loan Balance shall be payable by Customer monthly on each Interest Due Date, commencing with the Interest Due Date occurring in the calendar month in which the Activation Date shall occur. Unless otherwise hereafter directed in writing by MLBFS on or after the first to occur of the Maturity Date or the date of termination of the WCMA Line of Credit pursuant to the terms hereof, such interest will be automatically charged to the WCMA Account on the applicable Interest Due Date, and, to the extent not paid with free credit balances or the proceeds of sales of any Money Accounts then in the WCMA Account, as hereafter provided, paid by a WCMA Loan and added to the WCMA Loan Balance. All interest shall be computed for the actual number of days elapsed on the basis of a year consisting of 360 days.

(ii) Upon the occurrence and during the continuance of any Default, but without limiting the rights and remedies otherwise available to MLBFS hereunder or waiving such Default, the interest payable by Customer hereunder shall at the option of MLBFS accrue and be payable at the Default Interest Rate. The Default Interest Rate, once implemented, shall continue to apply to the Obligations under this Loan Agreement and be payable by Customer until the date such Default is either cured or waived in writing by MLBFS.

(iii) Notwithstanding any provision to the contrary in this Agreement or any of the Additional Agreements, no provision of this Agreement or any of the Additional Agreements shall require the payment or permit the collection of any amount in excess of the maximum amount of interest permitted to be charged by law ("Excess Interest"). If any Excess Interest is provided for, or is adjudicated as being provided for, in this Agreement or any of the Additional Agreements, then: (A) Customer shall not be obligated to pay any Excess Interest; and (B) any Excess Interest that MLBFS may have received hereunder or under any of the Additional Agreements shall, at the option of MLBFS, be: (1) applied as a credit against the then unpaid WCMA Loan Balance, (2) refunded to the payer thereof, or (3) any combination of the foregoing.

(f) **Payments.** All payments required or permitted to be made pursuant to this Loan Agreement shall be made in lawful money of the United States. Unless otherwise directed by MLBFS, payments on account of the WCMA Loan Balance may be made by the delivery of checks (other than WCMA Checks), or by means of FTS or wire transfer of funds (other than funds from the WCMA Line of Credit) to MLPF&S for credit to Customer's WCMA Account. Notwithstanding anything in the WCMA Agreement to the contrary, Customer hereby irrevocably authorizes and directs MLPF&S to apply available free credit balances in the WCMA Account to the repayment of the WCMA Loan Balance prior to application for any other purpose. Payments to MLBFS from funds in the WCMA Account shall be deemed to be made by Customer upon the same basis and schedule as funds are made available for investment in the Money Accounts in accordance with the terms of the WCMA Agreement. All funds received by MLBFS from MLPF&S pursuant to the aforesaid authorization shall be applied by MLBFS to repayment of the WCMA Loan Balance. The acceptance by or on behalf of MLBFS of a check or other payment for a lesser amount than shall be due from Customer, regardless of any endorsement or statement thereon or transmitted therewith, shall not be deemed an accord and satisfaction or anything other than a payment on account, and MLBFS or anyone acting on behalf of MLBFS may accept such check or other payment

without prejudice to the rights of MLBFS to recover the balance actually due or to pursue any other remedy under this Loan Agreement or applicable law for such balance. All checks accepted by or on behalf of MLBFS in connection with the WCMA Line of Credit are subject to final collection.

(g) **Irrevocable Instructions to MLPF&S.** In order to minimize the WCMA Loan Balance, Customer hereby irrevocably authorizes and directs MLPF&S, effective on the Activation Date and continuing thereafter so long as this Agreement shall be in effect: (i) to immediately and prior to application for any other purpose pay to MLBFS on the WCMA Loan Balance or other amounts payable by Customer hereunder all available free credit balances from time to time in the WCMA Account; and (ii) if such available free credit balances are insufficient to pay the WCMA Loan Balance and such other amounts, and there are in the WCMA Account at any time any investments in Money Accounts (other than any investments constituting any Minimum Money Accounts Balance under the WCMA Directed Reserve Program), to immediately liquidate such investments and pay to MLBFS to the extent of any WCMA Loan Balance and such other amounts the available proceeds from the liquidation of any such Money Accounts.

(h) **Statements.** MLPF&S will include in each monthly statement it issues under the WCMA Program information with respect to WCMA Loans and the WCMA Loan Balance. Any questions that Customer may have with respect to such information should be directed to MLBFS; and any questions with respect to any other matter in such statements or about or affecting the WCMA Program should be directed to MLPF&S.

(i) **Use of WCMA Loan Proceeds.** The proceeds of each WCMA Loan initiated by Customer shall be used by Customer solely for working capital in the ordinary course of its business, or, with the prior written consent of MLBFS, for other lawful business purposes of Customer not prohibited hereby. **Customer agrees that under no circumstances will the proceeds of any WCMA Loan be used: (i) for personal, family or household purposes of any person whatsoever, or (ii) to purchase, carry or trade in securities, or repay debt incurred to purchase, carry or trade in securities, whether in or in connection with the WCMA Account, another account of Customer with MLPF&S or an account of Customer at any other broker or dealer in securities, or (iii) unless otherwise consented to in writing by MLBFS, to pay any amount to Merrill Lynch and Co., Inc. or any of its subsidiaries, other than Merrill Lynch Bank USA, Merrill Lynch Bank & Trust Co. or any subsidiary of either of them (including MLBFS and Merrill Lynch Credit Corporation).**

(j) **Renewal at Option of MLBFS; Right of Customer to Terminate.** MLBFS may at any time, in its sole discretion and at its sole option, renew the WCMA Line of Credit for one or more Renewal Years; it being understood, however, that no such renewal shall be effective unless set forth in a writing executed by a duly authorized representative of MLBFS and delivered to Customer. Unless any such renewal is accompanied by a proposed change in the terms of the WCMA Line of Credit (other than the extension of the Maturity Date), no such renewal shall require Customer's approval. Customer shall, however, have the right to terminate the WCMA Line of Credit at any time upon written notice to MLBFS.

(k) **Line Fees.** (i) In consideration of the extension of the WCMA Line of Credit by MLBFS to Customer during the period from the Activation Date to the Initial Maturity Date, Customer has paid or shall pay the Line Fee to MLBFS. If the Line Fee has not heretofore been paid by Customer, Customer hereby authorizes MLBFS, at its option, to either cause the Line Fee to be paid on the Activation Date with a WCMA Loan, or invoice Customer for such Line Fee (in which event Customer shall pay said fee within 5 Business Days after receipt of such invoice). No delay in the Activation Date, howsoever caused, shall entitle Customer to any rebate or reduction in the Line Fee or to any extension of the Initial Maturity Date.

(ii) Customer shall pay an additional Line Fee for each Renewal Year. In connection therewith, Customer hereby authorizes MLBFS, at its option, to either cause each such additional Line Fee to be paid with a WCMA Loan on or at any time after the first Business Day of such Renewal Year or invoiced to Customer at such time (in which event Customer shall pay such Line Fee within 5 Business Days after receipt of such invoice). Each Line Fee shall be deemed fully earned by MLBFS on the date payable by Customer, and no termination of the WCMA Line of Credit, howsoever caused, shall entitle Customer to any rebate or refund of any portion of such Line Fee; provided, however, that if Customer shall terminate the WCMA Line of Credit not later than 5 Business Days after the receipt by Customer of notice from MLBFS of a renewal of the WCMA Line of Credit, Customer shall be entitled to a refund of any Line Fee charged by MLBFS for the ensuing Renewal Year.

### Article III. GENERAL PROVISIONS

### 3.1 REPRESENTATIONS AND WARRANTIES

Customer represents and warrants to MLBFS that:

(a) **Organization and Existence.** Customer is a corporation, duly organized and validly existing in good standing under the laws of the State of Florida and is qualified to do business and in good standing in each other state where the nature of its business or the property owned by it make such qualification necessary.

(b) **Execution, Delivery and Performance.** The execution, delivery and performance by Customer of this Loan Agreement and by Customer and each Guarantor of such of the Additional Agreements to which it is a party: (i) have been duly authorized by all requisite action. (ii) do not and will not violate or conflict with any law or other governmental requirement, or any of the agreements, instruments or documents which formed or govern Customer or any such Guarantor, and (iii) do not and will not breach or violate any of the provisions of, and will not result in a default by Customer or any such Guarantor under, any other agreement, instrument or document to which it is a party or by which it or its properties are bound.

(c) **Notices and Approvals.** Except as may have been given or obtained, no notice to or consent or approval of any governmental body or authority or other third party whatsoever (including, without limitation, any other creditor) is required in connection with the execution, delivery or performance by Customer or any Guarantor of such of this Loan Agreement and the Additional Agreements to which it is a party.

(d) **Enforceability.** This Loan Agreement and such of the Additional Agreements to which Customer or any Guarantor is a party are the respective legal, valid and binding obligations of Customer and such Guarantor, enforceable against it or them, as the case may be, in accordance with their respective terms, except as enforceability may be limited by bankruptcy and other similar laws affecting the rights of creditors generally or by general principles of equity.

(e) **Collateral.** Except for any Permitted Liens: (i) Customer has good and marketable title to the Collateral, (ii) none of the Collateral is subject to any lien, encumbrance or security interest, and (iii) upon the filing of all Uniform Commercial Code financing statements executed by Customer with respect to the Collateral in the appropriate jurisdiction(s) and/or the completion of any other action required by applicable law to perfect its liens and security interests, MLBFS will have valid and perfected first liens and security interests upon all of the Collateral.

(f) **Financial Statements.** Except as expressly set forth in Customer's financial statements, all financial statements of Customer furnished to MLBFS have been prepared in conformity with generally accepted accounting principles, consistently applied, are true and correct in all material respects, and fairly present the financial condition of it as at such dates and the results of its operations for the periods then ended (subject, in the case of interim unaudited financial statements, to normal year-end adjustments); and since the most recent date covered by such financial statements, there has been no material adverse change in any such financial condition or operation. All financial statements furnished to MLBFS of any Guarantor are true and correct in all material respects and fairly represent such Guarantor's financial condition as of the date of such financial statements, and since the most recent date of such financial statements, there has been no material adverse change in such financial condition.

(g) **Litigation.** No litigation, arbitration, administrative or governmental proceedings are pending or, to the knowledge of Customer, threatened against Customer or any Guarantor, which would, if adversely determined, materially and adversely affect the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any such Guarantor or the continued operations of Customer.

(h) **Tax Returns.** All federal, state and local tax returns, reports and statements required to be filed by Customer and each Guarantor have been filed with the appropriate governmental agencies and all taxes due and payable by Customer and each Guarantor have been timely paid (except to the extent that any such failure to file or pay will not materially and adversely either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer).

(i) **Collateral Location.** All of the tangible Collateral is located at a Location of Tangible Collateral.

(j) **No Outside Broker.** Except for employees of MLBFS, MLPF&S or one of their affiliates, Customer has not in connection with the transactions contemplated hereby directly or indirectly engaged or dealt with, and was not introduced or referred to MLBFS by, any broker or other loan arranger.

Each of the foregoing representations and warranties: (i) has been and will be relied upon as an inducement to MLBFS to provide the WCMA Line of Credit, and (ii) is continuing and shall be deemed remade by Customer concurrently with each request for a WCMA Loan.

## 3.2 FINANCIAL AND OTHER INFORMATION

(a) Customer shall furnish or cause to be furnished to MLBFS during the term of this Loan Agreement all of the following:

(i) **Annual Financial Statements.** Within 120 days after the close of each fiscal year of Customer, a copy of the annual reviewed financial statements of Customer, including in reasonable detail, a balance sheet and statement of retained earnings as at the close of such fiscal year and statements of profit and loss and cash flow for such fiscal year;

(ii) **Interim Financial Statements.** Within 45 days after the close of each fiscal quarter of Customer, a copy of the interim financial statements of Customer for such fiscal quarter (including in reasonable detail both a balance sheet as of the close of such fiscal period, and statement of profit and loss for the applicable fiscal period);

(iii) **Tax Returns.** Not later than 15 days after the date filed with the Internal Revenue Service, a copy of each annual Federal Income Tax Return of Customer and each individual Guarantor;

(iv) **A/R Agings.** Within 15 days after the close of each fiscal month of Customer, a copy of the Accounts Receivable Aging of Customer as of the end of such fiscal month;

(v) **Inventory Reports.** Within 15 days after the close of each fiscal month of Customer, a copy of the Inventory Report (as and to the extent applicable, breaking out Inventory by location, and separately reporting any work in process) of Customer as of the end of such fiscal month; and

(vi) **Other Information.** Such other information as MLBFS may from time to time reasonably request relating to Customer, any Guarantor or the Collateral.

(b) **General Agreements With Respect to Financial Information.** Customer agrees that except as otherwise specified herein or otherwise agreed to in writing by MLBFS: (i) all annual financial statements required to be furnished by Customer to MLBFS hereunder will be prepared by either the current independent accountants for Customer or other independent accountants reasonably acceptable to MLBFS, and (ii) all other financial information required to be furnished by Customer to MLBFS hereunder will be certified as correct in all material respects by the party who has prepared such information, and in the case of internally prepared information with respect to Customer, certified as correct by its chief financial officer.

## 3.3 OTHER COVENANTS

Customer further covenants and agrees during the term of this Loan Agreement that:

(a) **Financial Records; Inspection.** Customer will: (i) maintain at its principal place of business complete and accurate books and records, and maintain all of its financial records in a manner consistent with the financial statements heretofore furnished to MLBFS, or prepared on such other basis as may be approved in writing by MLBFS; and (ii) permit MLBFS or its duly authorized representatives, upon reasonable notice and at reasonable times, to inspect its properties (both real and personal), operations, books and records.

(b) **Taxes.** Customer and each Guarantor will pay when due all taxes, assessments and other governmental charges, howsoever designated, and all other liabilities and obligations, except to the extent that any such failure to pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor or the continued operations of Customer.

(c) **Compliance With Laws and Agreements.** Neither Customer nor any Guarantor will violate any law, regulation or other governmental requirement, any judgment or order of any court or governmental agency or authority, or any agreement, instrument or document to which it is a party or by which it is bound, if any such violation will materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer.

(d) **No Use of Merrill Lynch Name.** Except upon the prior written consent of MLBFS, neither Customer nor any Guarantor will directly or indirectly publish, disclose or otherwise use in any advertising or promotional material, or press release or interview, the name, logo or any trademark of MLBFS, MLPF&S, Merrill Lynch and Co., Incorporated or any of their affiliates.

(e) **Notification By Customer.** Customer shall provide MLBFS with prompt written notification of: (i) any Default; (ii) any materially adverse change in the business, financial condition or operations of Customer; (iii) any information which indicates that any financial statements of Customer or any Guarantor fail in any material respect to present fairly the financial condition and results of operations purported to be presented in such statements; and (iv) any change in Customer's outside accountants. Each notification by Customer pursuant hereto shall specify the event or information causing such notification. and, to the extent applicable, shall specify the steps being taken to rectify or remedy such event or information.

(f) **Notice of Change.** Customer shall give MLBFS not less than 30 days prior written notice of any change in the name (including any fictitious name) or principal place of business or residence of Customer or any Guarantor.

(g) **Continuity.** Except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld: (i) Customer shall not be a party to any merger or consolidation with, or purchase or otherwise acquire all or substantially all of the assets of, or any material stock, partnership, joint venture or other equity interest in, any person or entity, or sell, transfer or lease all or any substantial part of its assets, if any such action would result in either: (A) a material change in the principal business, ownership or control of Customer, or (B) a material adverse change in the financial condition or operations of Customer; (ii) Customer shall preserve its existence and good standing in the jurisdiction(s) of establishment and operation; (iii) Customer shall not engage in any material business substantially different from its business in effect as of the date of application by Customer for credit from MLBFS, or cease operating any such material business; (iv) Customer shall not cause or permit any other person or entity to assume or succeed to any material business or operations of Customer; and (v) Customer shall not cause or permit any material change in its controlling ownership.

(h) **Minimum Tangible Net Worth.** Customer's "tangible net worth" shall at all times exceed $2,000,000.00. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(i) **Debt to Tangible Net Worth.** The ratio of Customer's total debt to Customer's tangible net worth shall not at any time exceed 2.0 to 1.

## 3.4 COLLATERAL

(a) **Pledge of Collateral.** To secure payment and performance of the Obligations, Customer hereby pledges, assigns, transfers and sets over to MLBFS and grants to MLBFS first liens and security interests in and upon all of the Collateral, subject only to Permitted Liens.

(b) **Liens.** Except upon the prior written consent of MLBFS, Customer shall not create or permit to exist any lien, encumbrance or security interest upon or with respect to any Collateral now owned or hereafter acquired other than Permitted Liens.

(c) **Performance of Obligations.** Customer shall perform all of its obligations owing on account of or with respect to the Collateral; it being understood that nothing herein, and no action or inaction by MLBFS, under this Loan Agreement or otherwise, shall be deemed an assumption by MLBFS of any of Customer's said obligations.

(d) **Sales and Collections.** So long as no Event of Default shall have occurred and be continuing, Customer may in the ordinary course of its business: (i) sell any Inventory normally held by Customer for sale, (ii) use or consume any materials and supplies normally held by Customer for use or consumption and (iii) collect all of its Accounts. Customer shall take such action with respect to protection of its Inventory and the other Collateral and the collection of its Accounts as MLBFS may from time to time reasonably request.

(e) **Account Schedules.** Upon the request of MLBFS, made now or at any reasonable time or times hereafter, Customer shall deliver to MLBFS, in addition to the other information required hereunder, a schedule identifying, for each Account and all Chattel Paper subject to MLBFS' security interests

hereunder, each Account Debtor by name and address and amount, invoice or contract number and date of each invoice or contract. Customer shall furnish to MLBFS such additional information with respect to the Collateral, and amounts received by Customer as proceeds of any of the Collateral, as MLBFS may from time to time reasonably request.

(f)   **Alterations and Maintenance.** Except upon the prior written consent of MLBFS, Customer shall not make or permit any material alterations to any tangible Collateral which might materially reduce or impair its market value or utility. Customer shall at all times keep the tangible Collateral in good condition and repair, reasonable wear and tear excepted, and shall pay or cause to be paid all obligations arising from the repair and maintenance of such Collateral, as well as all obligations with respect to any Location of Tangible Collateral, except for any such obligations being contested by Customer in good faith by appropriate proceedings.

(g)   **Location.** Except for movements required in the ordinary course of Customer's business, Customer shall give MLBFS 30 days' prior written notice of the placing at or movement of any tangible Collateral to any location other than a Location of Tangible Collateral. In no event shall Customer cause or permit any material tangible Collateral to be removed from the United States without the express prior written consent of MLBFS.

(h)   **Insurance.** Customer shall insure all of the tangible Collateral under a policy or policies of physical damage insurance providing that losses will be payable to MLBFS as its interests may appear pursuant to a Lender's Loss Payable Endorsement and containing such other provisions as may be reasonably required by MLBFS. Customer shall further provide and maintain a policy or policies of comprehensive public liability insurance naming MLBFS as an additional party insured. Customer shall maintain such other insurance as may be required by law or is customarily maintained by companies in a similar business or otherwise reasonably required by MLBFS. All such insurance policies shall provide that MLBFS will receive not less than 10 days prior written notice of any cancellation, and shall otherwise be in form and amount and with an insurer or insurers reasonably acceptable to MLBFS. Customer shall furnish MLBFS with a copy or certificate of each such policy or policies and, prior to any expiration or cancellation, each renewal or replacement thereof.

(i)   **Event of Loss.** Customer shall at its expense promptly repair all repairable damage to any tangible Collateral. In the event that any tangible Collateral is damaged beyond repair, lost, totally destroyed or confiscated (an "Event of Loss") and such Collateral had a value prior to such Event of Loss of $25,000.00 or more, then, on or before the first to occur of (i) 90 days after the occurrence of such Event of Loss, or (ii) 10 Business Days after the date on which either Customer or MLBFS shall receive any proceeds of insurance on account of such Event of Loss, or any underwriter of insurance on such Collateral shall advise either Customer or MLBFS that it disclaims liability in respect of such Event of Loss, Customer shall, at Customer's option, either replace the Collateral subject to such Event of Loss with comparable Collateral free of all liens other than Permitted Liens (in which event Customer shall be entitled to utilize the proceeds of insurance on account of such Event of Loss for such purpose, and may retain any excess proceeds of such insurance), or deposit into the WCMA Account an amount equal to the actual cash value of such Collateral as determined by either the insurance company's payment (plus any applicable deductible) or, in absence of insurance company payment, as reasonably determined by MLBFS; it being further understood that any such deposit shall be accompanied by a like permanent reduction in the Maximum WCMA Line of Credit. Notwithstanding the foregoing, if at the time of occurrence of such Event of Loss or any time thereafter prior to replacement or line reduction, as aforesaid, an Event of Default shall have occurred and be continuing hereunder, then MLBFS may at its sole option, exercisable at any time while such Event of Default shall be continuing, require Customer to either replace such Collateral or make a deposit into the WCMA Account and reduce the Maximum WCMA Line of Credit, as aforesaid.

(j)   **Notice of Certain Events.** Customer shall give MLBFS immediate notice of any attachment, lien, judicial process, encumbrance or claim affecting or involving $25,000.00 or more of the Collateral.

(k)   **Indemnification.** Customer shall indemnify, defend and save MLBFS harmless from and against any and all claims, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any nature whatsoever which may be asserted against or incurred by MLBFS arising out of or in any manner occasioned by (i) the ownership, collection, possession, use or operation of any Collateral, or (ii) any failure by Customer to perform any of its obligations hereunder; excluding, however, from said indemnity any such claims, liabilities, etc. arising directly out of the willful wrongful act or active gross negligence of MLBFS. This indemnity shall survive the expiration or termination of this Loan Agreement as to all matters arising or accruing prior to such expiration or termination.

## 3.5 EVENTS OF DEFAULT

The occurrence of any of the following events shall constitute an "Event of Default" under this Loan Agreement:

(a)   **Exceeding the Maximum WCMA Line of Credit.** If the WCMA Loan Balance shall at any time exceed the Maximum WCMA Line of Credit and Customer shall fail to deposit sufficient funds into the WCMA Account to reduce the WCMA Loan Balance below the Maximum WCMA Line of Credit within five (5) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(b) **Other Failure to Pay.** Customer shall fail to pay to MLBFS or deposit into the WCMA Account when due any other amount owing or required to be paid or deposited by Customer under this Loan Agreement, or shall fail to pay when due any other Obligations, and any such failure shall continue for more than five (5) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(c) **Failure to Perform.** Customer or any Guarantor shall default in the performance or observance of any covenant or agreement on its part to be performed or observed under this Loan Agreement or any of the Additional Agreements (not constituting an Event of Default under any other clause of this Section), and such default shall continue unremedied for ten (10) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(d) **Breach of Warranty.** Any representation or warranty made by Customer or any Guarantor contained in this Loan Agreement or any of the Additional Agreements shall at any time prove to have been incorrect in any material respect when made.

(e) **Default Under Other Agreement.** A default or Event of Default by Customer or any Guarantor shall occur under the terms of any other agreement, instrument or document with or intended for the benefit of MLBFS, MLPF&S or any of their affiliates, and any required notice shall have been given and required passage of time shall have elapsed.

(f) **Bankruptcy Event.** Any Bankruptcy Event shall occur.

(g) **Material Impairment.** Any event shall occur which shall reasonably cause MLBFS to in good faith believe that the prospect of full payment or performance by Customer or any Guarantor of any of their respective liabilities or obligations under this Loan Agreement or any of the Additional Agreements to which Customer or such Guarantor is a party has been materially impaired. The existence of such a material impairment shall be determined in a manner consistent with the intent of Section 1-208 of the UCC.

(h) **Acceleration of Debt to Other Creditors.** Any event shall occur which results in the acceleration of the maturity of any indebtedness of $100,000.00 or more of Customer or any Guarantor to another creditor under any indenture, agreement, undertaking, or otherwise.

(i) **Seizure or Abuse of Collateral.** The Collateral, or any material part thereof, shall be or become subject to any material abuse or misuse, or any levy, attachment, seizure or confiscation which is not released within ten (10) Business Days.

## 3.6 REMEDIES

(a) **Remedies Upon Default.** Upon the occurrence and during the continuance of any Event of Default, MLBFS may at its sole option do any one or more or all of the following, at such time and in such order as MLBFS may in its sole discretion choose:

(i) **Termination.** MLBFS may without notice terminate the WCMA Line of Credit and all obligations to provide the WCMA Line of Credit or otherwise extend any credit to or for the benefit of Customer (it being understood, however, that upon the occurrence of any Bankruptcy Event the WCMA Line of Credit and all such obligations shall automatically terminate without any action on the part of MLBFS); and upon any such termination MLBFS shall be relieved of all such obligations.

(ii) **Acceleration.** MLBFS may declare the principal of and interest on the WCMA Loan Balance, and all other Obligations to be forthwith due and payable, whereupon all such amounts shall be immediately due and payable, without presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate or other notice or formality of any kind, all of which are hereby expressly waived; provided, however, that upon the occurrence of any Bankruptcy Event all such principal, interest and other Obligations shall automatically become due and payable without any action on the part of MLBFS.

(iii) **Exercise Other Rights.** MLBFS may exercise any or all of the remedies of a secured party under applicable law, including, but not limited to, the UCC, and any or all of its other rights and remedies under this Loan Agreement and the Additional Agreements.

(iv) **Possession.** MLBFS may require Customer to make the Collateral and the records pertaining to the Collateral available to MLBFS at a place designated by MLBFS which is reasonably convenient to Customer, or may take possession of the Collateral and the records pertaining to the Collateral without the use of any judicial process and without any prior notice to Customer.

(v) **Sale.** MLBFS may sell any or all of the Collateral at public or private sale upon such terms and conditions as MLBFS may reasonably deem proper. MLBFS may purchase any Collateral at any such public sale. The net proceeds of any such public or private sale and all other amounts actually collected or received by MLBFS pursuant hereto, after deducting all costs and expenses incurred at any time in the collection of the Obligations and in the protection, collection and sale of the Collateral, will be applied to the payment of the Obligations, with any remaining proceeds paid to Customer or whoever else may be entitled thereto, and with Customer and each Guarantor remaining jointly and severally liable for any amount remaining unpaid after such application.

(vi) **Delivery of Cash, Checks, Etc.** MLBFS may require Customer to forthwith upon receipt, transmit and deliver to MLBFS in the form received, all cash, checks, drafts and other instruments for the payment of money (properly endorsed, where required, so that such items may be collected by MLBFS) which may be received by Customer at any time in full or partial payment of any Collateral, and require that Customer not commingle any such items which may be so received by Customer with any other of its funds or property but instead hold them separate and apart and in trust for MLBFS until delivery is made to MLBFS.

(vii) **Notification of Account Debtors.** MLBFS may notify any Account Debtor that its Account or Chattel Paper has been assigned to MLBFS and direct such Account Debtor to make payment directly to MLBFS of all amounts due or becoming due with respect to such Account or Chattel Paper and MLBFS may enforce payment and collect, by legal proceedings or otherwise, such Account or Chattel Paper.

(viii) **Control of Collateral.** MLBFS may otherwise take control in any lawful manner of any cash or non-cash items of payment or proceeds of Collateral and of any rejected, returned, stopped in transit or repossessed goods included in the Collateral and endorse Customer's name on any item of payment on or proceeds of the Collateral.

(b) **Set-Off.** MLBFS shall have the further right upon the occurrence and during the continuance of an Event of Default to set-off, appropriate and apply toward payment of any of the Obligations, in such order of application as MLBFS may from time to time and at any time elect, any cash, credit, deposits, accounts, financial assets, investment property, securities and any other property of Customer which is in transit to or in the possession, custody or control of MLBFS, MLPF&S or any agent, bailee, or affiliate of MLBFS or MLPF&S Customer hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional Collateral.

(c) **Power of Attorney.** Effective upon the occurrence and during the continuance of an Event of Default, Customer hereby irrevocably appoints MLBFS as its attorney-in-fact, with full power of substitution, in its place and stead and in its name or in the name of MLBFS, to from time to time in MLBFS' sole discretion take any action and to execute any instrument which MLBFS may deem necessary or advisable to accomplish the purposes of this Loan Agreement, including, but not limited to, to receive, endorse and collect all checks, drafts and other instruments for the payment of money made payable to Customer included in the Collateral.

(d) **Remedies are Severable and Cumulative.** All rights and remedies of MLBFS herein are severable and cumulative and in addition to all other rights and remedies available in the Additional Agreements, at law or in equity, and any one or more of such rights and remedies may be exercised simultaneously or successively.

(e) **Notices.** To the fullest extent permitted by applicable law, Customer hereby irrevocably waives and releases MLBFS of and from any and all liabilities and penalties for failure of MLBFS to comply with any statutory or other requirement imposed upon MLBFS relating to notices of sale, holding of sale or reporting of any sale, and Customer waives all rights of redemption or reinstatement from any such sale. Any notices required under applicable law shall be reasonably and properly given to Customer if given by any of the methods provided herein at least 5 Business Days prior to taking action. MLBFS shall have the right to postpone or adjourn any sale or other disposition of Collateral at any time without giving notice of any such postponed or adjourned date. In the event MLBFS seeks to take possession of any or all of the Collateral by court process, Customer further irrevocably waives to the fullest extent permitted by law any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession, and any demand for possession prior to the commencement of any suit or action.

## 3.7 MISCELLANEOUS

(a) **Non-Waiver.** No failure or delay on the part of MLBFS in exercising any right, power or remedy pursuant to this Loan Agreement or any of the Additional Agreements shall operate as a waiver thereof, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy. Neither any waiver of any provision of this Loan Agreement or any of the Additional Agreements, nor any consent to any departure by Customer therefrom, shall be effective unless the same shall be in writing and signed by MLBFS. Any waiver of any provision of this Loan Agreement or any of the Additional Agreements and any consent to any departure by Customer from the terms of this Loan Agreement or any of the Additional Agreements shall be effective only in the specific instance and for the specific purpose for which given. Except as otherwise expressly provided herein, no notice to or demand on Customer shall in any case entitle Customer to any other or further notice or demand in similar or other circumstances.

(b) **Disclosure.** Customer hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Customer. In connection with said authorization, the parties recognize that in order to provide a WCMA Line of Credit certain information about Customer is required to be made available on a computer network accessible by certain affiliates of MLBFS, including MLPF&S.

(c) **Communications.** All notices and other communications required or permitted hereunder shall be in writing, and shall be either delivered personally, mailed by postage prepaid certified mail or sent by express overnight courier or by facsimile. Such notices and communications shall be deemed to be given on the date of personal delivery, facsimile transmission or actual delivery of certified mail, or one Business Day after delivery to an express overnight courier. Unless otherwise specified in a notice sent or delivered in accordance with the terms hereof, notices and other communications in writing shall be given to the parties hereto at their respective addresses set forth at the beginning of this Loan Agreement, or, in the case of facsimile transmission, to the parties at their respective regular facsimile telephone number.

(d) **Fees, Expenses and Taxes.** Customer shall pay or reimburse MLBFS for: (i) all Uniform Commercial Code filing and search fees and expenses incurred by MLBFS in connection with the verification, perfection or preservation of MLBFS' rights hereunder or in the Collateral or any other collateral for the Obligations; (ii) any and all stamp, transfer and other taxes and fees payable or determined to be payable in connection with the execution, delivery and/or recording of this Loan Agreement or any of the Additional Agreements; and (iii) all reasonable fees and out-of-pocket expenses (including, but not limited to, reasonable fees and expenses of outside counsel) incurred by MLBFS in connection with the collection of any sum payable hereunder or under any of the Additional Agreements not paid when due, the enforcement of this Loan Agreement or any of the Additional Agreements and the protection of MLBFS' rights hereunder or thereunder, excluding, however, salaries and normal overhead attributable to MLBFS' employees. Customer hereby authorizes MLBFS, at its option, to either cause any and all such fees, expenses and taxes to be paid with a WCMA Loan, or invoice Customer therefor (in which event Customer shall pay all such fees, expenses and taxes within 5 Business Days after receipt of such invoice). The obligations of Customer under this paragraph shall survive the expiration or termination of this Loan Agreement and the discharge of the other Obligations.

(e) **Right to Perform Obligations.** If Customer shall fail to do any act or thing which it has covenanted to do under this Loan Agreement or any representation or warranty on the part of Customer contained in this Loan Agreement shall be breached, MLBFS may, in its sole discretion, after 5 Business Days written notice is sent to Customer (or such lesser notice, including no notice, as is reasonable under the circumstances), do the same or cause it to be done or remedy any such breach, and may expend its funds for such purpose. Any and all reasonable amounts so expended by MLBFS shall be repayable to MLBFS by Customer upon demand, with interest at the Interest Rate during the period from and including the date funds are so expended by MLBFS to the date of repayment, and all such amounts shall be additional Obligations. The payment or performance by MLBFS of any of Customer's obligations hereunder shall not relieve Customer of said obligations or of the consequences of having failed to pay or perform the same, and shall not waive or be deemed a cure of any Default.

(f) **Further Assurances.** Customer agrees to do such further acts and things and to execute and deliver to MLBFS such additional agreements, instruments and documents as MLBFS may reasonably require or deem advisable to effectuate the purposes of this Loan Agreement or any of the Additional

Agreements, or to establish, perfect and maintain MLBFS' security interests and liens upon the Collateral, including, but not limited to: (i) executing financing statements or amendments thereto when and as reasonably requested by MLBFS; and (ii) if in the reasonable judgment of MLBFS it is required by local law, causing the owners and/or mortgagees of the real property on which any Collateral may be located to execute and deliver to MLBFS waivers or subordinations reasonably satisfactory to MLBFS with respect to any rights in such Collateral.

(g) **Binding Effect.** This Loan Agreement and the Additional Agreements shall be binding upon, and shall inure to the benefit of MLBFS, Customer and their respective successors and assigns. Customer shall not assign any of its rights or delegate any of its obligations under this Loan Agreement or any of the Additional Agreements without the prior written consent of MLBFS. Unless otherwise expressly agreed to in a writing signed by MLBFS, no such consent shall in any event relieve Customer of any of its obligations under this Loan Agreement or the Additional Agreements.

(h) **Headings.** Captions and section and paragraph headings in this Loan Agreement are inserted only as a matter of convenience, and shall not affect the interpretation hereof.

(i) **Governing Law.** This Loan Agreement, and, unless otherwise expressly provided therein, each of the Additional Agreements, shall be governed in all respects by the laws of the State of Illinois.

(j) **Severability of Provisions.** Whenever possible, each provision of this Loan Agreement and the Additional Agreements shall be interpreted in such manner as to be effective and valid under applicable law. Any provision of this Loan Agreement or any of the Additional Agreements which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Loan Agreement and the Additional Agreements or affecting the validity or enforceability of such provision in any other jurisdiction.

(k) **Term.** This Loan Agreement shall become effective on the date accepted by MLBFS at its office in Chicago, Illinois, and, subject to the terms hereof, shall continue in effect so long thereafter as the WCMA Line of Credit shall be in effect or there shall be any Obligations outstanding.

(l) **Counterparts.** This Loan Agreement may be executed in one or more counterparts which, when taken together, constitute one and the same agreement.

(m) **Jurisdiction; Waiver.** CUSTOMER ACKNOWLEDGES THAT THIS LOAN AGREEMENT IS BEING ACCEPTED BY MLBFS IN PARTIAL CONSIDERATION OF MLBFS' RIGHT AND OPTION, IN ITS SOLE DISCRETION, TO ENFORCE THIS LOAN AGREEMENT (INCLUDING THE WCMA NOTE SET FORTH HEREIN) AND THE ADDITIONAL AGREEMENTS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE CUSTOMER OR ANY COLLATERAL FOR THE OBLIGATIONS MAY BE LOCATED. CUSTOMER IRREVOCABLY SUBMITS ITSELF TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND CUSTOMER WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM, AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT. CUSTOMER FURTHER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS. MLBFS AND CUSTOMER HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE WCMA LINE OF CREDIT, THIS LOAN AGREEMENT, ANY ADDITIONAL AGREEMENTS AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS LOAN AGREEMENT. CUSTOMER FURTHER WAIVES THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS.

(n) **Integration.** THIS LOAN AGREEMENT, TOGETHER WITH THE ADDITIONAL AGREEMENTS, CONSTITUTES THE ENTIRE UNDERSTANDING AND REPRESENTS THE FULL AND FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR WRITTEN AGREEMENTS OR PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS OF THE PARTIES. WITHOUT LIMITING THE FOREGOING, CUSTOMER ACKNOWLEDGES THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN: (I) NO PROMISE OR COMMITMENT HAS BEEN MADE TO IT BY MLBFS, MLPF&S OR ANY OF THEIR RESPECTIVE EMPLOYEES, AGENTS OR REPRESENTATIVES TO EXTEND THE AVAILABILITY OF THE WCMA LINE OF CREDIT OR THE MATURITY DATE, OR TO INCREASE THE MAXIMUM WCMA LINE OF CREDIT, OR OTHERWISE EXTEND ANY OTHER CREDIT TO CUSTOMER OR ANY OTHER PARTY; (II) NO PURPORTED EXTENSION OF THE MATURITY DATE, INCREASE IN THE MAXIMUM WCMA LINE OF CREDIT OR OTHER EXTENSION OR AGREEMENT TO EXTEND CREDIT SHALL BE VALID OR BINDING UNLESS EXPRESSLY SET FORTH IN A WRITTEN INSTRUMENT SIGNED BY MLBFS; AND (III) THIS LOAN AGREEMENT SUPERSEDES AND REPLACES ANY AND ALL PROPOSALS, LETTERS OF INTENT AND APPROVAL AND COMMITMENT LETTERS FROM MLBFS TO CUSTOMER, NONE OF WHICH SHALL BE CONSIDERED AN ADDITIONAL AGREEMENT. NO AMENDMENT OR MODIFICATION OF THIS AGREEMENT OR ANY OF THE ADDITIONAL AGREEMENTS TO WHICH CUSTOMER IS A PARTY SHALL BE EFFECTIVE UNLESS IN A WRITING SIGNED BY BOTH MLBFS AND CUSTOMER.

**IN WITNESS WHEREOF**, this Loan Agreement has been executed as of the day and year first above written.

**SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**

By: _C. Leo Smith_ _____

Signature (1)                                              Signature (2)

_C. Leo Smith_

Printed Name                                              Printed Name

_President_

Title                                                              Title

STATE OF _GEORGIA_ }

COUNTY OF _CLAYTONS_ } SS.

The foregoing instrument was acknowledged before me this day of _5th APRIL_ AD, 2000 by _CHRISTIAN L. SMITH_ of **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a Florida corporation, on behalf of the corporation. Said person is personally known to me or has produced _FLORIDA DRIVERS LICENSE_ as identification.

_Sherry W Watkins_

NOTARY PUBLIC

_SHERRY W WATKINS_

PRINTED NAME OF NOTARY PUBLIC

My Commission Expires:

_10-08-01_                Notary Public, Clayton County, Georgia
                                My Commission Expires October 8, 2001

[S E A L]

Accepted at Chicago, Illinois:
**MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.**

By: _Wendy Champin_ _____

-11-

## EXHIBIT A

**ATTACHED TO AND HEREBY MADE A PART OF WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64 BETWEEN MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. AND SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**

Additional Locations of Tangible Collateral:

3141 W. McNab Road
Pompano Beach, FL  33069

768 NW 57th Court
Fort Lauderdale, FL  33309

# Merrill Lynch

## SECRETARY'S CERTIFICATE

The undersigned hereby certifies to **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.** that the undersigned is the duly appointed and acting Secretary (or Assistant Secretary) of **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a corporation duly organized, validly existing and in good standing under the laws of the State of Florida; and that the following is a true, accurate and compared transcript of resolutions duly, validly and lawfully adopted on the ___3___ day of ___APRIL___, 2000 by the Board of Directors of said Corporation acting in accordance with the laws of the state of incorporation and the charter and by-laws of said Corporation:

"RESOLVED, that this Corporation is authorized and empowered, now and from time to time hereafter, to borrow and/or obtain credit from, and/or enter into other financial arrangements with, MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. ("MLBFS"), and in connection therewith to grant to MLBFS liens and security interests on any or all property belonging to this Corporation; all such transactions to be on such terms and conditions as may be mutually agreed from time to time between this Corporation and MLBFS; and

"FURTHER RESOLVED, that the President, any Vice President, Treasurer, Secretary or other officer of this Corporation, or any one or more of them, be and each of them hereby is authorized and empowered to: (a) execute and deliver to MLBFS on behalf of this Corporation any and all loan agreements, promissory notes, security agreements, pledge agreements, financing statements, mortgages, deeds of trust, leases and/or all other agreements, instruments and documents required by MLBFS in connection therewith, and any present or future extensions, amendments, supplements, modifications and restatements thereof, all in such form as any such officer shall approve, as conclusively evidenced by his or her signature thereon, and (b) do and perform all such acts and things deemed by any such officer to be necessary or advisable to carry out and perform the undertakings and agreements of this Corporation in connection therewith; and any and all prior acts of each of said officers in these premises are hereby ratified and confirmed in all respects; and

"FURTHER RESOLVED, that MLBFS is authorized to rely upon the foregoing resolutions until it receives written notice of any change or revocation from an authorized officer of this Corporation, which change or revocation shall not in any event affect the obligations of this Corporation with respect to any transaction conditionally agreed or committed to by MLBFS or having its inception prior to the receipt of such notice by MLBFS."

The undersigned further certifies that: (a) the foregoing resolutions have not been rescinded, modified or repealed in any manner, are not in conflict with any agreement of said Corporation and are in full force and effect as of the date of this Certificate, and (b) the following individuals are now the duly elected and acting officers of said Corporation and the signatures set forth below are the true signatures of said officers:

President: _____

Vice President: _____

Treasurer: _____

Secretary: _____

Additional Title _____

IN WITNESS WHEREOF, the undersigned has executed this Certificate and has affixed the seal of said Corporation hereto, pursuant to due authorization, all as of this ___3___ day of ___April___, 2000.

(Corporate Seal)

_____
Secretary

Printed Name: _____



Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 269-1373
FAX: (312)499-3253

August 4, 2000

Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

### Re: Amendment to Loan Documents

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA  LOAN AND SECURITY AGREEMENT NO. 741-07L64** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) Effective Immediately, the term "Maximum WCMA Line of Credit" shall mean $580,000.00.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents other than the existing covenant violations; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

Provided that no Event of Default, other than the existing covenant violations, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have

Smith International E̲̲     ̲es, Inc. d/b/a Ameriplast
August 4, 2000
Page No. 2

occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) an officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 3 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 3-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____

Matthew B. Hanson
Division Portfolio Manager

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name:  STEVE  MEISTLE

Title:  CONTROLLER

Approved:

_____
**C. Leo Smith**

_____
**Pilar Concha**

CC:  Leo Smith

g: wordaprn: wac amendments\smith .ntl decrease.doc

Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 269-1373
FAX: (312)499-3253

 **Merrill Lynch**

August 4, 2000

Mr. Steve Meistle
Controller
Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL  33069

Re: **Amendment To Loan Documents**

Dear Mr. Meistle,

Based on our recent discussions regarding certain covenant violations that have occurred, we enclose herewith a Letter Agreement amending the documents evidencing our loans or extensions of credit.

Please note that the enclosed Letter Agreement must be fully executed and returned to me within 3 Business Days from the date hereof.

If you have any questions, please call me at (312) 269-1373.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____

Matthew B. Hanson
Division Portfolio Manager

cc: Lily Tapia
   Leo Smith



Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

November 2, 2000

Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

Re: Amendment to Loan Documents

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) Effective immediately, the term "Maximum WCMA Line of Credit" shall mean $700,000.00

(b) Customer's "tangible net worth" shall at all times exceed $1,800,000.00. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to: (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(c) The ratio of Customer's total debt to Customer's tangible net worth, determined as aforesaid, shall not at any time exceed 2.5 to 1.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is

ME        ICH BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc. d/b/a Ameriplast
November 2, 2000
Page No. 2

continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

**MLBFS requests that as soon as feasible Customer furnish to MLBFS the following item (however, the Effective Date of this Letter Agreement is not conditioned upon the receipt of the such item):**

**A UCC-3 termination from BankAtlantic**

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) an officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
Stewart T. Newman
Senior Relationship Manager

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name: _____

Title: _____

Smith International Enterprises, Inc. d/b/a Ameriplast
November 2, 2000
Page No. 3

*Approved:*

_____
**C. Leo Smith**


_____
**Pilar Concha**

g:\word\admin\lay\portfolio\smith international enterprises (amndt 1).doc

Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

 **Merrill Lynch**

January 31, 2001

Mr. Leo Smith
President
Smith International Enterprises, Inc.
d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

Re: **WCMA Line of Credit Increase**

Dear Mr. Smith,

I am pleased to advise you that the request of Smith International Enterprises, Inc. d/b/a Ameriplast for an increase of its WCMA Line of Credit has been approved upon the terms set forth in the enclosed Letter Agreement.

Note that, among other conditions in said Letter Agreement, in order for this increase to become effective, one copy of the enclosed Letter Agreement must be fully executed and returned to me within 14 days from the date hereof.

If you have any questions, please call me at (312) 499-3306.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
Stewart T. Newman
Senior Relationship Manager

cc: Rob Dixon

Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

 **Merrill Lynch**

January 31, 2001

Smith International Enterprises, Inc.
d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

### Re: WCMA Line of Credit Increase

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) The term "Maximum WCMA Line of Credit" shall mean $1,000,000.00.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

**Note further that under the terms of the Loan Documents Customer is responsible for UCC filing and search fees and expenses and any taxes in connection with the Loan Documents**

MERI‌    CH BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc.
d/b/a Ameriplast
January 31, 2001
Page No. 2

**and/or such filing and for a Florida documentary stamp tax in the amount of $1,050.00. Consult your tax advisor about this tax, since it may not be due if the Loan Documents are executed outside of the State of Florida, as evidenced by a notary's acknowledgment at the end of certain of the Loan Documents. Subject to such evidence that the tax is not payable, please also include with the executed documents a check for the documentary stamp taxes payable to "Lexis Document Services".**

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) an officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
Stewart T. Newman
Senior Relationship Manager

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name: C. Leo Smith

Title: PRESIDENT

Smith International Enterprises, Inc.
d/b/a Ameriplast
January 31, 2001
Page No. 3

STATE OF _Florida_ }
                                        } SS.
COUNTY OF _Broward_ }

The foregoing instrument was acknowledged before me this day of _February 1, 2001_ AD, 2001 by _C. Leo Smith_ of **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a Florida corporation, on behalf of the corporation. Said person is personally known to me or has produced _personally known_ as identification.

_Donna Skaro-Fuson_
NOTARY PUBLIC

_Donna Skaro-Fuson_
PRINTED NAME OF NOTARY PUBLIC

My Commission Expires: _1-19-03_

Donna Skaro-Fuson
Commission # CC 802810
Expires JAN. 19, 2003
BONDED THRU
ATLANTIC BONDING CO., INC.

_Approved:_

_____
C. Leo Smith

_____
Pilar Concha

g:\word\comp\kf\amendments\smith international - amend.doc

_2\5\01_
_NO Doc stamp fee required_
_Per Matt H's conversation w/_
_Nikki - since original loan_
_was not signed in FL._

Private Client Group

 **Merrill Lynch**

**Merrill Lynch Business
Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

April 20, 2001

Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

### Re: WCMA Line of Credit Increase and Extension

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below) the Loan Documents are hereby amended as follows:

(a) The "Maturity Date" of the WCMA Line of Credit is hereby extended to April 30, 2002.

(b) The "Maximum WCMA Line of Credit" is hereby increased to $1,250,000.00.

(c) The "Line Fee" for the period ending April 30, 2002, shall be $12,500.00. Customer hereby authorizes and directs MLBFS to charge said amount to WCMA Account No. 741-07L64 on or at any time after the Effective Date.

(d) Customer's "tangible net worth" shall at all times exceed $1,750,000.00. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to: (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

(e) The ratio of Customer's total debt to Customer's tangible net worth, determined as aforesaid, shall not at any time exceed 4.25 to 1.

(f) The "Net Cash Flow" of Customer as of the end of each of its fiscal years shall not be less than $100,000.00. As used herein, "Net Cash Flow" shall mean the (i) the sum of Customer's annual net after-tax income, any non-recurring expenses and depreciation and similar non-cash charges, less (ii) the sum of the current portion of Customer's long term debt, any non-recurring income and any dividends or other distributions to its owners; all as set forth on Customer's regular annual financial statements prepared in a manner consistent with the terms hereof.

Smith International Enterprises, Inc. d/b/a Ameriplast
April 20, 2001
Page No. 2

(g) In addition to existing requirements, Customer shall provide to MLBFS:

> Within 120 days after the close of each fiscal year of Customer, a copy of the annual audited financial statements of Customer, including in reasonable detail, a balance sheet and statement of retained earnings as at the close of such fiscal year and statements of profit and loss and cash flow for such fiscal year.

(h) Customer is no longer required to submit Corporate Tax Returns to MLBFS.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

**MLBFS requests that as soon as feasible Customer furnish to MLBFS the following item (however, the Effective Date of this Letter Agreement is not conditioned upon the receipt of the such item):**

> A copy of each individual Guarantor's current personal financial statements and 2000 personal tax returns.

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement enclosed herewith; and (b) **Note further that under the terms of the Loan Documents Customer is responsible for a Florida documentary stamp tax in the amount of $875.00. Consult your tax advisor about this tax, since it may not be due if the Loan Documents are executed outside of the State of Florida, as evidenced by a notary's acknowledgment at the end of the Loan Agreement. Subject to such evidence that the tax is not payable, please include a check for the documentary stamp taxes payable to "Lexis Document Services" with the executed documents; and** (c) An officer of MLBFS shall have reviewed and approved this Letter Agreement as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS. be void.

Smith International Enterprises, Inc. d/b/a Ameriplast
April 20, 2001
Page No. 3

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____

Stewart T. Newman
Senior Relationship Manager

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

X _____

Printed Name: O. Leo Smith

Title: President

STATE OF Florida            }
                            } SS.
COUNTY OF Broward           }

The foregoing instrument was acknowledged before me this day of 24 April_____ AD, 2001 by O Leo Smith_____ of SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST, a Florida corporation, on behalf of the corporation. Said person is personally known to me or has produced _____ as identification.

_____
NOTARY PUBLIC

_____
PRINTED NAME OF NOTARY PUBLIC

Donna Skaro-Fuson
Commission # CC 802810
Expires JAN. 19, 2003
BONDED THRU
ATLANTIC BONDING CO., INC.

My Commission Expires:

1 - 19 - 03
[S E A L]

Smith International Enterprises, Inc. d/b/a Ameriplast
April 20, 2001
Page No. 4

*Approved:*

_____
C. Leo Smith

_____
Pilar Concha

g:\word\admin\std\documentation\renewal letters\smith international enterprises, inc. ren-incr.doc

Private Client Group

**Merrill Lynch Business**
**Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 499-3253

 **Merrill Lynch**

April 20, 2001

Mr. Steve Meistle
Smith International Enterprises, Inc. d/b/a Ameriplast
3041 West McNab Road
Pompano Beach, FL 33069

Re: **WCMA Line of Credit Increase and Extension**

Dear Mr. Meistle,

I am pleased to advise you that the request of Smith International Enterprises, Inc. d/b/a Ameriplast for an increase and extension of its WCMA Line of Credit has been approved upon the terms set forth in the enclosed Letter Agreement.

Note that, among other conditions in said Letter Agreement, in order for this increase and extension to become effective, one copy of the enclosed Letter Agreement must be fully executed and returned to me within 14 days from the date hereof.

If you have any questions, please call me at (312) 499-3306.

Very truly yours,

MERRILL LYNCH BUSINESS
FINANCIAL SERVICES INC.

By: _____
   Stewart T. Newman
   Senior Relationship Manager

cc: Lily Tapia

4/26/01 T. Cc stamp tax required as technically / not new monies, no new monies are being disbursed. LM

Private Client Group

**Merrill Lynch Business**
**Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312) 845-9093

 **Merrill Lynch**

June 22, 2001

Smith International Enterprises, Inc. d/b/a Ameriplast
6290 NW 27th Way
Fort Lauderdale, FL 33309

### Re: WCMA Line of Credit Increase

Ladies & Gentlemen:

This Letter Agreement will serve to confirm certain agreements of Merrill Lynch Business Financial Services Inc. ("MLBFS") and Smith International Enterprises, Inc. d/b/a Ameriplast ("Customer") with respect to: (i) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64** between MLBFS and Customer (including any previous amendments and extensions thereof), and (ii) all other agreements between MLBFS and Customer or any party who has guaranteed or provided collateral for Customer's obligations to MLBFS (a "Guarantor") in connection therewith (collectively, the "Loan Documents"). Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

Subject to the terms hereof, effective as of the "Effective Date" (as defined below), the Loan Documents are hereby amended as follows:

(a) The term "Maximum WCMA Line of Credit" shall mean an amount equal to the lesser of: (A) $1,500,000.00 or (B) 80% of Customer's domestic Accounts and Chattel Paper, as shown on its regular books and records (excluding Accounts over 90 days old, Chattel Paper with installments or other sums more than 90 days past due, and Accounts and Chattel Paper directly or indirectly due from any person or entity not domiciled in the continental United States, Alaska or Hawaii, or from any shareholder, officer or employee of Customer or any affiliated entity) plus 50% of Customer's Inventory, as shown on its regular books and records (excluding all work in process inventory).

(b) The annual "Line Fee" is hereby increased to $15,000.00. In connection with the increase in the Maximum WCMA Line of Credit pursuant hereto, a portion of such new Line Fee in the amount of $2,100.00 (the "Increase Fee") is now due and owing. Customer hereby authorizes and directs MLBFS to charge the Increase Fee to WCMA Account No. 741-07L64 on or at any time after the Effective Date. Once charged, the Increase Fee is non-refundable.

(c) The ratio of Customer's total debt to Customer's tangible net worth shall not at any time exceed 5 to 1. For the purposes hereof, the term "tangible net worth" shall mean Customer's net worth as shown on Customer's regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer by officers, shareholders or affiliates of Customer.

MERRIL       .H BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc. d/b/a Ameriplast
June 22, 2001
Page No. 2

(d) "Obligations" shall mean all liabilities, indebtedness and other obligations of Customer to MLBFS, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary or joint or several, and, without limiting the foregoing, shall include interest accruing after the filing of any petition in bankruptcy, and all present and future liabilities, indebtedness and obligations of Customer under this Loan Agreement and under that certain WCMA Reducing Revolver Loan and Security Agreement No. 741-07L65.

(e) For all purposes of the Loan Documents, Customer's address shall be 6290 NW 27th Way, Fort Lauderdale, FL 33309.

(f) In addition to existing requirements, Customer shall provide to MLBFS:

• Not later than 120 days after the close of each fiscal year of Customer, a current signed financial statement of each individual Guarantor.

Except as expressly amended hereby, the Loan Documents shall continue in full force and effect upon all of their terms and conditions.

By their execution of this Letter Agreement, the below-named Guarantors hereby consent to the foregoing modifications to the Loan Documents, and hereby agree that the "Obligations" under their respective Unconditional Guaranty and/or agreements providing collateral shall extend to and include the Obligations of Customer under the Loan Documents, as amended hereby.

Customer and said Guarantors acknowledge, warrant and agree, as a primary inducement to MLBFS to enter into this Agreement, that: (a) no Default or Event of Default has occurred and is continuing under the Loan Documents; (b) each of the warranties of Customer in the Loan Documents are true and correct as of the date hereof and shall be deemed remade as of the date hereof; (c) neither Customer nor any of said Guarantors have any claim against MLBFS or any of its affiliates arising out of or in connection with the Loan Documents or any other matter whatsoever; and (d) neither Customer nor any of said Guarantors have any defense to payment of any amounts owing, or any right of counterclaim for any reason under, the Loan Documents.

**The obligations of MLBFS under this Letter Agreement are subject to its receipt (where applicable) and satisfaction with the following:**

      **A current personal financial statements for C. Leo Smith and Pilar Concha.**

      **An updated insurance certificate naming MLBFS as lender's loss payee.**

Provided that no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, and the condition specified above shall have been met to our satisfaction, the amendments and agreements in this Letter Agreement will become effective on the date (the "Effective Date") upon which: (a) Customer and the Guarantors shall have executed and returned the duplicate copy of this Letter Agreement and the other document enclosed herewith (b) **Customer shall furnish to MLBFS a check in the amount of $875.00 made payable to "Lexis Document Services" representing the stamp tax required by the Secretary**

MERRILL   ..H BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc. d/b/a Ameriplast
June 22, 2001
Page No. 3

**of State of Florida**; and (c) an officer of MLBFS shall have reviewed and approved this Letter Agreement and said other document as being consistent in all respects with the original internal authorization hereof.

Notwithstanding the foregoing, if Customer and the Guarantors do not execute and return the duplicate copy of this Letter Agreement and said other document within 14 days from the date hereof, or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur within said 14-day period, then all of said amendments and agreements will, at the sole option of MLBFS, be void.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
       Stewart T. Newman
       Senior Relationship Manager

*Accepted:*

**Smith International Enterprises, Inc. d/b/a Ameriplast**

By: _____

Printed Name: _____

Title: _____

*Approved:*

_____
**C. Leo Smith**

_____
**Pilar Concha**

MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.

Smith International Enterprises, Inc. d/b/a Ameriplast
June 22, 2001
Page No. 4

STATE OF _Florida_               }
                            } SS.
COUNTY OF _Brevard_  }

The foregoing instrument was acknowledged before me this day of _June 26, 2001_ AD, 2001 by _____ of **Smith International Enterprises, Inc. d/b/a Ameriplast**, a Florida corporation, on behalf of the corporation. Said person is <u>personally known</u> to me or has produced _____ as identification.

_Donna Skaro-Fuson_
NOTARY PUBLIC

_Donna Skaro-Fuson_
PRINTED NAME OF NOTARY PUBLIC

My Commission Expires: _6-19-03_

Donna Skaro-Fuson
Commission # CC 802810
Expires JAN. 19, 2003
BONDED THRU
ATLANTIC BONDING CO., INC.

g:\word\admin\jay\portfolio\smith international enterprises (incrse).doc

Private Client Group

**Merrill Lynch Business Financial Services Inc.**
222 North LaSalle Street
17th Floor
Chicago, Illinois 60601
(312) 499-3306
FAX: (312)845-9093

 **Merrill Lynch**

June 22, 2001

Mr. Steve Meistle
Smith International Enterprises, Inc. d/b/a Ameriplast
6290 NW 27th Way
Fort Lauderdale, FL 33309

Re: **WCMA Line of Credit Increase**

Dear Mr. Meistle,

I am pleased to advise you that the request of Smith International Enterprises, Inc. d/b/a Ameriplast for an increase of its WCMA Line of Credit has been approved upon the terms set forth in the enclosed Letter Agreement.

Note that, among other conditions in said Letter Agreement, in order for this increase to become effective, one copy of the enclosed Letter Agreement and the other document enclosed herewith must be fully executed and returned to me within 14 days from the date hereof.

If you have any questions, please call me at (312) 499-3306.

Very truly yours,

**Merrill Lynch Business Financial Services Inc.**

By: _____
Stewart T. Newman
Senior Relationship Manager

cc: Lily Tapia

# Merrill Lynch

## UNCONDITIONAL GUARANTY

**FOR VALUE RECEIVED,** and in order to induce **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.** ("MLBFS") to advance moneys or extend or continue to extend credit or lease property to or for the benefit of, or modify its credit relationship with, or enter into any other financial accommodations with **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST**, a corporation organized and existing under the laws of the State of Florida (with any successor in interest, including, without limitation, any successor by merger or by operation of law, herein collectively referred to as "Customer") under: (a) that certain **WCMA LOAN AND SECURITY AGREEMENT NO. 741-07L64** between MLBFS and Customer; (b) that certain **WCMA REDUCING REVOLVER LOAN AND SECURITY AGREEMENT NO. 741-07L65** between MLBFS and Customer (collectively, the "Loan Agreements"); (c) any "Additional Agreements", as that term is defined in the Loan Agreements; and (d) all present and future amendments, restatements, supplements and other evidences of any extensions, increases, renewals, modifications and other changes of or to the Loan Agreements or any Additional Agreements (collectively, the "Guaranteed Documents"), **the undersigned** (individually, "Guarantor", and collectively "Guarantors") **hereby jointly and severally unconditionally guarantee to MLBFS** (subject, however, to the limitation of liability hereinafter set forth): (i) the prompt and full payment when due, by acceleration or otherwise, of all sums now or any time hereafter due from Customer to MLBFS under the Guaranteed Documents, (ii) the prompt, full and faithful performance and discharge by Customer of each and every other covenant and warranty of Customer set forth in the Guaranteed Documents, and (iii) the prompt and full payment and performance of all other indebtedness, liabilities and obligations of Customer to MLBFS, howsoever created or evidenced, and whether now existing or hereafter arising (collectively, the "Obligations"). Guarantors further agree to pay all reasonable costs and expenses (including, but not limited to, court costs and reasonable attorneys' fees) paid or incurred by MLBFS in endeavoring to collect or enforce performance of any of the Obligations, or in enforcing this Guaranty. Guarantors acknowledge that MLBFS is relying on the execution and delivery of this Guaranty in advancing moneys to or extending or continuing to extend credit to or for the benefit of Customer.

This Guaranty is absolute, unconditional and continuing and shall remain in effect until all of the Obligations shall have been fully and indefeasibly paid, performed and discharged. Upon the occurrence and during the continuance of any default or Event of Default under any of the Guaranteed Documents, any or all of the indebtedness hereby guaranteed then existing shall, at the option of MLBFS, become immediately due and payable from Guarantors (it being understood, however, that upon the occurrence of any "Bankruptcy Event", as defined in the Loan Agreements, all such indebtedness shall automatically become due and payable without action on the part of MLBFS). Notwithstanding the occurrence of any such event, this Guaranty shall continue and remain in full force and effect. To the extent MLBFS receives payment with respect to the Obligations, and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, required to be repaid by MLBFS or is repaid by MLBFS pursuant to a settlement agreement, to a trustee, receiver or any other person or entity, whether under any Bankruptcy law or otherwise (a "Returned Payment"), this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by MLBFS, and the indebtedness or part thereof intended to be satisfied by such Returned Payment shall be revived and continued in full force and effect as if said Returned Payment had not been made.

The liability of Guarantors hereunder shall in no event be affected or impaired by any of the following, any of which may be done or omitted by MLBFS from time to time, without notice to or the consent of any Guarantor: (a) any renewals, amendments, modifications or supplements of or to any of the Guaranteed Documents, or any extensions, forbearances, compromises or releases of any of the Obligations or any of MLBFS' rights under any of the Guaranteed Documents; (b) any acceptance by MLBFS of any collateral or security for, or other guarantees of, any of the Obligations; (c) any failure, neglect or omission on the part of MLBFS to realize upon or protect any of the Obligations, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of Customer or any other guarantor, possessed by or under the control of MLBFS or any of its affiliates, toward the liquidation or reduction of the Obligations; (d) any invalidity, irregularity or unenforceability of all or any part of the Obligations, of any collateral security for the Obligations, or the Guaranteed Documents; (e) any application of payments or credits by MLBFS; (f) the granting of credit from time to time by MLBFS to Customer in excess of the amount set forth in the Guaranteed Documents; or (g) any other act of commission or omission of any kind or at any time upon the part of MLBFS or any of its affiliates or any of their respective employees or agents with respect to any matter whatsoever. MLBFS shall not be required at any time, as a condition of Guarantors' obligations hereunder, to resort to payment from Customer or other persons or entities whatsoever, or any of their properties or estates, or resort to any collateral or pursue or exhaust any other rights or remedies whatsoever.

No release or discharge in whole or in part of any one or more of the Guarantors or any other guarantor of the Obligations shall release or discharge any of the other Guarantors or any other guarantor, unless and until all of the Obligations shall have been indefeasibly fully paid and discharged. Guarantors expressly waive presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of advancement of funds under the Guaranteed Documents and all other notices and formalities to which Customer or Guarantors might be entitled, by statute or otherwise, and, so long as there are any Obligations or MLBFS is committed to extend credit to Customer, Guarantors waive any right to revoke or terminate this Guaranty without the express written consent of MLBFS.

So long as there are any Obligations, Guarantors shall not have any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right, or remedy of MLBFS against Customer or any security which MLBFS now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise.

MLBFS is hereby irrevocably authorized by Guarantors at any time during the continuance of an Event of Default under any of the Loan Agreements or any other of the Guaranteed Documents or in respect of any of the Obligations, in its sole discretion and without demand or notice of any kind, to appropriate, hold, set off and apply toward the payment of any amount due hereunder, in such order of application as MLBFS may elect, all cash, credits, deposits, accounts, financial assets, investment property, securities and any other property of any Guarantor which is in transit to or in the possession, custody or control of MLBFS or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), or any of their respective agents, bailees or affiliates. Guarantors hereby collaterally assign and grant to MLBFS a continuing security interest in all such property as additional security for the Obligations. Upon the

occurrence and during the continuance of an Event of Default, MLBFS shall have all rights in such property available to collateral assignees and secured parties under all applicable laws, including, without limitation, the Uniform Commercial Code.

Each Guarantor agrees to furnish to MLBFS such financial information concerning Guarantor as may be required by any of the Guaranteed Documents or as MLBFS may otherwise from time to time reasonably request. Guarantors further hereby irrevocably authorize MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about any Guarantors.

Each Guarantor severally warrants and agrees that: (a) unless clearly stated or noted, no material assets shown on any financial statements of such Guarantor heretofore or hereafter furnished to MLBFS are or will be held in an irrevocable trust, pension trust, retirement trust, IRA or other trust or form of ownership exempt from execution by creditors of such Guarantor; and, (b) except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld, such Guarantor will not hereafter transfer any material assets of such Guarantor to any trust or third party if the effect thereof will be to cause such assets to be exempt from execution by creditors of such Guarantor (excluding, however, normal and reasonable contributions to pension plans, retirement plans, etc., and IRA rollovers).

No delay on the part of MLBFS in the exercise of any right or remedy under any of the Guaranteed Documents, this Guaranty or any other agreement shall operate as a waiver thereof, and, without limiting the foregoing, no delay in the enforcement of any security interest, and no single or partial exercise by MLBFS of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. This Guaranty may be executed in any number of counterparts, each of which counterparts, once they are executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Guaranty. This Guaranty shall be binding upon Guarantors and their respective heirs and personal representatives, and shall inure to the benefit of MLBFS and its successors and assigns. All obligations of the Guarantors hereunder are joint and several.

This Guaranty shall be governed by the laws of the State of Illinois. **WITHOUT LIMITING THE RIGHT OF MLBFS TO ENFORCE THIS GUARANTY IN ANY JURISDICTION AND VENUE PERMITTED BY APPLICABLE LAW: (I) GUARANTORS AGREE THAT THIS GUARANTY MAY AT THE OPTION OF MLBFS BE ENFORCED BY MLBFS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE ANY GUARANTOR, CUSTOMER OR ANY COLLATERAL FOR THE OBLIGATIONS OF CUSTOMER MAY BE LOCATED, (II) GUARANTORS IRREVOCABLY SUBMIT TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND (III) GUARANTORS WAIVE ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT. GUARANTORS FURTHER WAIVE ANY RIGHTS TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS. MLBFS AND GUARANTORS HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS GUARANTY. GUARANTORS FURTHER WAIVE THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS.** Wherever possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. No modification or waiver of any of the provisions of this Guaranty shall be effective unless in writing and signed by Guarantors and an officer of MLBFS.

Dated as of March 29, 2000.

Guarantor:                                                                 Address:


C. LEO SMITH


PILAR CONCHA


Witness:


Printed Name: ROBERT A. DIXON

FL-SOS

| UNIFORM COMMERCIAL CODE | STATE OF FLORIDA **FINANCING STATEMENT** | FORM UCC-1 (REV. 1993) |
|---|---|---|

*This Financing Statement is presented to a filing officer for filing pursuant to the Uniform Commercial Code:*

**1. Debtor** (Last Name First if an Individual)
Smith International Enterprises, Inc. d/b/a Ameriplast

**1a. Date of Birth or FEI#**
65-0297121

| **1b. Mailing Address** 3041 W. McNab Road | **1c. City, State** POMPANO BEACH, FL | **1d. Zip Code** 33069 |
|---|---|---|

**2. Additional Debtor or Trade Name** (Last Name First if an Individual)
Ameriplast

**2a. Date of Birth or FEI#**

| **2b. Mailing Address** 3041 W. McNab Road | **2c. City, State** POMPANO BEACH, FL | **2d. Zip Code** 33069 |
|---|---|---|

**3. Secured Party** (Last Name First if an Individual)
Merrill Lynch Business Financial Services Inc.

| **3a. Mailing Address** 222 North LaSalle Street 17th Floor | **3b. City, State** CHICAGO, IL | **3c. Zip Code** 60601 |
|---|---|---|

**4. Assignee of Secured Party** (Last Name First if an Individual)

| **4a. Mailing Address** | **4b. City, State** | **4c. Zip Code** |
|---|---|---|

**5. This Financing Statement covers the following types or items or property [include description of real property on which located and owner of record when required. If more space is required, attach additional sheet(s)].**

All Accounts, Chattel Paper, Contract Rights, Inventory, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Assets of Debtor, howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located; together with all parts thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, and all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds).

In accordance with the terms of a certain Loan Agreement between Debtor and Secured Party, Debtor has agreed that except for certain "Permitted Liens" (as defined in said Loan Agreement), Debtor will not further encumber any of the above property without the prior written consent of Secured Party.

200000087184--6

413 UST 28⁰⁰

**6. Check only if Applicable:** ☐ Products of collateral are also covered.  ☐ Proceeds of collateral are also covered.  ☐ Debtor is transmitting utility.

**7. Check appropriate box:** (One box must be marked)
☐ All documentary stamp taxes due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
☒ Florida Documentary Stamp Tax is not required.   FL-SOS

**8. In accordance with s. 679.402(2), F.S., this statement is filed without the Debtor's signature to perfect a security interest in collateral:**
☐ already subject to a security interest in another jurisdiction when it was brought into this state or debtor's location changed to this state.
☐ which is proceeds of the original collateral described above in which a security interest was perfected.
☐ as to which the filing has lapsed. Date filed _____ and previous UCC-1 file number _____
☐ acquired after a change of name, identity, or corporate structure of the debtor.

**9. Number of additional sheets presented:**

*This Space for Use of Filing Officer*

**10. Signature(s) of Debtor(s)**
Smith International Enterprises, Inc. d/b/a Ameriplast
*C. Leo Smith,*
*President*

**11. Signature(s) of Secured Party or if Assigned, by Assignee(s)**
Merrill Lynch Business Financial Services Inc.
*Wendy Champion*   *Sr. Doc. Manager*

**12. Return Copy to:**

| Name | LEXIS DOCUMENT SERVICES INC |
|---|---|
| Address | PO BOX 2969 |
| | SPRINGFIELD, IL 62708 |
| Address | |
| City, State, Zip | |

FILED
00 APR 13 PM 1:16
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

FILING OFFICER COPY    **STANDARD FORM - FORM UCC-1**    Approved by Secretary of State, State of Florida

 **Merrill Lynch**

**LANDLORD'S SUBORDINATION AGREEMENT**

The undersigned **Landlord** is the record owner and lessor to **SMITH INTERNATIONAL ENTERPRISES, INC. D/B/A AMERIPLAST** ("Tenant") of the real property commonly known as 6290 NW 27th Way Ft. Lauderdale, FL 33309 (the "Premises").

Landlord has been advised that **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.** ("MLBFS") has or is about to lend moneys to, extend or continue to extend credit to or for the benefit of, or enter into another financial accommodation with, Tenant, or for the benefit of a third party based upon the credit and/or collateral of Tenant, and in connection therewith that Tenant has granted or is about to grant to MLBFS a security interest in, among other collateral, the following property of Tenant ("MLBFS' Collateral"); to wit:

All equipment, inventory, removable trade fixtures and other tangible and intangible personal property now and hereafter owned by Tenant.

Among other conditions thereof, MLBFS has required that Landlord execute and deliver this Agreement. Accordingly, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord hereby agrees as follows:

1. Landlord hereby subordinates for the benefit of MLBFS, and with respect to all present and future obligations of or secured by Tenant to MLBFS, any right or interest in MLBFS' Collateral which, but for this Agreement, would or might be prior to the rights and/or security interests of MLBFS, as aforesaid; and Landlord agrees so long as Tenant shall be obligated to MLBFS, it will not, without the prior consent of MLBFS, exercise any right under local law to levy or distrain upon any of MLBFS' Collateral.

2. Landlord further agrees that in the event that MLBFS shall at any time seek to take possession of or remove all or any part of MLBFS' Collateral from the Premises, Landlord will not hinder the same or interfere or object thereto, and Landlord hereby consents to MLBFS' entry upon the Premises for such purposes; provided, however, that: (i) any such removal shall be made during reasonable business hours; (ii) MLBFS shall not, without the prior written consent of Landlord, conduct any public or auction sale on the Premises; and (iii) MLBFS shall promptly at its expense repair any damage to the Premises directly caused by any such removal by MLBFS or its agents of MLBFS' Collateral from the Premises.

This Agreement shall be binding upon and shall inure to the benefit of Landlord and it successors, assigns, heirs and/or personal representatives, as applicable, and MLBFS and its successors and assigns.

Dated as of June 22, 2001.

Landlord: *Smith International Enterprises, Inc*

By: _____
    (Signature 1)                    (Signature 2)

*C Lee Smith*          *Pilar Concha*
(Printed Name)              (Printed Name)

*President*                *Vice President*
(Title)                    (Title)

# Merrill Lynch

## LANDLORD SUBORDINATION AGREEMENT

The undersigned Landlord is the record owner and lessor to SMITH INTERNATIONAL ENTERPRISES, INC. d/b/a AMERIPLAST ("Tenant") of the real property commonly known as 5141 W. McNab Road Pompano Beach, FL 33069 (the "Premises").

Landlord has been advised that MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. ("MLBFS") has or is about to lend moneys to, extend or continue to extend credit to or for the benefit of, or enter into other financial accommodations with Tenant, or for the benefit of a third party based upon the credit and/or collateral of Tenant, and in connection therewith has granted or is about to grant to MLBFS a security interest in, among other collateral, the following property of Tenant (MLBFS Collateral), to wit:

    All inventory and other tangible and intangible personal property now and hereafter owned by Tenant.

Among other conditions thereof, MLBFS has required that Landlord execute and deliver this Agreement. Accordingly, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord hereby agrees as follows:

1. Landlord hereby subordinates to the benefit of MLBFS, and with respect to all present and future obligations of or secured by Tenant to MLBFS, any right or interest in the MLBFS Collateral which, but for this Agreement, would or might be prior to the rights and/or security interest of MLBFS, as aforesaid; and Landlord agrees so long as Tenant shall be obligated to MLBFS, it will not, without the prior consent of MLBFS, exercise any right under said lease or levy or distrain upon any of MLBFS Collateral.

2. Landlord further agrees that in the event that MLBFS shall at any time seek to take possession of or remove all or any part of MLBFS Collateral from the Premises, Landlord will not hinder the same or interfere or object thereto, and Landlord hereby consents to MLBFS entry upon the Premises for such purpose; provided, however, that (i) any such removal shall be made during reasonable business hours; (ii) MLBFS shall not, without the prior written consent of Landlord, conduct any public or auction sale on the Premises; and (iii) MLBFS shall promptly at its expense make any damage to the Premises directly caused by any such removal by MLBFS or its agents of the MLBFS Collateral from the Premises.

This Agreement shall be binding upon and shall inure to the benefit of Landlord and it successors, assigns, heirs and/or personal representatives, as applicable, and MLBFS and its successors and assigns.

Dated as of April 7, 2000.        See attached Addendum and made a part hereof.

Landlord:  McNAB WEST                    MERRILL LYNCH BUSINESS FINANCIAL
                                         SERVICES, INC.

By _Barbara B. Payne_  _4-13-2000_  By _____
   (Signature 1)        (Signature 2)

Barbara B. Payne, Agent for Landlord/Owners
   (Printed Name)        (Printed Name)

                                         Title: _____

_____    _____
   (Title)                   (Title)

## ADDENDUM TO LANDLORD'S SUBORDINATION AGREEMENT

LENDER:    MERRILL LYNCH BUSINESS FINANCIAL SERVICE, INC.

TENANT:    SMITH INTERNATIONAL ENTERPRISES, INC., d/b/a
           AMERIPLAST

LANDLORD: McNAB WEST

PREMISES: 3141 West McNab Road, Pompano Beach, FL.

The following provisions are made a part of the Landlord's Subordination
Agreement set forth and described above:

"Irrespective of the provisions set forth in paragraph 2 of the Agreement,
MERRILL LYNCH BUSINESS FINANCIAL SERVICE, INC. ("MLBFS") shall not
take possession of any of the collateral from the premises so long as the lease of
the premises is not current and in full effect and shall hold Landlord harmless
from the cost of repairing any damage to the premises caused by such removal.

Landlord and MLBFS shall cause the premises to be inspected prior to and upon
completion of such removal and MLBFS shall promptly pay the cost of any
repairs necessary to restore the premises to their condition prior to removal."

LENDER:    MERRILL LYNCH BUSINESS FINANCIAL SERVICE, INC.

           By:_____

           Title_____

           Date:_____

LANDLORD: McNAB WEST

           By: _Barbara B. Payne_
               Barbara B. Payne

           Title:  Agent for Landlord/Owners

           Date: _April 13, 2000_

P.02

04-18-2000  03:10PM    .AUCH WEAVER MILLSAPS
FROM : J PERRY KNIGHT            FAX NO. : 19416802541        Apr. 18 2000 04:18PM P1

**Merrill Lynch**                    LANDLORD'S SUBORDINATION AGREEMENT

Dated as of April 7, 2000.

Landlord:

By: _Joyce B. Knight_

J. P. KNIGHT    JOYCE B. KNIGHT

TOTAL P.03

EXHIBIT "B"

FROM : LARRY S HYMAN CPA          FAX NO. : 813 251 6534      May. 23 2002 09:08AM P3

# SMITH INTERNATIONAL ENTERPRISES

**2625 EDGEWATER DRIVE**
**ORLANDO, FLORIDA 32804**

| | |
|---|---|
| Telephone | (407) 254-0011 |
| Fax | (407) 423-8516 |

May 22, 2002

Michael Horton
President
Signature Graphics, Inc.
Skyview Plaza
7611 S. Orange Blossom Trail
PMB 200
Orlando, Florida 32809

**Re:     Joint Venture Agreement**

Dear Mr. Horton:

Smith International Enterprises, Inc. is currently unable to obtain materials to produce product and meet its payroll obligations. Smith International Enterprises agrees to enter into a joint venture with Signature Graphics, Inc. whereby Signature Graphics, Inc. will obtain selected customers.

In exchange for obtaining these selected customers, Signature Graphics, Inc. agrees to pay for all materials and labor related to production of sales for such selected customers. Smith International Enterprises, Inc. will pay for the plant and support services related to production of sales for such selected customers.

After Signature Graphics, Inc. has collected and reimbursed itself for the direct cost of a specific job for a customer, Signature Graphics agrees to split the difference on the specific job with Smith International Enterprises, Inc. and pay the difference to Smith Enterprises, Inc. within ten (10) days.

If you agree to the terms of this letter agreement please sign below.

Very truly yours,

Frank L. Amodeo
President
Smith International Enterprises, Inc.

Michael Horton
President
Signature Graphics, Inc.

EXHIBIT "C"



**PLASTIC CARD MANUFACTURERS**

## *Bank Information for Wire Transfers*

COMPANY:     Ameriplast / A Signature Graphics Company
BANK:        Bank of America
ADDRESS:     101 S. Ocean Boulevard
             Pompano Beach, Florida 33062

ABA NUMBER:      063000047

ACCOUNT NUMBER:   003448048333/
**\*\* SIGNATURE GRAPHICS-AMERIPLAST DEPOSIT
    ACCOUNT\*\***

\*\*Please include **BOLD** Lettering with Account Number when making a
wire transfer.
\*\* Favor incluir el texto en **NEGRITAS** junto con el Número de Cuenta
   cuando envíen una transferencia bancaria.

05.02.02

**6290 NW 27th Way**                          **Phone 954.582.3401**
**Fort Lauderdale, FL 33309**                 **Fax  954.582.3433**

EXHIBIT "D"

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                              Case No. 02-04459-6J1
                                                    Chapter 11

SMITH INTERNATIONAL ENTERPRISES, INC.,
A/K/A AMERIPLAST,

                 Debtor.

_____/


**EXAMINER'S REPORT**


        Pursuant to the Order Upon Consideration of Merrill Lynch Business

Financial Services Inc.'s Emergency Motion to Appoint Trustee For the Estate of

Smith International Enterprises, Inc. a/k/a Ameriplast, and Directing Appointment

of Chapter 11 Examiner dated *nunc pro tunc* to June 5, 2002, on June 18, 2002

(the "Order") (Exhibit A), Soneet R. Kapila, the duly appointed Examiner

("Examiner") for Smith International Enterprises, Inc. a/k/a Ameriplast ("Debtor")

respectfully files his Examiner's Report.

1.      **SUMMARY OF FINDINGS**

        1.1     The Debtor has created an unnecessarily tangled web of related

entities, uncalled for in a business of this size. This convoluted corporate

structure is contrary to the best interest of creditors and renders no benefit to the

estate.  [See ¶ 5.5]

1.2     Signature Graphics, Inc. ("Signature"), a 50% shareholder of the Debtor, commingled the assets of the Debtor with its own, making it extremely onerous to identify the proceeds and profits generated both pre and post-petition by the Debtor's assets.

1.3     Signature is the de facto debtor and should be required to produce monthly financial reporting.

1.4     Signature and Amodeo control the Debtor's primary sources of cash, have taken over its customer base and control its employees, equipment and plant facilities.

1.5     The agreement dated April 24, 2002 (Exhibit G) assigning orders to PrintFactor, Inc. ("PrintFactor) may be a preferential or a fraudulent transfer with no evidence of any consideration paid by PrintFactor [See ¶5.6].

1.6     The Debtor entered into a post-petition joint venture agreement (the "JV Agreement") in May 2002.  The written agreement dated May 22, 2002, is inconsistent with the verbal agreement described to the Examiner by Frank L. Amodeo ("Amodeo") . The JV Agreement (Exhibit D) was executed post-petition and is not in the ordinary course of business and Court approval should have been obtained.

1.7     The Examiner does not believe the Debtor currently has insurance coverage for liability, building or contents. [See ¶ 6]

1.8     Given the Debtor's scant accounting records, the Examiner is unable to quantify the current post petition accounts payable.  Based on the

minimal amounts disbursed post-petition to date, it seems obvious that post-petition liabilities may be accumulating.

1.9    Investigation of pre-petition accounts receivable reveals that the bulk of the decreases in receivables resulted from write-offs rather than cash receipts. Testing the propriety of these receivables and write-offs would necessarily require direct confirmation with customers. [See ¶ 8.2]

1.10    The aforementioned conduct and pattern of practice may warrant appointment of a Chapter 11 Trustee.

2.    **PROCEDURAL BACKGROUND**

2.1    On April 30, 2002, Smith International Enterprises, Inc. filed a voluntary petition in the U.S. Bankruptcy Court for the Middle District of Florida seeking relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

2.2    On May 23, 2002, Merrill Lynch Business Financial Services Inc. ("Merrill Lynch") filed an Emergency Motion to Appoint Trustee for the Estate of Smith International Enterprises, Inc. a/k/a Ameriplast (the "Motion").

2.3    On June 18, 2002, the Court ordered the appointment of a Chapter 11 Examiner, nunc pro tunc to June 5, 2002.  Soneet R. Kapila was appointed the Chapter 11 Examiner by the United States Trustee.

3.    **DUTIES OF EXAMINER**

3.1    The duties of the Examiner are specifically delineated in the Order (Exhibit A) and require the preparation of a report containing findings in connection with the investigation.

4.    **INVESTIGATION PERFORMED**

4.1    The Examiner and his staff, working under the direct supervision of the Examiner, communicated with the following parties either by letter, telephone, in-person or electronically:

- Frank L. Amodeo

- Morris Davis ("Davis") – former president of Debtor and a shareholder in Signature.

- James Sadrianna ("Sadrianna") – responsible for the accounting records of Debtor and a shareholder in Signature.

- Keith Gage ("Gage") – paralegal reporting to Amodeo and responsible for corporate records.

- Patrick Higgins ("Higgins") – outside insurance agent.

- John Anthony, Esq. ("Anthony") – counsel for Merrill Lynch.

4.2    The Examiner conducted the following:

- Reviewed, evaluated and analyzed various documents (Exhibit B) provided by Amodeo related to corporate resolutions of the Debtor, agreements entered into by the Debtor and the transfer of ownership and control of the Debtor.

- Analyzed the Debtor's pre and post-petition financial records made available by Amodeo, Sadrianna and Davis related to accounts receivable, cash receipts and cash disbursements.

- Investigated the Debtor's insurance coverage.

4

- Investigated the pre and post-petition dealings of the Debtor with related individuals and entities, including any entity owned or controlled by the Debtor's current or former management.

4.3     The Examiner has not conducted any investigation or obtained any information under oath or from depositions.

5.     **HISTORY AND ORGANIZATION OF THE DEBTOR'S BUSINESS AND DEALINGS WITH RELATED PARTIES**

5.1     The Debtor's business activity is manufacturing/printing of phone cards, hotel keys, membership cards, etc.

5.2     The former shareholders of the Debtor, C. Leo Smith and Pilar Concha, transferred their respective 50% ownership interests on or about April 19, 2002, eleven (11) days prior to the bankruptcy filing date (Exhibits H, H.1 and H.2).

5.3     Mr. Smith transferred voting control and his stock to Primary Strategies.   In consideration for his transfer of control and ownership, Mr. Smith received 100,000 shares of PrintStar Corporation ("PrintStar"), a shell company organized for the purposes of "rolling up" other entities owned by common shareholders.   Mr. Smith is an officer/director of PrintStar.   The current shareholders of the Debtor contracted with Mr. Smith to retain his services in a sales capacity.

5.4     Ms. Concha agreed to transfer her stock to Signature on or about April 19, 2002.   The documents memorializing this transfer were not executed until June 3, 2002, after the Petition Date.   In consideration for her transfer of ownership, Ms. Concha received 100,000 shares of PrintStar.   In addition,

Signature agreed to pay Ms. Concha $2,000 per month through the end of 2002 ($14,000) and to reimburse her for health insurance premium payments.

5.5    Signature and various of its officers, along with Amodeo, are operating and controlling the Debtor.  On June 21, 2002, the Examiner's staff met with Amodeo at the Debtor's premises in Ft. Lauderdale (the "Amodeo meeting"). The Examiner learned that Signature acquired various other distressed businesses or bankrupt entities that have been or are currently before this Court including VDX Services, Inc, Apopka Press, Davis Digital Printing, Inc., assets of Notroh Enterprises and customers from other partnerships.  Signature has approximately 26 shareholders some of whom are known to be related parties, as discussed, herein including Amodeo, Davis, Sadrianna and Michael Horton. The Examiner prepared an organizational chart based on information provided by Amodeo, public records and corporate documents (Exhibit C), clearly an extraordinarily convoluted structure.

5.6    On April 24, 2002, the Debtor entered into an agreement with PrintFactor to assign specific orders to PrintFactor (Exhibit G).  According to public records PrintFactor was incorporated on April 22, 2002, as Ameriplast Sales Corporation and amended its name on April 24, 2002, to PrintFactor.  The Examiner has no information about the capitalization or financial status of PrintFactor.  The assignment agreement was signed by Davis, as President of the Debtor, and Sadrianna, as Director of PrintFactor.  There is no information of PrintFactor paying the Debtor the "Finders Fee" as required by the assignment. This agreement and assignment may constitute a preferential or fraudulent transfer.

5.7     According to Amodeo, Sadrianna is responsible for all prepetition financial records of the Debtor and for the financial records of Signature.

5.8     On April 25, 2002, Davis resigned as President of the Debtor and Amodeo was appointed.

5.9     On April 30, 2002, a voluntary petition of bankruptcy was filed and signed by Amodeo. Amodeo authorized Davis to open a debtor-in-possession account, a cash collateral account and any other account that might be deemed necessary or required during the Chapter 11 bankruptcy proceedings.

5.10    Amodeo told the Examiner that HRM Enterprises, Inc. ("HRM"), a company owned 100% by Amodeo, entered into an agreement with Signature to provide employee leasing for the Debtor. HRM is responsible for all payroll taxes and employee benefits.

5.11    At the Amodeo meeting, the Examiner witnessed an exchange between approximately seven (7) employees and Amodeo over payroll issues. Amodeo explained that the employees were upset that payroll checks had bounced. The Examiner inquired as to the bounced checks since HRM was responsible for payroll. Amodeo explained that the checks were for the last payroll disbursed from the Debtor's account on April 30, 2002. When questioned as to why it would take almost two months for the checks to bounce, Amodeo explained that these employees use check cashing facilities and it takes that long for the checks to get through the system. Amodeo told the employees that he was going to buy their wage claims out of court. Amodeo told the Examiner that his company, Credix Corporation ("Credix"), would buy the wage claims.

7

5.12    Credix is owned 100% by Amodeo.  According to Amodeo, Credix is in the business of liquidation.  It is the registered agent for Notroh Enterprises, Inc. ("Notroh").

5.13    Notroh is a corporation owned by Michael Horton, who is also an officer of the corporation.  The Examiner has no information as to any other shareholders.  Sadrianna is an officer of the corporation.  The insurance policy and alleged proof of insurance for the Debtor provided to the Examiner were in the name of Notroh.

6.    **INSURANCE**

6.1    At the Amodeo meeting, Amodeo assured the Examiner that the Debtor was insured.   The Examiner aggressively followed up with Gage, Amodeo, Sadrianna and the insurance agent, Higgins.   Higgins faxed a certificate of liability to the Examiner for a policy in the name of Notroh with the Debtor's premises and contents added in an "endorsement" box. The liability coverage indicated on the certificate was $1,000,000.  The amount included in the endorsement box for real and tangible property of the Debtor was approximately $8,000,000.

6.2    The Examiner explained to Higgins that a binder was required for not only liability coverage but also property coverage for the Debtor.  Higgins initially assured the Examiner that the amount of coverage was $8,000,000 and that the Notroh policy covered the Debtor but that he did not yet have the binder.  Higgins explained that the policy covered any entity acquired by Notroh for thirty (30) days after acquisition.

6.3    The Examiner suggested that Higgins contact The Hartford, the insurer, to confirm the Debtor's coverage.   Upon contacting The Hartford, Higgins learned that the maximum coverage for liability and property afforded under the policy was $1,000,000 and that The Hartford would not continue to provide coverage at the Debtor's location beyond the 30-day period.   On June 21, 2002 Higgins indicated verbally and in writing that he would obtain a property quote for full real property limits of $2,900,000 and contents coverage of $5,300,000 within the next ten (10) days.

,6.4    No binder or any other written proof of insurance was provided to the Examiner.   The Debtor was not acquired by Notroh.

6.5    At a hearing in this court on June 26, 2002, Peter Hill, Esq., counsel for the Debtor, agreed that the Debtor's insurance agent was in the process of obtaining insurance and, the court directed that proof of insurance be provided by July 5, 2002.

6.6    On July 5, 2002, the Examiner contacted Mr. Higgins and learned that the status of the insurance coverage had not changed.

7    **POST PETITION CONDUCT**

7.1    Most of the post-petition financial transactions of the Debtor are reflected in the accounting records of Signature.

7.2    Amodeo provided the Examiner with a letter addressed to the Debtor from Horton dated May 22, 2002, (post-petition) regarding a JV Agreement between the Debtor and Signature  (Exhibit D).

7.3    The Debtor did not provide a copy of an executed JV Agreement.

7.4     The JV Agreement is a post-petition transaction and is not a transaction in the normal course of the Debtor's business.

7.5     Both, at the Amodeo Meeting and subsequently, Amodeo stated that it was intended for Signature to become a public company. Since that process would require full disclosure of all financial records, the officers and directors of Signature would make all of its financial records available to the Examiner. Amodeo indicated that Sadrianna would be the individual responsible for providing the financial records of Signature. Sadrianna provided only the general ledger activity for the post-petition cash accounts. Examiner will require the complete general ledger to fully analyze the transactional activity.

7.6     The Examiner requested financial records of HRM; and, specifically, payroll records of those individuals working at the Debtor's premises that are staffed by HRM. Amodeo responded that "the Debtor has no relationship with HRM Enterprises and therefore there are not records relating to the Debtor and HRM employees."

7.7     All pre- and post-petition financial reports printed from the Debtor's software at the Fort Lauderdale location were titled Ameriplast/Signature Graphics Company. Amodeo told the Examiner verbally that all of the Debtor's customers and vendors believe they are dealing with Signature, not the Debtor, and that all customer invoices say Ameriplast/ A Signature Graphics Company.

8.     **FINANCIAL ANALYSIS**

8.1     *Debtor's Periodic Financial Report for the Period from May 1, 2002 through May 31, 2002 ("DIP report")*

a.     According to verbal representations by Amodeo, the JV Agreement requires that Signature cover the cost of payroll for those employees working at the Debtor's premises.  Such individuals would be employees of HRM and leased to Signature.  The DIP report reflects $59,000 in net payroll, which according to the cash receipts and disbursements journal attached to the DIP report, is for amounts wired to HRM from the Debtor's bank account.  Amodeo made a vague reference to the fact that this was an amount allowed by this court to cover pre-petition wages.  The Examiner was not provided any detailed information regarding the amounts disbursed to HRM.

b.     The DIP report reflects no expenditure for utilities and only $40 for telephone expense.  This may indicate that the Debtor is not paying all of its post-petition liabilities.

c.     The only post-petition addition to accounts receivable is an amount due from Signature.  The Debtor has not collected any post-petition receivables.

d.     According to Amodeo, since his involvement, the Debtor had no ability to purchase inventory or supplies to fulfill customer orders.  For this reason, all customers, vendors and labor responsibilities were transferred to Signature.  The DIP report shows that the Debtor purchased inventory and manufacturing supplies in the approximate amount of  $22,900.

e.     The Examiner attempted to reconcile the ending cash as reported in the Debtor's general ledger cash account with the opening cash reported in the DIP report.  The DIP report reflected opening cash as $7,125. The general ledger had numerous cash accounts, many of which do not appear

11

to be actual bank accounts.  See detail of the general ledger cash accounts as of April 29, 2002 at Exhibit E.

    8.2    *Pre-petition Accounts Receivable*

        a.    The Debtor's accounts receivable decreased approximately $1,200,000 from October 2001 to April 2002.  The Examiner reviewed accounts receivable information included in aging reports, general ledgers and cash receipts journals to try to determine the reason for the decrease.

        b.    The Examiner's analysis of the records found that the largest decreases in receivables occurred November to December 2001 ($814,000), December 2001 to January 2002 ($367,000) and March to April 2002 ($272,000). The Examiner attempted to trace through the general ledger and cash receipts journal each decrease in the aforementioned periods that was greater than $20,000.  The analysis of the financial records revealed that the bulk of the decreases in the accounts receivable were not a result of a customer payment; rather, a "paper entry" made by the Debtor.  The authenticity of these write-offs can only be tested by direct confirmation with customers.

        c.    The Examiner noted in his review of the accounts receivable records that the month-end total of accounts receivable per the detailed aging reports did not agree with the general ledger balance from October 2001 through April 2002.

        d.    The aging reports provided by the Debtor included a report for May 31, 2002.  Since the Examiner had been told that new sales were not being reported in the Debtor's records post-petition but rather in the records of Signature, the Examiner would expect the total accounts receivable in the aging

report to have changed only by the post-petition collections of pre-petition receivables in May. The accounts receivable aging reflects new receivables for the month of May. The aging accompanying the May DIP report includes the post-petition receivables and does not agree with the aging provided by Amodeo.

### 8.3    Post-petition Activity Accounted for by Signature

a.    Sadrianna provided the Examiner with selected information from the financial records of Signature. The records provided were only those that Signature decided were directly related to the Debtor. The information provided included general ledger detail for cash accounts related to the Debtor accompanied by cash receipts journals, bank reconciliations and bank statements; Sales Journal History related to former Debtor customers and a Customer Transaction Detail. Sadrianna explained that the Customer Transaction Detail could not be segregated for just the transactions related to the Debtor so Sadrianna highlighted those customers that were related.

b.    Sales Journal History covered the period April 18 through May 31, 2002. The date of the report indicates that customers were transferred to Signature and that sales were reported in Signature prior to the JV Agreement. The sales reported for the period were $503,000.

c.    Customer collections are deposited into either of two bank accounts controlled by Signature. The accounts are titled Signature Graphics, Inc., a/k/a Ameriplast Sales with an address on Edgewater in Orlando and Signature Graphics Inc. Ameriplast Operating Account with an address of 7611

S. Orange Blossom Trail in Orlando.     PrintFactor was formerly known as Ameriplast Sales.

   d. The Examiner noted that there were deposits made to the aforementioned bank accounts for customers that were not highlighted by Mr. Sadrianna as Ameriplast customers.   In particular, there were deposits of approximately $138,000 from customer 2917.  Customer 2917 was not marked in the customer history as an Ameriplast customer.   Upon review of information included with the cash receipts journal attached with the bank statements, the Examiner learned that customer 2917 is Signature. It is not clear whether the deposits represent collections on sales or if these are advances from Signature. The inconsistencies and lack of segregation in reporting leads the Examiner to conclude that amounts due the Debtor under the JV Agreement are not readily discernable and subject to error in calculation and identification.

   e. The Examiner noted unexplained credits to certain customers and could not reconcile the Customer History to the detail of sales and collections.

   f. The Examiner was not able to determine from the information provided how the amount reported in the DIP report as a receivable from Signature was calculated.

  8.4  *Pre-petition Cash Disbursments*

   a. The Debtor provided electronic check register data for 2001 and 2002.  The information was sorted alphabetically for the one year period prepetition.

b.    Included at Exhibits F, F.1 and F.2 are the summarized disbursements as well as the detailed listing of disbursements.

c.    Due to time constraints, we did not agree these amounts to bank statements so we cannot conclude regarding their accuracy or completeness.

d.    Additional amounts may have been disbursed by wire transfer and not be included at Exhibit F.

9.    **TAX COMPLIANCE**

9.1    The Examiner inquired as to timely filing of state and federal tax returns.

9.2    The most recently filed federal corporate income tax return was 1999.

9.3    Amodeo and Davis indicated that ADP is responsible for the filing of the payroll tax returns for the Debtor.  The Examiner requested copies of such returns but did not receive them.

9.4    The most recently filed Florida Intangible Return was for year 2001.

9.5    Davis provided copies of Florida Sales Tax Returns for the periods January through April 2002.

\* \* \* \* \*

Respectfully submitted this 10th day of July, 2002.

Soneet R .Kapila, Chapter 11 Examiner
1000 South Federal Highway, #200
Fort Lauderdale, Florida  33316
(954) 761-1011

X:\Smith International Enterprises\Examiner's Report\Report.doc

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via facsimile or U.S. First Class Mail (as indicated below) this 10th day of July, 2002, to the attached list.

Soneet R. Kapila, Chapter 11 Examiner

Peter N. Hill, Esq.
Wolff, Hill, McFarlin & Herron
     W. Colonial Drive
Orlando, FL 32804


HSBC Business Credit (USA)
One HSBC Center, 29th Floor
Buffalo, NY 14203


John A. Anthony, Esq.
Gray, Harris, Robinson,
Shackleford, Farrior
201 N. Franklin Street, #2200
Tampa, FL 33602

United States Trustee
c/o Miriam Suarez
135 W. Central Blvd., #620
Orlando, FL 32801


Alan J. Perlman, Esq.
Fowler, White, Burnett, et al.
100 SE 2nd Street, 17th Floor
Miami, FL 33131-2158


20 Largest Creditors to be serviced
by Merrill Lynch

Smith International, Inc.
a/k/a Ameriplast
2625 Edgewater Drive
Orlando, FL 32804


Daniel S. Mandel, Esq.
Mandel, Weisman & Brodie, P.A.
2101 Corporate Blvd., #300
Boca Raton, FL 33431

EXHIBIT "E"

# FLORIDA SECURED TRANSACTION REGISTRY

JOHN A. ANTHONY, ESQUIRE
GRAY HARRIS
201 N FRANKLIN STREET, SUITE 2200
TAMPA FL 33602

UCC number 20020191198X has been filed with the Florida Secured Transaction Registry. The expiration date for the filing is 05/24/2004.

Complete information related to the UCC filing is available on the internet at www.FloridaUCC.com. It is your responsibility to review all information associated with this filing to ensure information has been recorded correctly.

Please note: the State of Florida has approved revised versions of the following forms:
1) State of Florida Uniform Commercial Code Financing Statement Form (Form UCC-1)
2) State of Florida Uniform Commercial Code Financing Statement Form - Addendum (Form UCC-1 Addendum)
3) State of Florida Uniform Commercial Code Financing Statement Amendment Form (Form UCC-3)
4) State of Florida Uniform Commercial Code Financing Statement Amendment Form - Addendum (Form UCC-3 - Addendum)

These forms are available for download from: www.FloridaUCC.com.

If you have questions or concerns about this filing, please call FLORIDAUCC, Inc. at
(850) 222-8526.

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM**

FLORIDA SECURED TRANSACTION REGISTRY

# FILED
## 2002 Aug 13 AM 12:00
**\*\*\*\* 20020191198X \*\*\*\***
\*\*\*C \* 08130214372601-24.00\*\*\*21.00\*\*\*

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
813-273-5000

B. SEND ACKNOWLEDGEMENT TO:
Name   John A. Anthony, Esquire

Address   Gray Harris

Address   201 N. Franklin Street, Suite 2200

City/State/Zip   Tampa, FL 33602

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE   990000119007 | 1b. | ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

2a. ORGANIZATION'S NAME
Miami Quality Die Cutting and Finishing, Inc.

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

3a. ORGANIZATION'S NAME
Merrill Lynch Business Financial Services, Inc.

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 4. ☐ | **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|
| 5. ☐ | **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
| 6. ☐ | **ASSIGNMENT** (full or partial): Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11. |
| 7. ☒ | **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☒ Debtor or ☐ Secured Party of record. Check only one of these two boxes. |

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

| ☐ CHANGE name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c. | ☐ DELETE name: Give record name to be deleted in item 8a or 8b. | ☒ ADD name: Complete item 9a or 9b, and 9c; also complete items 9d-9g (if applicable). |
|---|---|---|

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

8a. ORGANIZATION'S NAME
Miami Quality Die Cutting and Finishing, Inc.

| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

9a. ORGANIZATION'S NAME
Miami Quality Graphics, Inc.

| 9b. INDIVIDUALS' LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 9c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3705 N.W. 51st Street | Miami | FL | 33142 | USA |

| 9d. TAX ID# 651136840 ☐ | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 9e. TYPE OF ORGANIZATION corporation for profit | 9f. JURISDICTION OF ORGANIZATION Florida | 9g. ORGANIZATIONAL ID# P00000096005 |
|---|---|---|---|---|

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☒ and enter name of DEBTOR authorizing this Amendment.

11a. ORGANIZATION'S NAME
Miami Quality Graphics, Inc.

| 11b. INDIVIDUALS' LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12. OPTIONAL FILER REFERENCE DATA   366478-21 |
|---|

STANDARD FORM - FORM UCC-3  (REV.12/2001)          Filing Office Copy          Approved by the Secretary of State, State of Florida

**EXHIBIT "F"**

**GRAY**HARRIS
——————
ATTORNEYS AT LAW

GRAY HARRIS
SHACKLEFORD FARRIOR

SUITE 2200
201 N. FRANKLIN STREET (33602)
P.O. BOX 3324
TAMPA, FLORIDA 33601
TEL 813-273-5000
FAX 813-273-5145
WEB grayharris.com

WRITER'S DIRECT DIAL
(813) 273-5066

August 12, 2002

E-MAIL ADDRESS
Janthony@grayharris.com

VIA TELECOPIER  407/649-4289
ORIGINAL WITH ENCLOSURES
TO FOLLOW VIA FEDERAL EXPRESS

VIA TELECOPIER - 407/423-8516
ORIGINAL WITH ENCLOSURES
TO FOLLOW VIA FEDERAL EXPRESS

Frank Amodeo
2625 Edgewater Drive
Orlando, FL  32804

Jim Sadrianna
2625 Edgewater Drive
Orlando, FL  32804

RE:     **In re Smith International Enterprises, Inc. a/k/a Ameriplast,**
**Bankruptcy Case No. 02-04459-6J1**

**Merrill Lynch Business Financial Services Inc. v. C. Leo Smith and Pilar Concha**
**Case No. 02-009140**

**Merrill Lynch Business Financial Services Inc. v. Frank Amodeo and Jim Sadrianna,**
**Circuit Court in and for Orange County, Florida, Case No. TBD**

Gentlemen:

As you know, this firm represents Merrill Lynch Business Financial Services Inc. ("Merrill Lynch") in connection with the above-referenced reorganization (the "Bankruptcy Case") of Smith International Enterprises, Inc. (the "Debtor"), the pending state court action (the "Guarantor Case") against C. Leo Smith and Pilar Concha (the "Guarantors") and a state court action (the "Fraud Case") to be initiated against both of you in connection with your dealings individually and in some corporate capacity involving Signature Graphics, Inc. and related entities (collectively, the "Transferee"). This letter is written pursuant to Florida's "Civil Theft Statute" to provide you with statutory notice in your individual and corporate capacity of claims arising from your improper conduct regarding assets (the "Collateral") pledged by the Debtor to Merrill Lynch to secure the lending relationship initially involving the Debtor and the Guarantors.

Although not necessary as a practical matter in light of our communications to date during the Bankruptcy Case, some background information regarding Merrill Lynch's claims is appropriate at this time. Merrill Lynch possesses two cross-collateralized secured claims (the "Claims") against the Borrower and the Guarantors, pursuant to a series of loan, security and guaranty documents (together, the "Loan Documents"). Pursuant to the Loan Documents, the Debtor granted Merrill Lynch a series of security interests and liens to secure the Claims in the Collateral. The Collateral

CLERMONT    LAKELAND    MELBOURNE    ORLANDO    TALLAHASSEE    TAMPA

GRAY HARRIS SHACKLEFORD FARRIOR

Frank Amodeo
Jim Sadrianna
August 12, 2002
Page 2

includes all or virtually all of the Debtor's assets, including inventory and accounts receivable historically maintained in the ordinary course of its business focusing upon the production and sale of printed plastic cards such as hotel guest room keys, credit cards, and similar products, as well as a more generalized printing operation.

The Claims are currently in excess of $1,604,172.18, inclusive of principal plus non-default rate interest, but exclusive of late fees, attorneys' fees, and related costs incurred since May 8, 2002, the date that the Claims were referred to this firm for enforcement of the Loan Documents. The Claims have been accelerated and demanded by Merrill Lynch as against the Debtor and the Guarantors (collectively, the "Initial Obligors"). On June 10, 2002, Merrill Lynch initiated the Guarantor Case to recover against the Guarantors by filing a verified complaint. The Debtor was not joined in the Guarantor case because we had just learned that it had initiated the Bankruptcy Case in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court"). The Bankruptcy Case remains pending at this time, and the Debtor has proposed a plan of reorganization and other relief that is consistent with what has been requested by Merrill Lynch of both of you as the Debtor's defacto current management by merger. However, we generally understand at this time that operations have ceased in all respects during the past two weeks, whether in the name of the Debtor or the Transferee.

Enclosed herewith is a copy of Merrill Lynch's motion to appoint a trustee in the Bankruptcy Case, as well as the initial report generated by Soneet Kapila in his capacity as examiner for the Debtor in the Bankruptcy Case. Exhibits to the report have been omitted because you are in possession of original copies as well. These materials reflect that the Debtor appears to have transferred all or virtually all of the Collateral to the Transferee, a business entity that we understand you both to own and control in all material respects. The Collateral remains subject to the liens and security interests of Merrill Lynch, even though transferred to the Transferee. Moreover, all of the Collateral components in the possession of the Transferee are subject to administration in the Bankruptcy Case. We believe that you and the Transferee also are in possession of information that should be released to Merrill Lynch and the examiner to better protect their corresponding interests and responsibilities. In these regards, I note especially in light of the closing of the business that the transfer of assets from the Debtor to the Transferee has seriously jeopardized the going concern value of the Collateral. The pattern of conduct exemplified by your conduct involving the transfer of assets to the Transferee and the resulting looting of the Collateral is commonly characterized in the vernacular as a "bust out."

GRAY HARRIS SHACKLEFORD FARRIOR

Frank Amodeo
Jim Sadrianna
August 12, 2002
Page 3

From all of the foregoing, it is apparent that the Transferee and each of you have conspired to conceal and improperly dispose of said Collateral in a manner violative of all provisions of Chapter 818, Florida Statutes. Moreover, this conduct falls well within the definition of "theft" as set forth in Florida Statutes § 812.014 and other related statutory and case law. To the extent that the Collateral has been transferred to the Transferee under your management and control, and to the extent that you have then sold, encumbered, transferred, or otherwise utilized the same, you have engaged in a pattern of conduct that constitutes "dealing in stolen property" pursuant to Florida Statutes § 812.025.

In light of the foregoing, and without in any way limiting Merrill Lynch's rights and remedies with respect to other tort claims it may possess against you both and the Transferee, including without limitation conversion, Merrill Lynch is providing you with the following statutory notice:

PURSUANT TO FLORIDA STATUTES § 772.11, THIS LETTER SERVES AS WRITTEN DEMAND FOR TREBLE DAMAGES IN THE MINIMUM AMOUNT OF $4,812,516.54. YOU ARE HEREBY DIRECTED TO COMPLY WITH SUCH DEMAND WITHIN 30 DAYS AFTER RECEIPT OF THIS DEMAND. IF YOU DO NOT COMPLY WITH SUCH DEMAND, MERRILL LYNCH HAS INSTRUCTED THIS LAW FIRM TO FILE A CIVIL ACTION AGAINST YOU.

At this time, Merrill Lynch further demands immediate return of the Collateral that you and the Transferee continue to possess, including all cash and non-cash proceeds of the Collateral and an accounting for Collateral that has been sold, encumbered, consumed, wasted, or otherwise rendered unvaluable as collateral to secure the Claims. You are instructed to immediately return the same to Merrill Lynch in care of the undersigned, assuming that logistical arrangements can be coordinated in these regards. Your assistance at this time will mitigate your liability.

Please note that I am providing a copy of this correspondence to counsel of record for C. Leo Smith in the Guarantor Case. Because the Guarantors were only recently served with initial process in the Guarantor Case, and because service upon them has been difficult, this copy is being provided as a courtesy. A copy is also being provided to the remaining Guarantor, Pilar Concha, who as yet remains unrepresented. However, in order to comply with Florida's "Civil Theft Statute," I am additionally providing notice to the Transferee and its counsel of record in the Bankruptcy Case. This civil theft notice is intended to make demand additionally upon the Transferee, jointly and severally with each of you, for the full amount set forth above. Because of the wording of Florida's "Civil

GRAY HARRIS SHACKLEFORD FARRIOR

Frank Amodeo
Jim Sadrianna
August 12, 2002
Page 4

Theft Statute," it is necessary and appropriate as a matter of law to direct this correspondence to represented parties, but our policy is to additionally provide notice to opposing counsel as we are doing in this context.

The gravity of the allegations contained herein are such that Merrill Lynch will take legal action to protect its rights and to seek damages it is entitled to pursuant to applicable law if this matter is not promptly addressed. No rights that Merrill Lynch may possess against any other parties, in rem or in personam, have been or will be compromised as a result of any further action or inaction on the part of Merrill Lynch in attempting to mitigate damages that we currently expect to be significant. However, in closing, please note that Merrill Lynch and our firm would be pleased to respond to any further communications that may otherwise precede the onset of additional litigation in this matter.

Sincerely,

John A. Anthony

Enclosures
cc:   Merrill Lynch Business Financial Services Inc.
      Larry S. Hyman
      Peter N. Hill
      David E. Peterson
      Soneet Kapila
      Signature Graphics, Inc.
      Bart Houston
      Pilar Concha                                          #533290/ldw

JS 44
(Rev 12/96)

# CIVIL COVER SHEET 02 - 61191

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM)

## I.(a) PLAINTIFFS

Merrill Lynch Business Financial
  Services Inc.

## DEFENDANTS

Frank L. Amodeo and James Sadrianna

**CIV - HUCK** MAGISTRATE JUDGE
TURNOFF

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U S PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Orange
(IN U S PLAINTIFF CASES ONLY)
NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

*BROWARD 0:02cv61191 Huck/WCT*

**(c)** ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)
John A. Anthony, Gray, Harris & Robinson,
P.A., P.O. Box 3324, Tampa, FL 33601
(813) 273-5066

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE   DADE,   MONROE,   (BROWARD)   PALM BEACH,   MARTIN,   ST LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

- ☐ 1 U S Government Plaintiff
- ☐ 3 Federal Question (U S Government Not a Party)
- ☐ 2 U S Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault Libel & Slander | | B☐ 630 Liquor Laws | | B☐ 450 Commerce/ICC Rules/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 640 R R & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | B☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | B☐ 660 Occupational Safety-Health | ☐ 830 Patent | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | B☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | A☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 540 Mandamus & Other | ☐ 791 Empl Ret Inc Security Act | A☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | A☐ 871 IRS — Third Party 26 USC 7609 | B☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | | A OR B Chapters 812 & 818, Fla. Stat. |

## VI. CAUSE OF ACTION
(CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

*28 U.S.C. §1332 - The matter in controversy exceeds the sum of $75,000, exclusive of interest + costs, and is between citizens of different states.*

LENGTH OF TRIAL
via *1V* days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER FRCP 23

DEMAND $ *1,604,172.18+*

CHECK YES only if demanded in complaint
**JURY DEMAND:** ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions)

JUDGE _____ DOCKET NUMBER _____

DATE *8/23/02*

SIGNATURE OF ATTORNEY OF RECORD *Stephanie Bosnack*

FOR OFFICE USE ONLY

RECEIPT # *526024*   AMOUNT *150.00*   APPLYING IFP ___   JUDGE ___

AUG 2 7 2002